UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, INDIANA BROADCASTERS ASSOCIATION, INDIANA PROFESSIONAL CHAPTER OF THE SOCIETY OF PROFESSIONAL JOURNALISTS, INDIANAPOLIS STAR, NEXSTAR MEDIA INC., SCRIPPS MEDIA, INC., and TEGNA INC., | CASE NO. 1:23-cv-1805 **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiffs*, | |
| v. | |
| TODD ROKITA, *in his official capacity as Attorney General of Indiana*, RYAN MEARS, *in his official capacity as Marion County Prosecutor*, and KERRY FORESTAL, *in his official capacity as Marion County Sheriff*, | |
| *Defendants*. | |

## <u>INTRODUCTION</u>

1.      "[T]he press serves and was designed to serve as a powerful antidote

to any abuses of power by governmental officials[,] and as a constitutionally

chosen means for keeping officials elected by the people responsible to all the

people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219

(1966).

2.      That role is of particular importance in the context of law enforcement, where journalists "guard[] against the miscarriage of justice by subjecting the police"—and the important powers that they exercise—"to extensive public scrutiny." *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).

3.      On April 20, 2023, Indiana enacted a statute, HB 1186 ("the Act"), that unconstitutionally abridges the press's ability to fulfill that function.  The Act went into effect on July 1, 2023, and is now codified at Ind. Code § 35-44.1-2-14.

4.      In relevant part, the Act makes it a misdemeanor to "knowingly or intentionally approach[] within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop."  Ind. Code § 35-44.1-2-14.  This provision has grave implications for the ability of members of the news media, including Plaintiffs, to exercise their First Amendment rights.

5.      By criminalizing peaceful, nonobstructive newsgathering on matters of public importance, the Act violates the First Amendment both on its face and as applied to Plaintiffs.

6.      The Act grants law enforcement officers limitless, standardless discretion to prevent journalists from approaching near enough to document the way officers perform their duties in public places.  It provides for unconstitutional "government by the moment-to-moment opinions of a policeman on his beat."

*Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965) (quoting *Cox v. Louisiana*, 379 U.S. 536, 579 (1965) (Black, J., concurring)).

7.      The Act authorizes law enforcement officers to bar journalists from reporting—for any reason or no reason—on an enormous diversity of events of public interest, from a parade or political rally to an arrest or use of physical force.

8.      The Act applies with equal force to a reporter gathering the news in a public park, standing on a sidewalk, or lawfully present at a press conference.

9.      And the Act provides no exceptions for circumstances where 25 feet is too far—as it will often be—for a member of the press to document newsworthy activity, including officers' own performance of their official responsibilities.

10.      The breadth and importance of the reporting that will be chilled if the Act remains in effect despite its infirmities are difficult to overstate.

11.      For one, "the public became aware of the circumstances surrounding George Floyd's death because citizens standing on a sidewalk exercised their First Amendment rights." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020).  The Act would, on those same facts, empower officers to force members of the press and public from the sidewalk—and "[if] police could stop criticism or filming by asking onlookers to leave," law enforcement could "effectively silence them" and "bypass the Constitution." *Jordan v. Jenkins*, 73 F.4th 1162, 1169–70 (10th Cir. 2023) (citation omitted).

12.     Plaintiffs are the Reporters Committee for Freedom of the Press, the Indiana Broadcasters Association, the Indiana Professional Chapter of the Society of Professional Journalists, the Indianapolis Star, Nexstar Media Inc., Scripps Media, Inc., and TEGNA Inc.—organizations that exercise the right to gather and publish news, defend and advocate for the rights of the press, and/or otherwise represent the interests of journalists working in Indiana.

13.     Plaintiffs bring this action to redress the constitutional harms that will continue to be inflicted upon them and other members of the news media in Indiana by Ind. Code § 35-44.1-2-14.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     Venue is proper in the Southern District of Indiana under 28 U.S.C. § 1391(b) because Defendants reside in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

16.     The Reporters Committee for Freedom of the Press ("Reporters Committee") is a nonprofit association founded by journalists and media lawyers in 1970.  Today, its attorneys provide pro bono legal representation, amicus curiae

support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

17.     The Indiana Broadcasters Association ("IBA") is an alliance of more than 250 member radio and television broadcasters in Indiana.  The IBA has a substantial interest in the newsgathering process and the public's access to public records and matters of public concern and safety.  It also advocates for member stations and represents the broadcasting industry before the Indiana General Assembly.  The IBA's members employ full-time reporters who gather news on matters of public concern, including news about law enforcement gathered through the use of audiovisual recording equipment, on a routine daily basis.

18.     The Indiana Professional Chapter of the Society of Professional Journalists ("IndianaProSPJ") works to promote and protect First Amendment freedoms, offers scholarships, sponsors the annual "Best of Indiana" journalism contest, and conducts professional development programs.  IndianaProSPJ's members include full-time reporters who gather news on matters of public concern, including news about law enforcement gathered through the use of photography or audiovisual recording equipment, on a routine daily basis.

19.     The Indianapolis Star ("IndyStar") is an Indianapolis-based newspaper that delivers the latest news from the area in print, mobile, and online.  IndyStar has published continuously since 1903 and is a subsidiary of

Gannett Satellite Information Network, LLC.  IndyStar employs full-time reporters who gather news on matters of public concern, including news about law enforcement gathered through the use of photography or audiovisual recording equipment, on a routine daily basis.

20.     Nexstar Media Inc. ("Nexstar") is a leading diversified media company that leverages localism to bring new services and value to consumers and advertisers through its traditional media, digital, and mobile media platforms.  In Indiana, Nexstar owns and operates WTWO and WAWV in Terre Haute; WTTV and WXIN in Indianapolis; WANE in Fort Wayne; and WEHT and WTVW in Evansville.  Nexstar employs full-time reporters who gather news on matters of public concern, including news about law enforcement gathered through the use of audiovisual recording equipment, on a routine daily basis.

21.     Scripps Media, Inc. ("Scripps") is the nation's fourth-largest local TV broadcaster, operating a portfolio of 61 stations in 41 markets.  In Indiana, Scripps owns and operates WRTV in Indianapolis.  Scripps employs full-time reporters who gather news on matters of public concern, including news about law enforcement gathered through the use of audiovisual recording equipment, on a routine daily basis.

22.     TEGNA Inc. ("TEGNA") owns or services (through shared service agreements or other similar agreements) 64 television stations in 52 markets.  In

Indiana, TEGNA owns and operates WTHR in Indianapolis.  TEGNA employs full-time reporters who gather news on matters of public concern, including news about law enforcement gathered through the use of audiovisual recording equipment, on a routine daily basis.

23.     Defendant Todd Rokita is the Attorney General of Indiana.  He has "broad powers in the enforcement of the criminal laws of the state," *Arnold v. Sendak*, 416 F. Supp. 22, 23 (S.D. Ind. 1976), *aff'd*, 429 U.S. 968 (1976), and is "bound up with criminal enforcement at every stage after the initial charges are laid—at his option at trial, and by statutory command on appeal," *Whole Woman's Health Alliance v. Hill*, 377 F. Supp. 3d 924, 935–36 (S.D. Ind. 2019) (Attorney General a proper defendant in a suit that "challenges the constitutionality of criminally enforceable statutes").  He is sued in his official capacity.

24.     Defendant Ryan Mears is the prosecuting attorney for Marion County.  Under Indiana law, he has principal authority to "conduct all prosecutions for felonies, misdemeanors, or infractions" in that jurisdiction.  Ind. Code § 33-39-1-5(1).  He is sued in his official capacity.

25.     Defendant Kerry Forestal is the sheriff of Marion County.  Under Indiana law, he is a "final policymaker for law enforcement" in his jurisdiction.  *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995) (citing Ind. Code §§ 36-2-13-1–14).  He is sued in his official capacity.

## **FACTUAL ALLEGATIONS**

26.     Plaintiffs are organizations that gather and publish news and represent the interests of journalists and news organizations working in Indiana.

27.     The Plaintiffs who gather and publish information on matters of public concern routinely document the manner in which law enforcement officers perform their official duties in public places.  That includes IndyStar and the Indiana-based stations of Nexstar, Scripps, and TEGNA—all of which are in the business of regularly publishing newsworthy information, and all of which employ journalists assigned to cover the activities of Indiana law enforcement on a regular basis—as well as the individual journalist members of IBA and IndianaProSPJ.

28.     For instance, Plaintiff IndyStar reported extensively on the protests in June 2020 in the wake of the murder of George Floyd.  *See* Joe Mutascio, *This Weekend Marks 1 Year Since Protests, Riots Rocked Indianapolis.  Here's a Look Back*, IndyStar (May 28, 2021), https://perma.cc/7QDF-MKBT (collecting stories).

29.     The same is true of Nexstar station WANE.  *See, e.g.*, Dirk Rowley, *Peaceful Protests Turn Violent, Police Arrest 29*, WANE (May 29, 2020), https://perma.cc/GMU9-AV4B; *Police Use Tear Gas Again to Disperse Crowd During Second Day of Protests*, WANE (May 30, 2020), https://perma.cc/3H2G-98UQ.

30.    The same is true of Scripps station WRTV.  *See, e.g.*, Andrew Smith, *Here's What Happened with Protests and Demonstrations this Weekend in Downtown Indianapolis*, WRTV (June 1, 2020), https://perma.cc/5B8L-AG2M; Bob Blake, *Police, Protesters Have Moment of Unity During Protest Near Governor's Residence*, WRTV (June 2, 2020), https://perma.cc/3AAJ-7E4W.

31.    And the same is true of TEGNA station WTHR.  *See, e.g.*, WTHR, *2nd Night of Protests in Indianapolis*, YouTube (May 30, 2020), https://perma.cc/VW42-26K8.

32.    That reporting required close contact with members of law enforcement and often relied on videos or photographs captured within 25 feet of officers performing their official duties.  *See* Elizabeth DePompei, *'Highly Upsetting': Report Says IMPD Was Unprepared in George Floyd, Dreasjon Reed Protests*, IndyStar (Feb. 26, 2021), https://perma.cc/6NMJ-TYEQ; Blake, *Police, Protesters Have Moment of Unity*, *supra*; Rowley, *Protests Turn Violent*, *supra*.

33.    A broad range of other assemblies, rallies, or public events similarly bring Plaintiffs' reporters into close contact with law enforcement—and will continue to do so.  *See, e.g.*, John Doran, *City Leaders, Police Call on Public's Help to Reduce Violent Crime*, WTHR (Apr. 27, 2023), https://perma.cc/CYN7-JL3X; Kayla Molander, *Thousands Rally in Indianapolis Following Roe v Wade Decision*, WRTV (June 26, 2022), https://perma.cc/C543-6MJ6; Kelly Wilkinson,

*K-9 Parade for Immunocompromised Child Is Like Being with Family*, IndyStar (Apr. 14, 2020), https://perma.cc/P22W-B692.

34.     Reporting from within close proximity of law enforcement officers performing official responsibilities is likewise essential in other contexts, including at crime scenes[1] and in interviews and press conferences held by law enforcement.[2]

35.     On April 20, 2023, Governor Eric Holcomb of Indiana signed into law HB 1186, creating a new criminal offense.  As relevant here, the Act provides:

> A person who knowingly or intentionally approaches within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching commits unlawful encroachment on an investigation, a Class C misdemeanor.

Ind. Code § 35-44.1-2-14.

36.     The Act went into effect on July 1.  *See* Ind. Code § 35-44.1-2-14.

37.     The Act directly burdens the exercise of First Amendment rights.

---

[1]     *See, e.g.*, WXIN, *Live Interview: Update on Two Officers Shot in Mitchell, Indiana*, YouTube (Feb. 5, 2023), https://perma.cc/8ZCH-F727; Matt McKinney, *WATCH: IMPD Officer Gets Emotional After 1-Year-Old Shot and Killed*, WRTV (Mar. 29, 2018), https://perma.cc/8Q4P-6HFQ.

[2]     *See, e.g.*, WXIN, *MCSO Press Conference into Deputy Durm's Death Investigation*, YouTube (Aug. 30, 2023), https://perma.cc/UNW7-F5T7; Cierra Putman, *IMPD Chief Believes Crackdown on Violent Crime is Working*, WTHR (Dec. 15, 2022), https://perma.cc/P444-299B.

38.     Whenever a journalist receives an order to withdraw while documenting law enforcement activity from a distance of less than 25 feet, that journalist is put to a choice between committing a crime or forgoing reporting.

39.     For visual journalists, 25 feet is often too far to obtain a clear line of sight to newsworthy events, especially at tumultuous public events like protests.

40.     That distance is also too great to reliably capture audio of those events.  *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377–78 (1997) (a 15-foot buffer is beyond "normal conversational distance").

41.     For journalists and news organizations, there is no adequate substitute for first-hand recordings, "uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public." *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012).

42.     The Plaintiffs who gather and publish news in Indiana fear complying with the Act is not practically possible under the circumstances in which they or their reporters often work.

43.     Especially at fast-moving crowd scenes, reporters cannot reliably determine whether they are within 25 feet of a particular officer.  *See Schenck*, 519 U.S. at 378 n.9 (noting that it would be "quite difficult" to tell whether speaker attempting to obey 15-foot buffer zone "actually strayed to within 14 or 13 feet").

44.     Reporters also cannot comply with an order to withdraw when there is no practical way for a reporter to retreat through a densely packed crowd, where there is not enough space on a public sidewalk for a journalist to withdraw without trespassing on private property, or where multiple officers have issued overlapping and mutually contradictory orders. *See Schenck*, 519 U.S. at 378–79 (noting the difficulty speakers would face in "know[ing] how to remain in compliance" with floating 15-foot buffer zones that could surround multiple other moving individuals).

45.     For the Plaintiffs who gather and publish news in Indiana, these burdens and uncertainties chill the exercise of their and their reporters' First Amendment rights to document and report on public officials' activities.

46.     What's more, because of the burdens the Act imposes on journalists in Indiana, the statute has "compel[led]" the Plaintiffs who defend and advocate for the rights of the press, including the IBA, IndianaProSPJ, and the Reporters Committee for Freedom of the Press, "to devote resources to combatting the effects of that law that are harmful to the organization[s'] mission[s]." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (citation and internal quotation marks omitted).

47.     For instance, Plaintiff the Reporters Committee publishes legal resources to inform journalists of their legal rights and aid them in complying with

relevant laws.  *See, e.g.*, Reporters Comm. for Freedom of the Press, *Police, Protesters, and the Press* (2022), https://perma.cc/4FWX-Q9NJ.  The Reporters Committee has already published new materials on its website to educate journalists on the Act and its terms[3] and intends to update its existing resources.

48.     The Reporters Committee also regularly hosts trainings for journalists and newsrooms, including trainings that address the right to record, best practices for journalists covering law enforcement, and what to do if arrested in the course of newsgathering.  *See* Reporters Comm. for Freedom of the Press, *Trainings* (last accessed Sept. 5, 2023), https://perma.cc/DND2-3RXT.  The Reporters Committee intends to host additional trainings in Indiana to address the effects of the Act.

49.     Finally, the Reporters Committee anticipates an increased need for legal advice and representation for journalists working in Indiana due to the Act.

50.     The Reporters Committee has observed an increase in arrests of individuals documenting law enforcement in jurisdictions with similar laws.

51.     In Miami Beach, Florida, enforcement of a comparable—but narrower—ordinance was suspended less than three months after its enactment because arrest data showed that a majority of arrests under the law "were of people

---

[3]     *See, e.g.*, Emily Hockett, *Efforts to Criminalize 'Encroachment' on Police Encroach on First Amendment Rights*, Reporters Comm. for Freedom of the Press (June 26, 2023), https://perma.cc/8S68-9L22.

who'd been using their phones to record officers."  Martin Vassolo & David Ovalle, *Miami Beach Suspends Law Used by Cops to Arrest People Who Film Them. Training Ordered*, Miami Herald (Aug. 20, 2021), bit.ly/3sGpzgF.

52.     The same appears to be true in Indiana: To date, the only reported instances in which the Act has been enforced have involved individuals who were recording law enforcement at the time.  *See* Complaint, *Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Aug. 8, 2023) (alleging that "citizen-journalist" plaintiff was threatened with arrest under the Act while recording South Bend police); John Doran, *Woman Arrested Under New Indiana Law for Filming Police Within 25 Feet*, WTHR (Oct. 4, 2023), https://perma.cc/P3SF-VQR2.

53.     In the past, the Reporters Committee has seen an increase in calls to its hotline, *see* Reporters Comm. for Freedom of the Press, *Legal Hotline* (last accessed Sept. 5, 2023), https://perma.cc/HH7J-DY22, whenever newsworthy events bring journalists into contact with law enforcement.  The Reporters Committee anticipates an increase in calls from Indiana as a result of the Act.

54.     In addition, Reporters Committee attorneys have been assigned to address legal needs created by the Act, including through this lawsuit.

55.     On each front, the Reporters Committee has diverted limited resources that it "would have spent differently or not spent at all."  *Lawson*, 937 F.3d at 954.

56.     The burdens the Act imposes on Plaintiffs are unconstitutional.

57.    The Act violates the First Amendment by "vest[ing] unbridled discretion in a government official over whether to permit or deny expressive activity."  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988).

58.    The Act authorizes officers to issue a dispersal order even if an individual's presence neither obstructs the officer in the performance of their duties nor poses any other safety risk.  Legislators rejected an amendment that would have limited the Act to "conduct that would cause a reasonable person to believe that the person intends to interfere with the execution of the officer's duties." Senate Motion MO118606, Ind. Gen. Assemb., 2023 Sess., https://perma.cc/P35T-AUYS.

59.    The Act does not require that dispersal orders be tailored in any way to accommodate the First Amendment right to document law enforcement activity. The state Senate considered but rejected an amendment that would have made it a defense to prosecution "that the person would be unable to observe the law enforcement officer executing the officer's duties from a distance greater than twenty-five (25) feet if the officer is executing the officer's duties on: (1) public property; or (2) private property . . . where the person otherwise has the right to be."  Senate Motion MO118604, Ind. Gen. Assemb., 2023 Sess., https://perma.cc/2SPE-8FRA.

60.     Lawmakers made no findings to support the choice of a 25-foot buffer or the need for the Act in light of existing laws that already prohibit obstruction.[4]

61.     In addition, the Act is unconstitutionally vague because it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement."  *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

62.     In each of those respects, because a journalist in Indiana can "stand on a public sidewalk . . . only at the whim of any police officer of that city," the Act poses an "ever-present potential for arbitrarily suppressing First Amendment liberties," including the liberty of the press to document what public officials do with public power in public spaces.  *Shuttlesworth*, 382 U.S. at 90–91.

63.     Plaintiffs ask this Court to issue a declaration that the Act violates the Constitution and an injunction against its enforcement by the Defendants.

## COUNT I
### Violation of the First Amendment (As Applied)

64.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

65.     Plaintiffs intend to engage in peaceful, nonobstructive newsgathering within 25 feet of law enforcement officers performing their duties in public spaces.

---

[4]     *See* Ind. Code § 35-44.1-3-1; Ind. Code § 35-44.1-4-5; Ind. Code § 9-21-8-1.

66.     Plaintiffs' proposed course of conduct is protected by the First Amendment, which protects "the gathering and dissemination of information about government officials performing their duties in public," *Alvarez*, 679 F.3d at 600, including the making of recordings that document those duties, *see id.*; *Jordan*, 73 F.4th at 1169 ("[S]ince the First Amendment protects the right to criticize police, then *a fortiori* it protects the right to remain in the area to be able to criticize the observable police conduct.").

67.     Plaintiffs' proposed course of conduct is proscribed by the Act.

68.     Criminalizing peaceful, nonobstructive newsgathering advances no legitimate interest.  The state has no power to restrict reporting that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them."  *Alvarez*, 679 F.3d at 606; *accord Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (newsgathering in public "that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation").

69.     The Act is not narrowly tailored.  Its scope is untethered to whether a journalist's conduct "risk[s] substantial harm or if dispersal is otherwise *necessary*," *Bell v. Keating*, 697 F.3d 445, 459 (7th Cir. 2012), and the 25-foot bubble is far broader than necessary to protect any legitimate interest, *see Glik*, 655

F.3d at 80, 84 (individual "roughly ten feet away" is at "a comfortable remove" (citation omitted)).

70.     The Act fails to leave open "alternative observation opportunities," *Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017), when 25 feet is too great a distance for Plaintiffs to visually observe or capture audio of newsworthy events.

71.     The Act is therefore unconstitutional as applied to Plaintiffs' peaceful, nonobstructive efforts to document officers performing duties in public spaces.

## COUNT II

### Violation of the First Amendment (Facial Overbreadth)

72.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

73.     On its face, the Act "restricts access to traditional public fora" and authorizes officers to regulate a sweeping volume of First Amendment activity, including Plaintiffs' otherwise lawful newsgathering. *McCullen v. Coakley*, 573 U.S. 464, 476 (2014).

74.     In its "inevitable effect" and "stated purposes," the Act is a content-based restriction on newsgathering designed to prevent members of the press and public from exercising the right to document policing, and it is subject to strict scrutiny. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011) (citation omitted).

75.     The Act is not narrowly tailored to a compelling government interest.

76.     Whatever interest Indiana intended to advance, the statute contains no standards channeling officers' discretion toward that interest.  Instead, the Act "vests unbridled discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood*, 486 U.S. at 755, and its 25-foot sweep is far broader than necessary to accommodate any legitimate government interest.

77.     Even if the Act were construed as a content-neutral time, place, or manner restriction or a law that also targets conduct, it would remain overbroad.

78.     The Act sweeps in an enormous breadth of protected speech and newsgathering that poses no risk of obstruction.  *See Bell*, 697 F.3d at 456–57 (even where the "triggering conduct cannot be an act constituting protected expression," a statute "still implicate[s] protected expression" where, "once triggered, it may be applied to disperse people engaged in peaceful speech or expressive conduct").

79.     Because the Act is substantially overbroad relative to any legitimate sweep that it might have, the statute violates the First Amendment on its face.

## COUNT III
### Violation of the Fourteenth Amendment (Void for Vagueness)

80.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

81.     The Act "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even

encourage[s] arbitrary and discriminatory enforcement." *City of Chicago*, 527 U.S. at 56.  In both respects, the statute is unconstitutionally vague.

82.     Because the Act authorizes officers to order an individual to withdraw for any reason (or for no reason), the statute provides no "warning about the behavior that [can] prompt[] a lawful dispersal order." *Bell*, 697 F.3d at 462.

83.     The Act likewise fails to provide fair notice and an opportunity to comply because reporters cannot workably determine whether they are within the 25-foot bubble when gathering news at a crowded public event.

84.     The Act is independently void for vagueness because the law "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

85.     The statute contains no standards of any kind to guide law enforcement officers in deciding who should be ordered to withdraw.

86.     In each respect, the Act violates the Fourteenth Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request from this Court:

1)      A declaratory judgment that the Act violates the First and Fourteenth Amendments of the Constitution on its face and as applied to Plaintiffs;

2)      An injunction restraining Defendants from enforcing the Act;

3)      An award of attorney's fees pursuant to 42 U.S.C. § 1988;

4)      Costs of suit; and

5)      Such other and further relief as the Court may deem just and proper.

Dated:  October 6, 2023

/s/ Katie Townsend
Katie Townsend
ktownsend@rcfp.org
Gabe Rottman*
Grayson Clary*
Emily Hockett*
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310

*Attorneys for Plaintiffs Reporters Committee
for Freedom of the Press, Indiana
Broadcasters Association, Indiana
Professional Chapter of the Society of
Professional Journalists, Indianapolis Star,
Nexstar Media Inc., Scripps Media, Inc.,
and TEGNA Inc.*

*\* Pro hac vice application pending*