## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| **Reporters Committee for Freedom of the Press**, **Indiana Broadcasters Association**, **Indiana Professional Chapter of the Society of Professional Journalists**, **Indianapolis Star**, **Nexstar Media Inc.**, **Scripps Media, Inc.**, and **Tegna Inc.**,<br><br>*Plaintiffs*,<br><br>  *v.*<br><br>**Todd Rokita**, in his official capacity as Attorney General of Indiana, **Ryan Mears**, in his official capacity as Marion County Prosecutor, and **Kerry Forestal**, in his official capacity as Marion County Sheriff,<br><br>*Defendants*. | **Case No. 1:23-cv-1805** |

## Defendants' Brief in Support of Joint Motion to Dismiss

Plaintiffs Reporters Committee for Freedom of the Press, Indiana Broadcasters Association, Indiana Professional Chapter of the Society of Professional Journalists, Indianapolis Star, Nexstar Media, Inc., Scripps Media, Inc., and Tegna Inc. (collectively, "**Media Organizations**"), purporting to represent the interests of the press, have asked this Court to declare unconstitutional Ind. Code § 35-44.1-2-14 ("**Buffer Law**"), a law that has never been enforced against any of them. Nor, as their own examples show, is it likely to be used to target *any* press member, as it has never been invoked against any press member except with extraordinary deference to extremely belligerent individuals who, while disrupting lawful police activity, happen to be filming. This Court should dismiss this suit for lack of jurisdiction because Media Organizations have alleged no facts sufficient to establish standing or ripeness.

Moreover, they bring this action despite litigation in the Northern District, *Nicodemus v. City of South Bend*, in which a party representing the interests of the press, Mr. Nicodemus, has raised *exactly* the same issues in litigation that, by its very nature, preserves the interests of Media Organizations. Specifically, a ruling in favor of Mr. Nicodemus would render the challenged law unconstitutional on the same grounds, and in favor of the same interests, that Media Organizations assert here, fully preserving them. Accordingly, this case should also be dismissed (or, alternatively, stayed) on grounds of the first-filed rule and collateral estoppel.

For these reasons, as explained below, Defendants Todd Rokita, in his official capacity as Attorney General of Indiana, Ryan Mears, in his official capacity as Marion County Prosecutor, and Kerry Forestal, in his official capacity as Marion County Sheriff (collectively, "**Indiana**") respectfully request that this Court grant their Motion to Dismiss.

## Legal Standard

The Constitution requires that plaintiffs seeking to invoke a federal court's jurisdiction must have standing. "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the[] elements" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). While the Court must, for purposes of a motion to dismiss, accept Media Organizations' factual allegations as true, it need not credit "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Finally, in considering a motion to dismiss, courts have great discretion in administering their dockets and determining if the action at hand is duplicative of existing litigation. *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993).

# Argument

## I. Media Organizations have alleged no facts establishing injury.

Media Organizations seek declaratory and injunctive relief to redress the purported injury caused to them by Ind. Code § 35-44.1-2-14, which permits a law enforcement officer engaged in lawful duties to order a person to stop approaching within 25 feet and makes "knowing[] or intentional[]" disobedience a Class C misdemeanor. The problem is simple: Media Organizations have never *suffered* such an injury, nor is there any reason to believe they will—in fact, their own allegations and examples show it is almost certain they will not. Specifically, they do not allege that the Buffer Law has actually been or will likely be enforced against them, they do not allege that they have self-censored as a result of the Buffer Law, and they do not allege that they intend to self-censor. And in a twist of irony, the only instances of enforcement they *do* allege show that the Buffer Law is *not* being enforced in the manner they claim to fear, but is only being enforced evenhandedly and with great deference to those recording law enforcement, in situations in which it is plainly needed. Accordingly, Media Organizations' Complaint ("**Complaint**" or "**Compl.**"), Dkt. 1, should be dismissed for lack of standing and ripeness.

## A. Standing requires actual or imminent concrete injury.

To establish standing in a case challenging the constitutionality of a law, parties must demonstrate, *inter alia*, that they have "suffered an injury in fact[.]" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, *as revised* (May 24, 2016); *see also Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020). This injury "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citations omitted). Furthermore, it must be a

constitutional injury—it must be an injury to a right, rather than a generalized grievance. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 482 (1982); *see also, e.g.*, *Democratic Party of Wisconsin v. Vos*, 966 F.3d 581, 588 (7th Cir. 2020) (no standing because injury alleged was "not a federal constitutional injury.").

"For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc.*, 578 U.S. at 339 (citations omitted). In the absence of a particularized injury via enforcement—that is, that the law at issue has actually been enforced against a plaintiff—the injury must be something more than a mere "notional or subjective fear of chilling[.]" *Speech First, Inc.*, 968 F.3d at 638 (quoting *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012)). Thus, absent such enforcement, a plaintiff may establish standing in one of two ways: (**1**), "a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does"; or, (**2**), "a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.* (citations omitted). Absent any such showing of injury, a plaintiff lacks standing.

**B. Media Organizations fail to allege actual or imminent concrete injury.**

Media Organizations do not allege any constitutional injury. They do not allege that the Buffer Law has actually been enforced against them. *See generally* Compl. Far from having their speech chilled, they state that they not only currently conduct "reporting requir[ing] close contact with members of law enforcement . . . [,] often rel[ying] on videos or photographs captured within 25 feet of officers performing their official duties," *id.* at ¶ 32, but "*will continue to do so*," *id.* at ¶ 33 (emphasis added). Accordingly, the "chill" alleged by Plaintiffs, *id.* at ¶ 45,  is not

supported by these facts.

Nor is it supported by any other facts alleged by Media Organizations.

Because Media Organizations allege neither actual particularized enforcement nor actual self-censorship, but the opposite, the only way for them to establish standing is by showing that there is a credible threat of enforcement against conduct in which they intend to engage.

**1. Actual enforcement shows there is not a hint of a threat of constitutional injury.**

Media Organizations' own examples of how the Buffer Law is enforced demonstrate that there is *not* a threat of it being enforced in the unconstitutional manner they fear. Because the alleged threat of enforcement of a challenged statute must be "credible," *Speech First, Inc.*, 968 F.3d at 638, courts are greatly aided by examples of how the statute *has* been enforced. *E.g.*, *Love Church v. City of Evanston*, 896 F.2d 1082, 1086 (7th Cir. 1990) (because of "historic policy of non-enforcement and . . . repeated violation of the Ordinance without any municipal retaliation, plaintiffs [could not] reasonably assert that they fear enforcement"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) (parties' "fail[ure] to offer any evidence that their communications have been monitored under" challenged statutes "substantially undermine[d] their standing theory"). After all, law enforcement's use of a statute is not likely to suddenly change without a change in the statute itself. The two examples Media Organizations provide, however, show only that the Buffer Law *is* being enforced both evenhandedly—to press and non-press alike—and only when necessary to prevent interference with necessary law enforcement activity.

### a. *Nicodemus v. City of South Bend*

Media Organizations first cite an ongoing case, *see* Compl. ¶ 52, in which law

enforcement *declined* to use the Buffer Law to arrest a citizen journalist, despite his continuous belligerence and delays in complying with police orders.

That case, *Nicodemus v. City of South Bend*, is currently awaiting a final decision in the Northern District. The plaintiff, Donald Nicodemus, alleged that a law enforcement officer, pursuant to the Buffer Law, ordered him and "others who had assembled" to move back from the corner of an intersection near a police investigation. Complaint ¶ 26, *Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Aug. 8, 2023), Dkt. 1 [hereinafter "***Nicodemus* Compl.**"]. However, three facts that Nicodemus did not dispute show that *Nicodemus* does not support Media Organizations' purported fear.

First, the Buffer Law was not actually enforced against Nicodemus—he was not arrested—despite his repeated arguing with the officer and delay in complying. Defs.' Ex. A, Resp. Opp'n to Mot. Prelim. Inj. at 3–6, No. 3:23-cv-00744, Dkt. 25.

Second, the officer's "decision to order everyone on the corner to move back had nothing to do with the fact that two of them were recording." *Id.* at 5. Instead, the order was for the preservation of both officer and civilian safety, *id.* at 3, and for the prevention of interference with crime scene investigation, *id.* at 4–5.

Third, the officer did, in fact, "order[] *everyone* at the northeast corner of the intersection to move back 25 feet, not just the people who were recording." *Id.* at 6 (emphasis added).

Nicodemus did not dispute these facts. *See generally* Defs.' Ex. B, Reply Supp. of Mot. Prelim. Inj., No. 3:23-cv-00744, Dkt. 31. Instead, he admitted that "the relevant facts are uncontested," including "the facts of Mr. Nicodemus's interaction with the police . . . and the reasons that South Bend Police invoked" the Buffer Law, and the fact that not only Nicodemus,

but "others" in the same area who were not recording, were ordered back. *Id.* at 2–3.

So the facts of *Nicodemus* are clear in demonstrating, if anything, a *lack* of credible threat of the enforcement that Media Organizations purport to fear. First, the Buffer Law was used to support the safety of officers and civilians and to prevent interference with crime scene investigation, all of which are compelling state interests. *United States v. Bonin*, 932 F.3d 523, 535 (7th Cir. 2019) (public safety and "protecting the integrity of government processes [are] compelling."); *United States v. Blackman*, No. 18-CR-00728, 2023 WL 3346822, at *4 (N.D. Ill. 2023) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175–76 (1991)) ("Crime investigation is a compelling interest."). Second, it was not used to target the press, but was invoked against *all* bystanders. Third, it was not actually enforced to arrest anyone in the press—i.e., Nicodemus—*despite* repeated argument and delay in complying. If anything, *Nicodemus* shows law enforcement's extraordinary *deference* to the press in declining to enforce the Buffer Law against press members.

### b. Mary Nichols incident.

Media Organizations' second example of enforcement is equally ineffective to show a credible threat to establish standing. The cited article concerns a citizen, Mary Nichols, filming an arrest and attempting to film inside the ambulance in which the arrestee was placed. Compl. ¶ 52; John Doran, *Woman Arrested Under New Indiana Law for Filming Police Within 25 Feet*, WTHR (Oct. 4, 2023), https://www.wthr.com/article/news/crime/woman-arrested-under-new-indiana-law-for-filming-police-within-25-feet-lawrence/531-d286bb6d-d4a3-4202-a1e2-40124f3400f7.[1] For five reasons, the video embedded in the article makes clear that this example

---

[1] Where Media Organizations' links include non-working videos, Indiana cites to the same material on the "live" page that is accessible from each "perma.cc" URL in Plaintiffs' citations.

only serves to show, once again, that Media Organizations' fear is *not* credible.

First, Nichols *was able*, from outside the buffer zone police allegedly established, to capture clear, unobstructed footage of the law enforcement activity she wished to film—police moving the arrestee into the ambulance. *Id.* at timestamp 07:07–07:12 (Nichols' footage of same[2]).

Second, as in *Nicodemus*, law enforcement showed great deference to Nichols, declining to arrest her after her first violation of the buffer zone. *Id.* at timestamp 07:10–7:38 (showing the progression of events: after backing up pursuant to law enforcement orders, Nichols later disregards those orders by approaching directly to the ambulance, then is *not* arrested, but given a second warning, and is only arrested after arguing against said warning).

Third, Indiana news outlets recognize that the interest in maintaining medical and arrestee privacy is a substantial interest, *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 978 F. Supp. 2d 1, 9 (D.D.C. 2013), as demonstrated by the fact that the arrestee, who is placed in an ambulance, has been blurred out. Doran, timestamps 06:53–06:56, 07:04–07:12.

Fourth, Nichols' attempt to record the arrestee *inside* the ambulance, from the immediate rear of the ambulance, *id.* at 07:16–07:35 (showing Nichols stating she was "trying to record in the back of the ambulance" (07:16–07:19) and Nichols' video footage taken from directly behind the ambulance, capturing inside of ambulance and then back window of ambulance (07:19–07:33)), clearly would have offended these privacy interests.

---

[2]The video makes clear that the incident footage supplied is Nichols'. *See, e.g.*, *id.* at timestamp 07:13–07:35 (interview footage of Nichols in which she explains, "I'm trying to record in the back of the ambulance," followed by incident footage in which Nichols' reflection can be seen, with reporter's voiceover noting that the footage is "video Nichols provided . . . ." (*id.* at timestamp 07:26)).

Fifth, in addition to protecting these privacy interests through the Buffer Law, police also ensured the safety of all present, including Nichols, by ensuring proper distance between an arrest event and bystanders. *See id.* at timestamp 07:48–07:52; *see also supra* Part I.B.1.a; Defs.' Ex. C, Dr. Richard Celeste, Expert Report, *Police Practices and Procedures Analysis Regarding Indiana Code § 35-44.1-2-14* [hereinafter "**Celeste Report**"] at 5, 8–16, 18–20, No. 3:23-cv-00744, Dkt. 25-6. Accordingly, this incident, like *Nicodemus*, shows only a deferential use of the Buffer Law, and only for the purposes of preventing violation of arrestee and medical privacy and to protect bystanders in a potentially volatile event.

### c. *All* enforcement examples show a lack of credible threat.

Media Organizations' only two examples of enforcement, then, demonstrate that reality is quite the opposite of the picture they paint. Although the Buffer Law was invoked in these two examples, law enforcement officers in both instances afforded the greatest deference reasonably possible to individuals recording them. Since a credible threat of enforcement injuring a constitutional right is required for standing, Media Organizations' own examples, which show that their fear is the opposite of credible, serve only to provide this Court with ample reason to find they lack standing.

Although these examples (which Media Organizations classify as "the only reported instances in which the Act has been enforced," Compl. ¶ 52) serve to demonstrate well that the Buffer Law is always enforced in a manner that defers to and preserves First Amendment rights, one further incident compels this conclusion.

When executing a felony warrant on an individual inside a residence, two officers of the Marion County Sheriff's Office were met by a separate individual who "was extremely

belligerent, repeatedly screaming and cursing at all deputies on scene, shutting the front door repeatedly, and consistently refusing commands to exit the residence . . . ." *See* Defs.' Ex. D, Officer's Arrest Report at 2. After eventually "start[ing] to comply with [these] commands," she then refused "lawful orders to leave the incident area," stated, "[I'm going to] go back in the house," and attempted to do so. *Id.* After the officers hindered this attempt, one of them "convince[d] her to start moving towards the yellow caution tape surrounding the scene," and "[s]he eventually stepped past the yellow tape, but was physically pressing up against it, attempting to get closer to the scene again." *Id.* She was therefore directed—with a request, followed by a command—to "move back 25 feet from [the officer] and the caution tape," but she refused. *Id.* After resisting the officers' attempts to detain her, she was placed under arrest. *Id.*

The Buffer Law was invoked, in this instance, "in the interest of officer safety," *id.*, a compelling state interest, *supra* Part I.B.1.a. There is no indication of an attempt to record any part of this incident. This additional example therefore belies Media Organizations' contention that "the only reported instances in which the Act has been enforced have involved individuals who were recording law enforcement at the time," Compl. ¶ 52. This further demonstrates that the Buffer Law is being used, and will inevitably continue to be used, not against the press *qua* press, but only in situations where it is needed to preserve compelling interests, no matter who is ordered to retreat.

### d. Media Organizations' complaint omits relevant policy considerations.

Finally, Media Organizations fail to account for the policies of law enforcement agencies. "Administrative interpretation and implementation" are "highly relevant" in facial challenges to state law, as federal courts "must consider any limiting construction" an "enforcement agency"

has. *Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989) (citations omitted). The *Ward* Court found that discretion was properly limited by the city's "interpret[ation]," "policy," "practice," and "goal" with respect to the regulation challenged there. *Id.* at 795. Such policy and implementation is relevant to the merits of a facial challenge because it goes to the heart of how a statute is likely to be enforced. Because the likelihood of enforcement determines whether an alleged enforcement threat is credible or not, such policies are relevant to standing.

The Marion County Sheriff's Office Training Academy specifically addresses the right to record police, stating, "Persons who are lawfully in a public space . . . have a First Amendment right to record things in plain sight, to include police activity," and, "Police may not threaten, intimidate, or otherwise discourage or interfere with the recording of police activities. However, the right to record is not absolute and is subject to legitimate and reasonable legal restrictions." Defs.' Ex. E, Marion County Sheriff's Office Training Academy, *Recording Police Activity*, at 5. This echoes the policies of other Indiana law enforcement agencies. *E.g.*, Defs.' Ex. F, South Bend Police Department, *Policy Manual*, Policy 425.2. Indeed, such policies are common throughout the country. *See, e.g.*, Defs.' Ex. C, Celeste Report, at 18 (citing New Jersey policy as example). These policies likely explain why Media Organizations cannot provide a single example of the Buffer Law being enforced as they purport to fear and, in light of these policies, the likelihood of the Buffer Law being so enforced is infinitesimal.

**2. Media Organizations' remaining allegations cannot establish standing where there is no threat.**

Every instance of the Buffer Law's use cited in this case, and the policies *about* its use, demonstrate that it is *not* used to target the press. When individuals record law enforcement activity, policy directs officers to show extraordinary deference to them, and officers *do* in fact

show such deference. Therefore, the only rational conclusion is that there is no credible threat of enforcement of the Buffer Law in a manner that would pose an injury to the constitutional rights of members of the press.

That leaves this Court with an easy task in analyzing Media Organizations' remaining contentions. They allege that their intended conduct will put them to the "choice between committing a crime or forgoing reporting," *id.* at ¶ 38, but all examples of the Buffer Law's enforcement show that it has never been used to target reporting. They allege that "25 feet is often too far to obtain" clear video or audio, *id.* at ¶ 39–40, that "there is no adequate substitute for first-hand recordings," *id.* at ¶ 41, and that they "fear complying with the Act is not practically possible" in many circumstances, *id.* at ¶ 42, but for two reasons, these contentions do not help them. First, because there is no credible threat of the Buffer Law being enforced to target the press, they are irrelevant. Second, the distance between two lanes of traffic, Defs.' Ex. C, Celeste Report, at 19, is not too great a distance to capture video, as Media Organizations' own examples show. *E.g.*, Doran, timestamp 07:03–07:12 (showing Mary Nichols' footage from "more than 25 feet from officers," clearly capturing the officer activity at the back of the ambulance she wished to capture); Answer, ¶¶ 32, 34 (observing that examples from Media Organizations' Complaint show that footage in question *is* captured with no problems from more than 25 feet away).[3]

---

[3]Although also irrelevant since there is no credible threat of enforcement in a way that would constitutionally injure them, Media Organizations' contentions in ¶¶ 43–44 of their Complaint are further irrelevant because they plainly have nothing to do with the Buffer Law at all. The Buffer Law requires "knowing[] or intentional[]" breach of the 25-foot zone. Accordingly, the purported fears of being unable to "reliably determine" 25 feet, ¶ 43, or having "no practical way . . . to retreat," ¶ 44, do not contemplate scenarios in which the Buffer Law would apply in the first place.

**Defs.' Br. in Support**
**of Joint Mot. to Dismiss**                    12

Finally, Media Organizations' assertions regarding their expenditure of resources, ¶¶ 46–49, 53–55, are to no avail to give them standing. Because a plaintiff cannot establish standing to challenge a statute when there is no credible threat that the statute will actually be enforced against him in a manner injuring a constitutional right, *a fortiori*, the plaintiff cannot establish standing by the even further-removed act of expending resources on that non-threatening statute. Accordingly, Media Organizations' claim of resource diversion, *id.* at ¶ 55, is inapposite. Indeed, the case they cite, *Common Cause Indiana v. Lawson*, 937 F.3d 944, 954 (7th Cir. 2019), concerned the allegation that resources would be expended in response to a credible threat to constitutional rights, 937 F.3d at 951 ("the injury . . . is either imminent or has already begun; it is concrete, ongoing, and likely to worsen"), but explicitly distinguished other types of cases, *id.* at 950–51 (stating, "[T]he present case [does not] involve[] any effort to rely on . . . speculative injury"; noting that plaintiffs cannot "rely for standing on the 'costly and burdensome measures . . . ' that they felt compelled to take, [if] they ha[ve] not shown the situation was . . . 'certainly impending.'" (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 411–14, 416 (2013)). Media Organizations' alleged resource diversion stemming from a purely speculative, and indeed very unlikely, injury cannot be relied on to establish standing.

Because Media Organizations fail to allege a constitutional injury, they lack standing and their Complaint should be dismissed.

## C. Media Organizations' claims are not ripe.

For the same reasons, Media Organizations' Complaint should also be dismissed because it is not ripe. "Article III standing and ripeness issues" often "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (quoted source omitted). To the extent the

two doctrines are distinct, "[i]t is sometimes argued that standing is about *who* can sue while ripeness is about *when* they can sue[.]" *Smith v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994). However, "if"—as here—"no injury has occurred, the plaintiff can be told either that *she* cannot sue, or that she cannot sue *yet*." *Id.* Since no injury has occurred here, Media Organizations' fear has not ripened into a justiciable controversy. Since no injury is credibly *likely* ever to occur, they cannot argue that the case is "ripe enough." Accordingly, Media Organizations' claims are not ripe and their Complaint should be dismissed.

## II. The Court should dismiss or, alternatively, stay this case on "first-filed" or collateral estoppel grounds.

Principles of wise judicial administration and conservation of scarce judicial resources counsel in favor of dismissing this case; or, in the alternative, staying the action pending resolution of *Nicodemus*, since Media Organizations' claims will be barred by collateral estoppel in the near future in light of the pending decisions in the *Nicodemus* case, *see, e.g.*, *Schneider Nat. Carriers, Inc. v. Carr*, 903 F.2d 1154, 1157 (7th Cir. 1990) ("A decision in [one action] would have been entitled to res judicata effect in [a concurrent action]").

## A. The Court should dismiss this case under the "first-filed" rule.

### 1. Under first-filed rule, courts have ample discretion to avoid duplicative litigation.

Federal district courts have ample discretion "to administer their dockets so as to conserve scarce judicial resources." *Trippe Mfg. Co. v. Am. Power Conversion Corp.*, 46 F.3d 624, 629 (7th Cir. 1995) (citations omitted). Beyond judicial economy, such prudent administration in the event of parallel litigation "protect[s] against the danger of the two proceedings reaching inconsistent results" and "eliminate[s] piecemeal and duplicative litigation." *Clark v. Lacy*, 376 F.3d 682, 687 (7th Cir. 2004). Accordingly, in the event of

concurrent federal litigation, avoiding duplication is the Court's duty. *Nicholson v. Nationstar Mortg. LLC of Delaware*, No. 17-CV-1373, 2018 WL 3344408, at \*3 (N.D. Ill. July 6, 2018) (cleaned up; citations omitted); *Asset Allocation & Mgmt. Co. v. W. Emps. Ins. Co.*, 892 F.2d 566, 573 (7th Cir. 1989) (district courts should "not . . . countenance the simultaneous litigation of identical claims in two federal courts"); *see also Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("the general principle is to avoid duplicative [federal] litigation.").

Therefore, a federal district court may dismiss such a case "for reasons of wise judicial administration," and such courts "are accorded 'a great deal of latitude and discretion' in determining whether one action is duplicative of another . . . ." *Serlin*, 3 F.3d at 223 (quoted sources omitted).

### a. In duplicative litigation, the later-filed case should be dismissed.

One doctrine developed to serve the court's duty to avoid duplicative litigation is the "first-filed rule" (or "first-to-file rule"),  "which instructs courts to defer to [the] previously-filed action," *Preci-Dip, SA v. Tri-Star Elecs. Int'l, Inc.*, No. 08 C 4192, 2008 WL 5142401, at \*2 (N.D. Ill. Dec. 4, 2008), "presum[ing] that the second-filed case should be dismissed in favor of the first-filed case," *Henan Mach. & Elec. Imp. & Exp. Co. v. WDF Int'l Trading Co., LLC*, No. 06-C-715-C, 2007 WL 5601486, at \*3 (W.D. Wis. May 29, 2007) (quoted source omitted); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Paramount Liquor Co.*, 34 F. Supp. 2d 1092, 1095 (N.D. Ill. 1999) (plaintiff bears burden of justifying divergence from rule). While "rigid[] adhere[nce]" to this rule is not required, *Trippe Mfg. Co.*, 46 F.3d at 629, a case should generally be dismissed as "duplicative if the 'claims, parties, and available relief do not significantly differ

between the two actions.'" *Serlin*, 3 F.3d at 223 (quoted source omitted).

### b. Actions are duplicative if parties and issues are substantially similar.

While there is no single test for determining whether two cases are duplicative, the

Supreme Court's decision in *Colorado River*, 424 U.S. 800—a seminal case upholding trial

court's dismissal of concurrent proceedings—and its progeny provide useful guidance. Although

*Colorado River* decision concerned federal-state concurrent litigation, the Court spoke to federal-

concurrent litigation as well, *e.g.*, *id.* at 817, and its principles apply in favor of dismissal with

even greater force to the latter, since (unlike state-federal concurrent litigation) "avoid[ing]

duplicative litigation" is the general rule in federal-concurrent litigation, *id. See, e.g.*, *Ridge Gold

Standard Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 572 F. Supp. 1210, 1212–13 (N.D. Ill.

1983) (noting that *Colorado River* concerned determination of whether litigation is duplicative;

dismissing federal-concurrent litigation after determining it was duplicative).

To be "parallel . . . , suits need not be identical," nor must there be "formal symmetry

between the two actions." *Clark*, 376 F.3d at 686 (citations omitted). Instead, "[a] suit is parallel

when substantially the same parties are contemporaneously litigating substantially the same

issues in another forum." *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698,

700 (7th Cir. 1992) (cleaned up; citation omitted).

For example, in *Schneider*, a driver (Carr) who was sued by a trucking company

(Schneider) due to a traffic accident, first counterclaimed for injuries arising from the accident,

alleging Schneider's driver was at fault, and later filed suit in state court against not only

Schneider, but additional plaintiffs—the state and a railroad company—alleging their actions

could have prevented a driver from seeing the stoplight. 903 F.2d at 1155 (7th Cir. 1990).

Despite these new parties and new claims, the *Schneider* court affirmed the district court's determination that "the suits covered substantially the same issues between substantially the same parties," because "[t]he issue of overriding importance in both suits was which of the two drivers ran the red light," and "[a]s between Carr and Schneider National Carriers, there [wa]s no difference whatever between the federal suit and the later state court action." *Id.* at 1156–57.

Accordingly, this Court must determine whether the parties and issues in this case are substantially the same as the parties and issues in *Nicodemus*. Some additional principles on each question make it clear that they are.

### c. Parties are substantially the same if they have the same interests.

The primary question in determining substantial similarity of parties is whether the interest they are pursuing is the same. Thus, even if "some of the names appearing on the two complaints are different," the parties nonetheless meet this requirement if their "interests . . . are nearly identical." *Clark*, 376 F.3d at 686; *see also Schneider*, 903 F.2d at 1156 ("The existence of additional parties in one suit does not of itself destroy parallelism."). For example, when the plaintiff in a later-filed case pursues the same interest in a legal fee determination that was pursued by a different party in first-filed litigation, the parties are considered "substantially the same." *Caminiti*, 962 F.2d at 700–01 (finding that a corporation and an estate had substantially similar interests in fee litigation). If "the granting of the relief" sought by the first-filing plaintiff "would dispose of all claims raised in the [later-filed] case," then the parties are likely substantially the same. *See id.* at 701; *Beck v. Dobrowski*, 559 F.3d 680, 686 (7th Cir. 2009).

### d. Issues are substantially the same if resolution of primary issue will resolve all claims.

Similarly, because the issues need only be substantially the same for the first-filed rule to

apply, the presence in the later-filed case of "'additional' claim[s] . . . premised on the" same overarching issue does not destroy the parallelism of the two cases. *Clark*, 376 F.3d at 686. Generally, if "resolving the [overarching] issue . . . will dispose of all claims presented in th[e later-filed] case," then the issues in each case are substantially the same. *Id.* "[T]he parallel nature of the actions cannot be . . . dispelled by repackaging the same issue under different causes of action." *Id.* at 687. As with the party-parallelism determination, if "the granting of the relief" sought by the first-filing plaintiff "would dispose of all claims raised in the [later-filed] case," then the issues are likely substantially the same. *See Caminiti*, 962 F.2d at 701; *Beck*, 559 F.3d at 686.

**2. This case, being parallel to the earlier *Nicodemus* action, should be dismissed.**

**a. *Nicodemus* and the present case are parallel.**

Both the parties and the issues in this case are substantially the same as those in *Nicodemus*, so this case should be dismissed under the first-filed rule. In doing so, no harm will befall Media Organizations.

Regarding the parties, although "the names appearing on the two complaints are different," the plaintiffs' "interests in the disputes are . . . identical," *Clark*, 376 F.3d at 686, and this is not changed by the fact of additional parties whose interests are the same, *see Schneider*, 903 F.2d at 1156. The plaintiffs in both cases purport to be members of the press, Compl. ¶ 12; *Nicodemus* Compl. ¶ 2, and both pursue claims against the Buffer Law as applied to the press. Compl. 20; *Nicodemus* Compl. 7. Indeed, Media Organizations use *Nicodemus* as an exemplar of precisely the Buffer Law application that they challenge. Of course, if the *Nicodemus* court grants the relief sought there—a declaration that the law is unconstitutional as applied to Nicodemus, *id.*

at 7, because he is a member of the press, *id.* at ¶¶ 2–3—then the Media Organizations' interests in their own as-applied (to the press) challenge will be fully protected.

While the foregoing also shows identity of issues in the as-applied challenges, the issues are identical as well in the facial challenges, for if the *Nicodemus* Court finds that the Buffer Law is facially unconstitutional, as Nicodemus argued, *e.g.*, Defs.' Ex. G, Mem. Supp. of Mot. Prelim. Inj. at 10, No. 3:23-cv-00744, Dkt. 20, then it will grant the declaratory and injunctive relief sought by Nicodemus on that basis, which is the same relief sought by Media Organizations. Compl. 20. Accordingly, all issues in the two cases are parallel.

### b. The relative progress of each case favors deference to *Nicodemus*.

In weighing whether to defer to ongoing parallel proceedings, courts consider the relative progress of the concurrent proceedings. *Tyrer v. City of S. Beloit*, 456 F.3d 744, 754–55 (7th Cir. 2006). Similar to *Tyrer*, where a nearly four-year head start "was entitled to great weight" in the decision to defer to earlier action, *id.*, *Nicodemus* has a significant procedural advantage over this nascent case. The *Nicodemus* court already held a trial on the merits consolidated with the preliminary injunction hearing and judgment is forthcoming, whereas the present case remains at the pleading stage. As in *Tyrer*, this substantial difference in progress counsels against wasted efforts from duplicative litigation. *Id.* The further advancement of *Nicodemus* tilts the scales towards dismissal.

### c. Dismissing the case promotes important policy interests.

In addition to the *Colorado River* factors, dismissing this case promotes sound policy interests related to wise judicial administration: judicial economy, fairness, and consistency. Proceeding with concurrent, overlapping litigation on the same issue in two federal forums

invites duplicative efforts and creates risks of inconsistent judgments. By contrast, deferring to the *Nicodemus* decision fosters fairness to both parties. On balance, these policy considerations favor dismissal over the inefficient alternative of simultaneous litigation.

Just as concurrent litigation in *Caminiti* risked duplicative efforts between the intertwined parties, 962 F.2d at 701, allowing Media Organizations' claims to proceed simultaneously with Nicodemus's creates the same risk of wasteful parallel litigation. The risk of duplicative and wasteful litigation is heightened as Media Organizations' interests are intertwined with those of Mr. Nicodemus. This pressing concern strongly favors deferring to *Nicodemus*. *See AAR Int'l, Inc.*, 250 F.3d at 518 (avoiding piecemeal litigation is a critical *Colorado River* factor).

**B. Media Organizations are collaterally estopped from bringing their claims.**

Should the Court decline to dismiss this case in light of the parallel proceedings in *Nicodemus*, which preserve Media Organization's interests, Indiana respectfully requests that the Court dismiss the case on collateral estoppel grounds. Alternatively, Indiana requests that the Court issue a stay of the proceedings to determine the way in which the *Nicodemus* decision will affect the claims asserted by Media Organizations, since even if not currently barred, their claims will likely be barred by collateral estoppel as soon as an opinion is issued in *Nicodemus*. *See, e.g.*, *Schneider*, 903 F.2d at 1157 ("A decision in [one action] would have been entitled to res judicata effect in [a concurrent action]"). Doing so will prevent the likely waste of time and resources of this Court and the parties.

**1. Legal standard for collateral estoppel.**

For collateral estoppel to apply, four requirements must be met: (1) the issue that one party seeks to preclude must be identical to an issue involved in the prior action; (2) the issue

must have been actually litigated in the prior action; (3) determination of the issue must have

been essential to the final judgment in the prior action; and (4) the party precluded from

relitigating the issue must have been represented (actually or through privity) or protected by the

court in the prior action. *Tate v. Showboat Marina Casino P'ship*, 250 F. Supp. 2d 958, 960

(N.D. Ill. 2003) (citing *Chicago Truck Drivers v. Century Motor Freight, Inc.*, 125 F.3d 526, 530

(7th Cir. 1997)); *Kunzelman v. Thompson*, 799 F.2d 1172, 1178 (7th Cir. 1986); *Taylor v.

Sturgell*, 553 U.S. 880, 900 (2008).

### 2. Collateral estoppel applies to Media Organizations' claims.

#### a. The First Amendment issues presented in both cases are the same.

The issues presented in this case are identical to those in *Nicodemus v. City of South

Bend*. As noted above, *supra* Part II.A.2.a, both cases make as-applied and facial challenges. The

single issue is the constitutionality of Indiana Code § 35-44.1-2-14, which prohibits approaching

within 25 feet of a law enforcement officer after being ordered to stop. In *Nicodemus*, the

plaintiff, Donald Nicodemus, alleges that this statute violates the First Amendment by granting

police unbridled discretion to order observers, like himself, to withdraw from recording law

enforcement activity in public places. *Nicodemus* Compl. ¶ 39. Specifically, the complaint asserts

that the statute is unconstitutional as applied to Nicodemus based on the allegations that it was

enforced against him while he was recording police activity as a citizen-journalist. *Id.* at

¶¶ 11–37 and p. 7.

The first element for collateral estoppel requires that the issue sought to be precluded

must be identical to the issue presented in the prior litigation. *See Coleman v. Donahoe*, 667 F.3d

835, 859 (7th Cir. 2012). Like the first-filed rule's analysis, the issues need not be exactly the

same, but must involve the same "bundle of legal principles" tied to the same operative facts. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 153-54 (2015). Notably, in facial challenges, this is a particularly easy hurdle to meet since "[t]he legal analysis pertaining to a vagueness and overbreadth challenge does not vary as the facts vary," so "the legal issues in [two facial challenges] . . . are identical . . . [and] collateral estoppel is applicable." *McTavish v. Spiotto*, 500 F.Supp. 703, 705 (N.D. Ill. 1980).

Here, the core First Amendment issue raised by Media Organizations is identical to the issue pending in *Nicodemus*, with regard to both the facial challenges and the as-applied challenges. *Supra* Part II.A.2.a. Both cases involve a constitutional challenge under the First Amendment to Indiana Code § 35-44.1-2-14 and the central legal principles surrounding the statute's alleged infringement of free speech and free press rights are the same. Compl. ¶ 57; *Nicodemus* Compl. ¶ 39. Both plaintiffs specifically object to the lack of standards governing officer discretion to bar recording from within 25 feet. Compl. ¶¶ 57–58, 61; *Nicodemus* Compl. ¶ 36. Because the only issues are the same, the first element of collateral estoppel is met.

### b. The issues have been actually litigated in *Nicodemus*.

The requirement that an issue be "actually litigated" for collateral estoppel does not necessitate a full trial or opinion on the matter. *See Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390, 394-95 (7th Cir. 1987); *see also, e.g.*, *Mains v. Citibank, N.A.*, 852 F.3d 669, 675 (7th Cir. 2017) (prior litigation of a motion to dismiss qualifies for preclusive effect). And here, although still pending, the *Nicodemus* court's consolidation of the preliminary injunction hearing with a trial on the merits, which occurred on October 13, 2023, ensures that a judgment will be entered on the constitutionality of the statute. *See* Order Granting Consolidation, *Nicodemus*, No.

3:23-cv-744, Dkt. 32. The court heard arguments and will issue a ruling that provides the basis

for its judgment. This level of consideration satisfies the "actually litigated" requirement.

Because the *Nicodemus* court will issue a judgment on the merits of the identical constitutional

issues presented here, the second element of collateral estoppel is met.

### c. The determination will be essential to the final judgment.

For collateral estoppel to apply, the issue of fact or law actually litigated and resolved

must have been essential to the judgment. *King v. Burlington N. & Santa Fe Ry.*, 538 F.3d 814,

818 (7th Cir. 2008) (citation omitted). Here, the constitutionality of the statute forms the crux of

Nicodemus' complaint and request for declaratory and injunctive relief. *Nicodemus* Compl. ¶ 39.

Resolution of this First Amendment issue will be the fundamental basis for the *Nicodemus*

judgment. Because the court's final decision will hinge on determining the constitutionality of

the statute, this issue is essential to the judgment. Therefore, the third element is satisfied here.

### d. Media Organizations' interests are fully represented in *Nicodemus*.

Media Organizations differ from the citizen journalist in *Nicodemus*, "but a successive

party may be in privity with a named party that represents the same legal interests. Strict identity

of the parties is not necessary to achieve privity." *Kunzelman*, 799 F.2d at 1178 (citing *Donovan

v. Estate of Fitzsimmons*, 778 F.2d 298, 301 (7th Cir. 1985)). Where a party to the present

litigation is adequately and fully represented by a party to the prior litigation, privity can be found

to bar relitigation of the same issues. Importantly, a party is adequately represented for preclusion

purposes if the "original court took care to protect the interests of the nonparty," *Taylor v.

Sturgell*, 553 U.S. at 900.

Media Organizations' First Amendment interests are fully represented and protected by

Nicodemus' constitutional challenge. Adequate representation, for collateral estoppel purposes, does not require "that the prior plaintiff raise and formulate all conceivable arguments on behalf of a cause of action in the best possible fashion." *Hartke v. Chi. Bd. of Election Comm'rs*, 651 F. Supp. 86, 90 (N.D. Ill. 1986). Rather, it is enough that the legal theories put forward by the prior plaintiff, in support of the requested relief, competently represents the same interest that the subsequent plaintiffs now pursue. *Id.* at 91.

Here, both Nicodemus and Media Organizations assert the identical right to record law enforcement activity in public forums under the First Amendment, establishing congruity of interests. *See McTavish*, 500 F.Supp. at 707 (privity where parties shared "identity of interests"). This identical interest is reflected in the prayers for relief in both cases, which seek a declaratory judgment that the statute is unconstitutional and injunctive relief against its enforcement. Compl. 20; *Nicodemus* Compl. 7; *see also* Defs.' Ex. G, Mem. in Support of Mot. for Prelim. Inj. at 10, No. 3:23-cv-00744, Dkt. 20 (arguing for preliminary injunction on basis of facial unconstitutionality). Moreover, as explained above, Nicodemus acts as an advocate and exemplar for the rights of journalists that the Media Organizations represent. *See Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1114 (9th Cir. 2021) (earlier litigant represented interests of present plaintiffs). Finally, the *Nicodemus* court will, by virtue of the nature of the claims, "t[ake] care to protect the interests of the nonparty" Media Organizations, *see Taylor*, 553 U.S. at 900, since any determination regarding the First Amendment constitutionality of the Buffer Law will apply to *all* members of the press. Given the alignment and protection of the Media Organizations' interests in Nicodemus' suit, the minor difference in parties should not bar collateral estoppel.

## Conclusion

For the reasons stated herein, Indiana respectfully requests that the Court dismiss Media Organizations' Complaint in its entirety based on the lack of standing and ripeness or, alternatively, on grounds of deference under the first-filed rule or preclusion due to the collateral estoppel effect of *Nicodemus*. As discussed above, the identity of issues and mutuality between the parties warrants preclusive effect being given to the imminent decision in *Nicodemus*.

Should the Court decline to dismiss at this stage, Indiana requests in the alternative that the Court stay all proceedings in this matter under the first-filed rule pending final resolution of the parallel *Nicodemus* case. As set forth above, granting a stay to determine how *Nicodemus* will affect the claims made in this case will avoid piecemeal litigation, and recognizes the relative progress of the cases and the dangers of contradictory federal court determinations.

Granting Indiana's Motion to Dismiss honors the standing and ripeness requirements of the Constitution, promotes judicial economy, and protects parties from duplicative and potentially inconsistent proceedings. Accordingly, Indiana respectfully requests that the Court grant its Motion to Dismiss. Should the Court reject dismissal, a stay avoids the same concerns while still allowing Media Organizations' claims to be heard, if any claims are not precluded, once the controlling issues are authoritatively determined in *Nicodemus*.

Dated: December 1, 2023

Respectfully Submitted,

OFFICE OF CORPORATION COUNSEL
John P. Lowrey, Ind. Bar No. 29349-53
Deputy Chief Litigation Counsel
200 E. Washington Street, Suite 1601
Indianapolis, Indiana 46204
T: (317) 327-4055
F: (317) 327-3968
john.lowrey@indy.gov
*Counsel for Kerry Forestal*

Theodore E. Rokita
Indiana Attorney General
Ind. Bar No. 18857-49

By:
/s/ James Bopp, Jr.
James Bopp, Jr., Ind. Bar No. 2838-84
T. Shetina, Ind. Bar No. 37887-45
THE BOPP LAW FIRM, PC
The National Building
1 South 6th Street
Terre Haute, Indiana 47807
jboppjr@aol.com
tshetina@bopplaw.com
Phone: 812/232-2434
Fax: 812/235-3685
*Counsel for Todd Rokita and Ryan Mears*

**Defs.' Br. in Support
of Joint Mot. to Dismiss**                    26

## Certificate of Service

I certify that on this 1st day of December 2023, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ James Bopp, Jr.</u>
James Bopp, Jr.