# Dr. Richard Celeste, Expert Report, *Police Practices and Procedures Analysis Regarding Indiana Code § 35-44.1-2-14*, *Nicodemus v. City of South Bend*, No. 3:23-cv-00744, Dkt. 25-6

## *Excerpts*

**Defendants' Exhibit C**

Case 1:23-cv-01805-JRS-MG   Document 26-4   Filed 12/01/23   Page 2 of 15 PageID #: 156
USDC IN/ND case 3:23-cv-00744-DRL-MGG   document 25-6   filed 09/26/23   page 4 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **1** of **22**

# POLICE PRACTICES and PROCEDURES ANALYSIS REGARDING

# [Indiana Code § 35-44.1-2-14]

# PREPARED FOR:

# THE BOPP LAW FIRM, P.C., LOCATED IN TERRE HAUTE, INDIANA

# EXPERT REPORT OF DR. RICHARD CELESTE

# LAW ENFORCEMENT TRAINING, CRIMINAL JUSTICE, USE OF FORCE, POLICE PURSUIT AND POLICE PRACTICES EXPERT/CONSULTANT

Defs.' Ex. C

Case 1:23-cv-01805-JRS-MG Document 26-4 Filed 12/01/23 Page 3 of 15 PageID #: 157
USDC IN/ND case 3:23-cv-00744-DRL-MGG document 25-6 filed 09/26/23 page 8 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **5** of **22**

1. **Citizen Safety**

It has been my experience, irrespective of whether a citizen is a suspect or an arrestee, they still have the right to be free from harm. An officer or officers engaged with a private citizen in a law enforcement context, not only has the right to be free from harm from the officer, he/she also has a right to be protected from harm from others.

By way of example, if an officer is arresting a subject who committed an act where a third party was harmed, the officer is also tasked with the duty to protect that arrestee from others who may desire to harm that person as a form of punishment or retribution. Indiana Code § 35-44.1-2-14 provides a measure of safety for the private citizen by ensuring that person(s) who may desire to harm the arrestee are put at a reasonable distance from the arrest.

It has been my experience that once an officer engages and or takes control or custody of a subject, the officer(s), are now duty bound to ensure that subject's safety.

2. **Victim Rights**

Based on my training, education, and experience, our society has evolved significantly into one that genuinely cares about victim rights. During my 40 plus years in law enforcement and criminal justice, I have observed that change whereby there is now a significant focus on victim witness assistance programs providing services to victims. A victim is a victim at the very moment that they suffer a harm as indicated by the following Indiana statute:

> Indiana Statute § 35-40-4-8 – defines "Victim," "Victim" means a person that has suffered harm as a result of a crime that was perpetrated directly against the person. The term does not include a person that has been charged with a crime arising out of the same occurrence.

Case 1:23-cv-01805-JRS-MG   Document 26-4   Filed 12/01/23   Page 4 of 15 PageID #: 158
USDC IN/ND case 3:23-cv-00744-DRL-MGG   document 25-6   filed 09/26/23   page 11 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **8** of **22**

until he/she is relieved by a supervisor. **[University of California Santa Cruz Police Department PD Policy Manual]**

- "Crime scenes can present a wide variety of physical, biological, chemical, and situational hazards with a level of personal risk of injury, illness, or exposure almost always present. Personnel shall not be exposed to an unreasonable level of risk to personal safety and shall be provided with the equipment and training necessary to mitigate risks." **[Guiding Principles for Crime Scene Investigation and Reconstruction Prepared by Crime Scene Investigation Subcommittee Version: 1.0 March 2020]**

- Crime scene investigators and reconstructionists shall document a crime scene in such a way that it preserves the context of the evidence to ensure others can later understand not just what was collected, but also where, how, and in what condition it was found. **[Guiding Principles for Crime Scene Investigation and Reconstruction Prepared by Crime Scene Investigation Subcommittee Version: 1.0 March 2020]**

- Maintaining Evidence Integrity Crime scene investigators and reconstructionists shall take appropriate steps to maintain evidence integrity by preventing contamination, tampering, alteration, or loss of evidence. Procedures and documents shall be utilized to account for the integrity and possession of evidence by tracking its handling and storage from its point of collection to its final disposition. **[Guiding Principles for Crime Scene Investigation and Reconstruction Prepared by Crime Scene Investigation Subcommittee Version: 1.0 March 2020]**

4. **Officer Safety**

Officer safety is a key issue when analyzing the issue of distance away from an officer while he is working. I have taken the last 4 years of FBI statistics relative to officers killed and assaulted to demonstrate the importance of officer safety.

**2019 FBI Releases 2019 Statistics on Law Enforcement Officers Killed in the Line of Duty**

Case 1:23-cv-01805-JRS-MG Document 26-4 Filed 12/01/23 Page 5 of 15 PageID #: 159
USDC IN/ND case 3:23-cv-00744-DRL-MGG document 25-6 filed 09/26/23 page 12 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **9** of **22**

According to statistics reported to the FBI, 89 law enforcement officers were killed in line-of-duty incidents in 2019. Of these, 48 officers died as a result of felonious acts, and 41 officers died in accidents. Comprehensive data tables about these incidents and brief narratives describing the fatal attacks are included in Law Enforcement Officers Killed and Assaulted, 2019, released today.

**Felonious Deaths**

The 48 felonious deaths occurred in 19 states and in Puerto Rico. The number of officers killed as a result of criminal acts in 2019 was 8 less than the 56 officers who were feloniously killed in 2018. The 5- and 10-year comparisons show an increase of 7 felonious deaths compared with the 2015 figure (41 officers) and a decrease of 7 deaths compared with 2010 data (55 officers).

Circumstances. Of the 48 officers feloniously killed:

- 15 died as a result of investigative or law enforcement activities
    - 6 were conducting traffic violation stops
    - 4 were performing investigative activities
    - 2 were drug-related matters
    - 2 were interacting with wanted persons
    - 1 was investigating suspicious person or circumstance
- 9 were involved in tactical situations
    - 3 were barricaded/hostage situations
    - 3 were serving, or attempting to serve, search warrants
    - 2 were serving, or attempting to serve, arrest warrants
    - 1 was reported in the category titled "other tactical situation"
- 5 were involved in unprovoked attacks
- 4 were responding to crimes in progress
    - 2 were robberies
    - 1 was larceny-theft
    - 1 was reported in the category titled "other crime against property"
- 3 were involved in arrest situations and were attempting to restrain/control/handcuff the offender(s) during the arrest situations

Case 1:23-cv-01805-JRS-MG Document 26-4 Filed 12/01/23 Page 6 of 15 PageID #: 160
USDC IN/ND case 3:23-cv-00744-DRL-MGG document 25-6 filed 09/26/23 page 13 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **10** of **22**

- 3 were assisting other law enforcement officers
    - 2 with vehicular pursuits
    - 1 with foot pursuit
- 3 were responding to disorders or disturbances
    - 2 were responding to disturbances (disorderly subjects, fights, etc.)
    - 1 was responding to a domestic violence call
- 3 were involved in vehicular pursuits
- 2 were ambushed (entrapment/premeditation)
- 1 was serving, or attempting to serve, a court order (eviction notice, subpoena, etc.).

## 2020 FBI 2020 Data on Law Enforcement Officers Killed & Assaulted [OCT 21, 2021/HOMELAND SECURITY DIGITAL LIBRARY]

The Federal Bureau of Investigations' (FBI) Uniform Crime Reporting Program (UCR) recently released 2020 statistics for the Law Enforcement Officers Killed and Assaulted (LEOKA) portion of their Law Enforcement Data Explorer.

Data for 2020 shows a total of 60,105 law enforcement officers assaulted while performing their duties; an increase of 4,071 from the 56,034 assaults reported in 2019.

- Of the 60,105 officers who were assaulted in 2020, 18,568 (30.9%) sustained injuries.
- 44,421 officers were assaulted with personal weapons (e.g., hands, fists, or feet); 25.8% of these officers were injured.
- 2,744 officers were assaulted with firearms; 6.1% of these officers were injured.
- 1,180 officers were assaulted with knives or other cutting instruments; 9.7% of these officers were injured.
- The remaining 11,760 officers were assaulted with other types of dangerous weapons; 16.8% of these officers were injured.

Case 1:23-cv-01805-JRS-MG Document 26-4 Filed 12/01/23 Page 7 of 15 PageID #: 161
USDC IN/ND case 3:23-cv-00744-DRL-MGG document 25-6 filed 09/26/23 page 14 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **11** of **22**

- Statistics released earlier this year reported <u>93 law enforcement officers died</u> in the line of duty in 2020. Of these, 46 officers died as a result of felonious acts, and 47 officers died in accidents.

"Through the Law Enforcement Officers Killed and Assaulted (LEOKA) Data Collection, the FBI provides data and training that helps keep law enforcement officers safe as they protect the nation's communities. The goal is to provide relevant, high quality, potentially lifesaving information to law enforcement agencies focusing on why an incident occurred, as opposed to what occurred during the incident, with the hope of preventing future incidents. The data collected is analyzed by the LEOKA team and the results are incorporated into the officer safety awareness training the FBI provides for partner agencies."

**2021 [FBI Law Enforcement Bulletin/April 5, 2023/Crime Data/Law Enforcement Officers Assaulted in 2021]**

According to statistics released by the FBI's Law Enforcement Officers Killed and Assaulted (LEOKA) program, 43,649 officers were assaulted while performing their duties in 2021. The data was collected from 7,886 law enforcement agencies employing 354,144 officers.

**Nationwide Estimates**

Estimated trend tables in the release provide year-over-year trends for 2020 to 2021. They include national and regional estimates of assaults by data elements that include weapons, location type, time of day, and type of assignment.

- Assaults on law enforcement officers increased 11.2% from 2020 to 2021.
- Assaults against officers involving weapons increased 10.5%, from an estimated 72,300 incidents in 2020 to an estimated 79,900 incidents in 2021.
- The estimated number of officers sustaining at least one injury from the assaults increased 18.3% from 2020 to 2021.

Each of these estimated data points were deemed statistically significant based on the NIBRS calculation process.

Case 1:23-cv-01805-JRS-MG   Document 26-4   Filed 12/01/23   Page 8 of 15 PageID #: 162
USDC IN/ND case 3:23-cv-00744-DRL-MGG   document 25-6   filed 09/26/23   page 15 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **12** of **22**

Assaults and Injuries

- Of the 43,649 officers assaulted in 2021, 35.2% (15,369) sustained injuries.
- By region, 49.5% (21,609) of the reported assaults occurred in the South, 25.8% (11,261) occurred in the West, 17.0% (7,437) took place in the Midwest, and 7.7% (3,342) happened in the Northeast.

Circumstances

- 28.6% (12,463) of the reported assaults occurred while officers responded to disturbance calls.
- 18.4% (8,046) of officers assaulted were attempting "other arrests."
- 13.8% (6,037) of officers were assaulted while handling, transporting, or maintaining custody of prisoners.

Of the officers assaulted in the line of duty:

- 74.3% (32,421) were attacked with personal weapons (e.g., hands, fists, or feet).
- 5.1% (2,247) were assaulted with firearms.
- 2.3% (1,000) were attacked with knives or other cutting instruments.
- 18.3% (7,981) were assaulted with other dangerous weapons.

## 2022 FBI Releases 2022 Statistics on Law Enforcement Officers Killed in the Line of Duty/ May 8, 2023

According to statistics reported to the FBI by March 1, 2023, 118 law enforcement officers were killed in line-of-duty incidents in 2022. Of these, 60 officers died as a result of felonious acts, and 58 officers died in accidents. Comprehensive data tables about these incidents and brief narratives describing the fatal attacks were released on May 8 in the Law Enforcement Officers Killed and Assaulted (LEOKA) portion of the FBI's Law Enforcement Data Explorer (a subset of the Crime Data Explorer).

**Felonious Deaths**

Case 1:23-cv-01805-JRS-MG Document 26-4 Filed 12/01/23 Page 9 of 15 PageID #: 163
USDC IN/ND case 3:23-cv-00744-DRL-MGG document 25-6 filed 09/26/23 page 16 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **13** of **22**

Sixty officers were feloniously killed in 2022, a decrease of 17.8% when compared to the 73 officers who were killed as a result of criminal acts in 2021. The 60 felonious deaths occurred in 28 states and the District of Columbia.

The five- and 10-year comparisons show an increase of three felonious deaths when compared with the 2018 figure (57 officers) and an increase of 33 deaths when compared with 2013 data (27 officers).

**Circumstances Encountered by Victim Officer Upon Arrival at Scene of Incident.** Of the 60 officers feloniously killed:

- Six officers were killed in unprovoked attacks.
- 12 officers died as a result of investigative/enforcement activities.
- 12 officers were ambushed (entrapment/premeditation).
- Four officers encountered/assisted an emotionally disturbed person.
- Four officers were involved in pursuits.
- Six officers responded to disorders/disturbances.
- Six officers were involved in tactical situations.
- One officer was involved in arrest situation.
- Three officers responded to crimes in progress.
- Three officers were assisting other law enforcement officers.
- Two were serving/attempting to serve a court order (eviction notice, subpoena, etc.).
- One officer was providing/deploying equipment (flares, traffic cones, etc.).

Continuing with the concern for officer safety as a police issue, I offer the following scenario:

Police officers are engaged with a subject who is on the ground. It may be for the purpose of providing medical attention or it may be an arrest situation. A subject is 25 feet from the scene. The subject wants to harm either the officer or the subject on the ground.

Case 1:23-cv-01805-JRS-MG   Document 26-4   Filed 12/01/23   Page 10 of 15 PageID #: 164
USDC IN/ND case 3:23-cv-00744-DRL-MGG   document 25-6   filed 09/26/23   page 17 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **14** of **22**

The average walking speed of an individual is generally considered to be approximately 3 mph as indicated in the following resource:

- "Studies show that the average adult walking speed is a little over 3 miles an hour, and 3.13 mph is the standard which most crosswalks, cities, bridges, airports, and other pedestrian spaces are designed for. This is also the standard for entertainment purposes, like video games and virtual reality, because it influences how we process visual and spatial imagery." **[Average Walking Speed: How Fast Do You Walk? (endurancely.com)]**

An individual walking at 3 mph will cover 25 feet in 6 seconds. An individual walking briskly will generally travel at 3.5 mph will cover 25 feet in 5 seconds. These numbers are actually very conservative. The aforementioned article indicates that a male age 30-39 will actually travel at 5.49 mph as a maximum walking speed which equates to 8.052 feet per second which results in covering 25 feet in just over 3 seconds. **[Convert 5.49 Miles per Hour to Feet per Second (calculateme.com)]**

Naturally, running will further decrease the time needed to cover 25 feet. These times are important when considering that if an individual has bad intentions he/she will be able to make contact with an officer or the subject on the ground in a time between less than 3 seconds and 6 seconds.

These times are further compressed because of the concept of stimulus-response or action-reaction. If an officer is attending to a task, such as rendering medical attention or controlling an individual, the officer's focus will be on the person(s) involved in the event and it is reasonable to believe that the officer will not recognize an approaching subject immediately which further compresses the officer's response time and places the officer in danger because of the split-second scenario.

Another issue present in current day society are the amount of protests that have occurred. Additionally, based on my experience, there appears to be an anti-law enforcement animus that has exacerbated the officer safety issue.

Case 1:23-cv-01805-JRS-MG   Document 26-4   Filed 12/01/23   Page 11 of 15 PageID #: 165
USDC IN/ND case 3:23-cv-00744-DRL-MGG   document 25-6   filed 09/26/23   page 18 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **15** of **22**

The Stimulus-Response is one in which I have trained police officers for over 3 decades and is described as follows:

The concept of action/reaction, stimulus/response or the reactionary gap has been part and parcel of law enforcement training for many years. Over the past 30 years I personally have trained thousands of officers and addressed these concepts over and over again. 37 years ago the concept of a reactionary gap was discussed in the following cited text:

> "There will be times when you want to widen the gap, especially if you know your lag time tends to be slow. **Remember that the time you need to react will always be longer than the time he needs to act.** [emphasis added] If he's holding a knife or other weapon that extends his reach, like a club, expand your reactionary gap to 21 feet or more. Have your side arm pointed at him while you're dealing with him. Don't rely only on verbal persuasion against potentially deadly weapons. If he has a gun or has one or both of his hands in his pockets, get and stay behind cover; distance and dialogue then are strictly secondary. Don't move out until you can clearly see his palms, your primary areas of responsibility." **[The Tactical Edge/Surviving High Risk Patrol by Charles Remsberg, page 437, 1986]**

Retired FBI agent John Michael Callahan authored a book titled, **["Lethal Force and the Objectively Reasonable Officer."]** Agent Callahan devoted an entire chapter titled, "Action versus Reaction – The Deadly Reactionary Gap."

Former FBI agents Hall and Patrick authored the book titled, "In Defense of Self and Others **(2005, 2010)** in which they state on page 140:

> "The generally accepted rule of thumb is that it takes 0.72- 1.0 seconds for an individual to first recognize another's action, identify the nature of the action, then formulate an initiator response (the reaction). This is an immutable physiological reality. The response itself will then entail additional time, depending on its nature, before any effect can be expected. For example, to react by drawing a holstered weapon could

Case 1:23-cv-01805-JRS-MG   Document 26-4   Filed 12/01/23   Page 12 of 15 PageID #: 166
USDC IN/ND case 3:23-cv-00744-DRL-MGG   document 25-6   filed 09/26/23   page 19 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **16** of **22**

> then add 0.5- 1.25 seconds to the interval proceeding firing a shot in self-defense.
>
> Reaction times are increased by a substantial magnitude when the individual is under stress, emotional duress (such as fear), were operating in new and uncertain circumstances. The increase can amount to 50-100% more time than normal, i.e., calm and unstressed reaction times. Yet in the space of the first 0.7- 1.0 seconds of an event, an unseen weapon can be raised and fired several times. A well-trained police officer understands that he cannot wait to see what happens. Nor is the officer required to be certain that death or injury is imminent. The perception of its imminent likelihood must only be reasonable."

The following references a journal article titled "Reasonableness and Reaction Time." **[J. Pete Blair/Advanced Law Enforcement Rapid Response Training. Police Quarterly (December 2011).]**

> "The process of perceiving the suspect's movement, interpreting the action, deciding on a response, and executing the response for the officer generally took longer than it took the suspect to execute the action of shooting, even though the officer already had his gun aimed at the suspect. While our sample size is not large, our results are consistent with previous research and our general understanding of the reaction process (Brebner and Welford, 1980; Grossman and Christensen, 2004; Honig and Lewinski, 2008; Luce; 1986; Welchman et al., 2010). Completing all of the steps necessary to interpret a situation, select, and then execute a response simply tends to take longer than it takes to execute an already decided upon action.

I offer the above references to demonstrate that stimulus-response is a very real concept and not an unsupported conclusion on my part. Officers and subjects they may be interacting with can have great difficulty maintaining safety if another desires to harm them and those subjects are at a close distance.

Case 1:23-cv-01805-JRS-MG   Document 26-4   Filed 12/01/23   Page 13 of 15 PageID #: 167
USDC IN/ND case 3:23-cv-00744-DRL-MGG   document 25-6   filed 09/26/23   page 21 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **18** of **22**

annual appropriations. Grant funds may only be used for the purchase of body cameras and may not be used to purchase video storage equipment or services." **[Indiana Department of Homeland Security]**

Additionally, it should be noted that law enforcement has strict rules regarding who and what can be recorded. This is done for privacy purposes relating to victims of crimes, the young age of a person, or medical concerns relating to privacy. Citizens would not have these same requirements and citizen rights may be impacted without mandating a standard distance.

### 7. Elimination of Unclear Police Actions and Officer Subjectivity

Officers in New Jersey are taught that unless person(s) "interfere," with an officer, officers do not direct them away. There exists no guidance as to how interference is defined except with the application of common sense. This results in subjectivity being used to develop a calculus of reasonableness by each individual officer.

Officers are taught that they need to operate on the basis of objective facts yet, in States without an objective standard such as the 25 foot rule, a subjective standard is implemented.

Having a standard (25 feet) eliminates defining the term "interferes" with an officer as is the case in the State of New Jersey and prevents arbitrary enforcement of the law.

### 8. Contemporary Tactics

Based on my Law enforcement experience and training officers for over three decades, it is noteworthy that, depending on the event, police shut down entire roadways, blocks of streets and whole areas in an effort to protect the community (fires, armed subjects, barricaded subjects, shootings, toxic leaks etc.) There is no public outcry when law enforcement selects, to the best of their ability, what is a safe distance and this will continue to be a tactic or strategy for the benefit of

Case 1:23-cv-01805-JRS-MG   Document 26-4   Filed 12/01/23   Page 14 of 15 PageID #: 168
USDC IN/ND case 3:23-cv-00744-DRL-MGG   document 25-6   filed 09/26/23   page 22 of 70

Exhibit A to Declaration of Dr. Richard Celeste
Page **19** of **22**

citizens irrespective of the 25 foot rule. The police officer's job is to "protect" and serve.

## 9. Support for the current distance

I am uncertain as to how the 25 foot distance was determined because I do not have any documents which address the distance selected. To that end, based on the concern of how quickly a person can get upon a subject, to include a victim, police officer, suspect, arrestee, or one in need of medical attention, I believe the distance is actually very reasonable.

Based on my experience, I would push the distance out further when considering the concept of action-reaction previously discussed in this report. That being said, as an example of a known reference, the width of a lane of travel on a freeway is 12 feet. **[U.S, Department of Transportation/Federal Highway Administration]**

In my opinion, based on my experience, requiring a subject stand 2 lanes of travel away from a police event is not unreasonable when taking into consideration other material addressed in this report.

## 10. Harmed Parties

With consideration to parties that are harmed, my experience has been that weight is given to any person(s) who desires to challenge the law and any party that may be potentially harmed (to include a victim, police officer, suspect, arrestee or one in need of medical attention). I am of the opinion that the potential harm to the later outweighs any desire to be closer to a police event for the purpose of observing, video-taping, recording, or livestreaming the event.

If the argument is that a subject's livelihood is compromised because of the 25 foot rule, I believe they could obtain what they desire by other means, such as a legal remedy to obtain body-camera footage or using higher quality equipment which are both common sense solutions when weighing the rights of others that I have identified (victim, police officer, suspect, arrestee or one in need of medical attention).

Case 1:23-cv-01805-JRS-MG   Document 26-4   Filed 12/01/23   Page 15 of 15 PageID #: 169
USDC IN/ND case 3:23-cv-00744-DRL-MGG   document 25-6   filed 09/26/23   page 23 of 70
Exhibit A to Declaration of Dr. Richard Celeste
Page **20** of **22**

## VI.  Summary/Conclusion

Opinions contained in this report are based on my review of those listed items as well as my 45 years of education, knowledge, experience and training in the field of law enforcement and criminal justice and are rendered to a reasonable degree of professional certainty based on the practices and procedures utilized in the law enforcement community. It is noted that opinions expressed in this report regarding this matter are included throughout this report and are not confined to the conclusion section of this report.

I respond in the following manner regarding my experience in law enforcement which includes crime scene management and significant experience in managing motor vehicle accidents:

- The distance of 25 feet does not stop any person from "observing and recording" the police but rather mandates a distance from where that citizen can accomplish that desire.
- The standard does not set forth an absolute prohibition to remain at a distance of 25 feet but consists of 2 distinct elements to include that the law enforcement officer be **lawfully engaged in the execution of the law enforcement officer's duties** [emphasis added] and the officer **orders the person** [emphasis added] to remain at a distance of 25 feet.
- The 25 foot standard is not designed to target a specific individual or individuals but rather, all citizens. The scope of my analysis is to address the requirements based on my training, education, and experience.
- It is reasonable to believe that absent a standard (25 feet rule) that there would be a greater chance of officers using unbridled discretion. For example, a citizen may engage in **live streaming which further supports my concern for citizens** capturing video and audio of a victim of a crime or a medical event. This is actual unbridled discretion. The image of an injured child or person in the throes of a medical event is unconscionable.
- **Any inference** that police officer accountability cannot be accomplished at 25 feet of visual observation is a vacuous assertion.