UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, INDIANA BROADCASTERS ASSOCIATION, INDIANA PROFESSIONAL CHAPTER OF THE SOCIETY FOR PROFESSIONAL JOURNALISTS, INDIANAPOLIS STAR, NEXSTAR MEDIA INC., SCRIPPS MEDIA, INC., and TEGNA INC., | CASE NO. 1:23-cv-1805-JRS-MG **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| *Plaintiffs*, | |
| v. | |
| TODD ROKITA, *in his official capacity as Attorney General of Indiana, and* RYAN MEARS, *in his official capacity as Marion County Prosecutor*, and KERRY FORESTAL, *in his official capacity as Marion County Sheriff*, | |
| *Defendants*. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................ii

INTRODUCTION...............................................................................................1

BACKGROUND..................................................................................................2

I.    The Act..........................................................................................................2

II.   Plaintiffs' newsgathering regularly brings their journalists in close
      proximity to law enforcement officers performing official duties.................3

III.  The Act's impact on Plaintiffs. ...................................................................8

ARGUMENT ...................................................................................................12

I.    Plaintiffs are likely to succeed on the merits of their arguments that
      HB 1186 violates the First and Fourteenth Amendments. ..........................13

      A.    Plaintiffs have standing to challenge HB 1186.................................14

      B.    HB 1186 violates the First Amendment as applied to Plaintiffs'
            peaceful, nonobstructive newsgathering in public places.................19

      C.    HB 1186 is facially overbroad. .........................................................23

            a.    The Act prohibits a substantial amount of protected
                  speech and newsgathering and is not susceptible to a
                  narrowing construction..........................................................24

            b.    The Act is a content-based prohibition that fails strict
                  scrutiny. .................................................................................25

            c.    The Act would likewise fail intermediate scrutiny.................28

      D.    HB 1186 is void for vagueness under the Due Process Clause. .........30

II.   The remaining factors favor injunctive relief. ...........................................33

CONCLUSION .................................................................................................35

i

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*All-Options, Inc. v. Att'y Gen. of Ind.*,
546 F. Supp. 3d 754 (S.D. Ind. 2021) ........................................................34

*Am. C.L. Union v. Alvarez*,
679 F.3d 583 (7th Cir. 2012)...................................................................*passim*

*Arnold v. Sendak*,
416 F. Supp. 22 (S.D. Ind. 1976) ................................................................18

*Arnold v. Sendak*,
429 U.S. 968 (1976)...................................................................................18

*Bell v. Keating*,
697 F.2d 445 (7th Cir. 2012)...............................................................*passim*

*Bond v. Utreras*,
585 F.3d 1061 (7th Cir. 2009)....................................................................16

*Brown v. Kemp*,
No. 21-1042, 2023 WL 7489920 (7th Cir. Nov. 13, 2023) ................*passim*

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006)................................................................13, 34

*City of Chicago v. Morales*,
527 U.S. 41 (1999).................................................................................2, 30

*City of Houston v. Hill*,
482 U.S. 451 (1987)....................................................................................26

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988)...............................................................................*passim*

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015)....................................................................................26

*Common Cause Ind. v. Lawson*,
    937 F.3d 944 (7th Cir. 2019)..........................................................................17

*Eversole v. Steele*,
    59 F.3d 710 (7th Cir. 1995)............................................................................18

*Frisby v. Schultz*,
    486 U.S. 474 (1988)......................................................................................26

*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011)......................................................................21, 22

*Goldhamer v. Nagode*,
    611 F. Supp. 2d 784 (N.D. Ill. 2009) ............................................................28

*Goyette v. City of Minneapolis*,
    338 F.R.D. 109 (D. Minn. 2021)....................................................................20

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)......................................................................................32

*Higher Soc'y of Ind. v. Tippecanoe County*,
    858 F.3d 1113 (7th Cir. 2017)........................................................................13

*Hodgkins ex rel Hodgkins v. Peterson*,
    355 F.3d 1048 (7th Cir. 2004)........................................................................28

*Ind. C.L. Found., Inc. v. Ind. Sec'y of State*,
    229 F. Supp. 3d 817 (S.D. Ind. 2017) ...........................................................26

*Index Newspapers LLC v. U.S. Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020)..........................................................................20

*Joelner v. Vill. of Washington Park*,
    378 F.3d 613 (7th Cir. 2004)....................................................................12, 34

*Jordan v. Jenkins*,
    73 F.4th 1162 (10th Cir. 2023) ......................................................................19

*Kolender v. Lawson*,
    461 U.S. 352 (1983)........................................................................................1

*Majors v. Abell*,
    317 F.3d 719 (7th Cir. 2003).........................................................................15

*Marcavage v. City of Chicago*,
    659 F.3d 626 (7th Cir. 2011)........................................................................20

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ............................................................................21, 27

*Meyer v. Walthall*,
    528 F. Supp. 3d 928 (S.D. Ind. 2021) ..........................................................17

*Mi.D. v. Indiana*,
    57 N.E.3d 809 (Ind. 2016) ...........................................................................25

*Nava v. Dep't of Homeland Sec.*,
    435 F. Supp. 3d 880 (N.D. Ill. 2020) ...........................................................18

*OCA-Greater Hous. v. Texas*,
    867 F.3d 604 (5th Cir. 2017).........................................................................17

*Reed v. Lieurance*,
    863 F.3d 1196 (9th Cir. 2017)..................................................................20, 22

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .....................................................................................26

*Schenk v. Pro-Choice Network of Western N.Y.*,
    519 U.S. 357 (1997) .........................................................................22, 23, 31

*Schirmer v. Nagode*,
    621 F.3d 581 (7th Cir. 2010).........................................................................28

*Schirmer v. Nagode*,
    621 F.3d 581 (7th Cir. 2010).........................................................................15

*Shuttlesworth v. Birmingham*,
    382 U.S. 87 (1965) ..................................................................................32, 33

*Smith v. Bd. of Elec. Comm'rs*,
    591 F. Supp. 70 (N.D. Ill. 1984) ..................................................................34

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011) ..........................................................................20, 23, 25

*Speech First, Inc. v. Killeen*,
    968 F.3d 628 (7th Cir. 2020)..........................................................................16

*United States v. Williams*,
    553 U.S. 285 (2008) .........................................................13, 23, 24, 32

*Whole Woman's Health All. v. Hill*,
    377 F. Supp. 3d 924 (S.D. Ind. 2019) ..........................................................18

**Statutes:**

Chi. Municipal Code § 8–4–010(d)........................................................................29

Ind. Code § 35-44.1-3-1(a)..........................................................................26, 27

Ind. Code § 35-45-2-5(3)..................................................................................27

Ind. Code § 36-2-13-1 .....................................................................................18

Ind. Code. § 33-39-1-5(1)................................................................................18

Ind. Code § 35-44.1-2-14 ...............................................................................1, 2

Wis. Stats § 29.083(2)(a)(7) ............................................................................29

**Other Authorities:**

Andrew Smith, *Here's What Happened with Protests and Demonstrations
    this Weekend in Downtown Indianapolis*, WRTV (June 1, 2020) .................4

*Arrest Made in Officer-Involved Shooting on Indy's East Side*, WTHR (Oct.
    16, 2023) .......................................................................................33

Bob Blake, *Police, Protesters Have Moment of Unity During Protest Near
    Governor's Residence*, WRTV (June 2, 2020) ...........................................4, 5

Cierra Putman, *IMPD Chief Believes Crackdown on Violent Crime is
    Working*, WTHR (Dec. 15, 2022) ....................................................................5

Clayton McMahan, *Fort Wayne Police Department Releases Bodycam Footage From Viral 'Hip Toss' Arrest in Late January*, WANE 15 (May 23, 2023) ................................................................................8

Dirk Rowley, *Peaceful Protests Turn Violent, Police Arrest 29*, WANE 15 (May 29, 2020) ............................................................................4, 5

Elizabeth DePompei, *'Highly Upsetting': Report Says IMPD Was Unprepared in George Floyd, Dreasjon Reed Protests*, IndyStar (Feb. 26, 2021) ................................................................................5

Joe Mustascio, *This Weekend Marks 1 Year Since Protests, Riots Rocked Indianapolis.  Here's a Look Back*, IndyStar (May 28, 2021) ........................4

John Doran, *City Leaders, Police Call on Public's Help to Reduce Violent Crime*, WTHR (Apr. 27, 2023) ...............................................................5, 17

John Doran, *Woman Arrested Under New Indiana Law for Filming Police Within 25 Feet*, WTHR (Oct. 4, 2023) ...........................................................15

Kayla Molander, *Thousands Rally in Indianapolis Following Roe v Wade Decision*, WRTV (June 26, 2022) .........................................................5

Kelly Wilkinson, *K-9 Parade for Immunocompromised Child Is Like Being with Family*, IndyStar (Apr. 14, 2020) ...............................................5

Lydia Reuille and Clayton McMahan, *Court Docs: Officer Performed 'Hip Toss,' Man 'Fell to the Ground' in Viral Video*, WANE 15 (Jan. 24, 2023) ................................................................................8

Martin Vassolo & David Ovalle, *Miami Beach Suspends Law Used by Cops to Arrest People Who Film Them. Training Ordered*, Miami Herald (Aug. 20, 2021) ................................................................................12

Matt McKinney, *WATCH: IMPD Officer Gets Emotional After 1-Year-Old Shot and Killed*, WRTV (Mar. 29, 2018) ................................................5

*Police Use Tear Gas Again to Disperse Crowd During Second Day of Protests*, WANE 15 (May 30, 2020) ...........................................................4

Reporters Comm. for Freedom of the Press, *Legal Hotline* (last visited Sept. 5, 2023) .................................................................................................12

Reporters Comm. for Freedom of the Press, *Police, Protestors and the Press* (2022) ..........................................................................................................11

Reporters Comm. for Freedom of the Press, *Trainings* (last visited Sept. 5, 2023) .................................................................................................11

S. Mot. MO118606, Ind. Gen. Assemb., 2023 Sess..................................................3

S. Mot. MO118604, Ind. Gen. Assemb., 2023 Sess..................................................3

WTHR, *2nd Night of Protests in Indianapolis*, YouTube (May 30, 2020)...............4

WXIN, *Live Interview: Update on Two Officers Shot in Mitchell, Indiana*, YouTube (Feb. 5, 2023) ...................................................................................5

WXIN, *MCSO Press Conference into Deputy Durm's Death Investigation*, YouTube (Aug. 30, 2023) ...............................................................................5

**Rules:**

Fed. R. Civ. P. 65(c)...............................................................................................34

# INTRODUCTION

The Constitution makes clear that the First Amendment right to gather and report the news cannot be restricted on the basis of the arbitrary "moment-to-moment judgment of the policeman on his beat." *Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (citation omitted). Because Indiana Code § 35-44.1-2-14 ("HB 1186" or the "Act") authorizes just that—vesting law enforcement officers with limitless, standardless discretion to prevent newsgathering and reporting about their official responsibilities—this Court should enjoin the statute's enforcement.

HB 1186 criminalizes "knowingly or intentionally approach[ing] within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching." Ind. Code § 35-44.1-2-14. Transparently aimed at curtailing the constitutional right of members of the public to record law enforcement carrying out their official duties, *see Am. C.L. Union v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012)—official duties that are, in the words of the Act's sponsor, "none of their business," Corrections and Criminal Law Hearing on HB 1186 (Mar. 7, 2023)—the Act gives officers boundless discretion to prevent Plaintiffs and other members of the press from approaching near enough to observe and document newsworthy activity. And because Indiana law already prohibits conduct that in fact obstructs law enforcement officers' duties, *see* Ind. Code § 35-

44.1-3-1(a)(1), the statute's "only evident purpose" is "to reach expressive activity that does *not* involve physical interference," *Brown v. Kemp*, No. 21-1042, 2023 WL 7489920, at *10 (7th Cir. Nov. 13, 2023) (emphasis added)

The Act violates the Constitution in multiple respects. For one, it violates the First Amendment as applied to newsgathering that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them." *Alvarez*, 679 F.3d at 607. And the Act is likewise overbroad on its face. Not only does the law—in both its "inevitable effect" and "stated purpose[]," *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011) (citation omitted)—impose content-based burdens designed to chill newsgathering and speech about policing, it also "vests unbridled discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988). For much the same reason, the Act is void for vagueness twice over: It "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

Because the Act cannot be reconciled with the Constitution, Plaintiffs— organizations that gather and report news in this District and throughout the state

on a regular basis, and those that work to protect the rights of journalists and news organizations in Indiana—respectfully move this Court to enjoin its enforcement.

## BACKGROUND

### I.    The Act.

On April 20, 2023, Indiana Governor Eric Holcomb signed into law HB 1186, which, in relevant part, makes it a criminal offense to "knowingly or intentionally approach[] within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching."  Ind. Code § 35-44.1-2-14.  The Act's author, Rep. Wendy McNamara, explained that the Act was intended as a response to "the public . . . increasingly getting more and more involved in a situation"—how law enforcement officers perform their official duties—"that's really none of their business."  Corrections and Criminal Law Hearing on HB 1186 (Mar. 7, 2023).  In enacting HB 1186, Indiana lawmakers considered and rejected an amendment that would have made it a defense "that the person would be unable to observe the law enforcement officer executing the officer's duties from a distance greater than twenty-five (25) feet," S. Mot. MO118604, Ind. Gen. Assemb., 2023 Sess., https://perma.cc/2SPE-8FRA, and likewise considered and rejected an amendment that would have limited the Act's scope to "conduct that would cause a reasonable person to believe that the person

3

intends to interfere with the execution of the officer's duties."  S. Mot.

MO118606, Ind. Gen. Assemb., 2023 Sess., https://perma.cc/P35T-AUYS.

The Act went into effect on July 1, 2023.  *See* Ind. Code § 35-44.1-2-14.

The Act has since repeatedly been enforced against members of the public for

attempting to film the police.  *See* Complaint, *Nicodemus v. City of South Bend*,

No. 3:23-cv-00744 (N.D. Ind. Aug. 8, 2023) (alleging that "citizen-journalist"

plaintiff was threatened with arrest under the Act while recording police officers in

South Bend); John Doran, *Woman Arrested Under New Indiana Law for Filming

Police Within 25 Feet*, WTHR (Oct. 4, 2023), https://perma.cc/P3SF-VQR2

## II.    Plaintiffs' newsgathering regularly brings their journalists in close proximity to law enforcement officers performing official duties.

Plaintiffs are organizations that gather and report news in Indiana on a

regular basis and otherwise represent the interests of journalists and news

organizations working in the state.  The Indianapolis Star ("IndyStar") and the

Indiana-based stations of Nexstar Media Inc. ("Nexstar"), Scripps Media Inc.

("Scripps"), and TEGNA Inc. ("Tegna)—all of which are in the business of

regularly gathering and publishing newsworthy information, and all of which

employ professional journalists assigned to cover the activities of Indiana law

enforcement on an ongoing basis—routinely document and report on the manner in

which law enforcement officers perform their official duties in public places.  The

same is true of the individual journalist members of the Indiana Professional

Chapter of the Society for Professional Journalists ("IndyProSPJ") and the individual station members of the Indiana Broadcasters Association ("IBA").

For instance, IndyStar reported extensively on the 2020 protests that followed the murder of George Floyd.  *See* Joe Mustascio, *This Weekend Marks 1 Year Since Protests, Riots Rocked Indianapolis.  Here's a Look Back*, IndyStar (May 28, 2021), https://perma.cc/7QDF-MKBT (collecting stories).  The same is true of Nexstar station WANE 15, *see* Dirk Rowley, *Peaceful Protests Turn Violent, Police Arrest 29*, WANE 15 (May 29, 2020), https://perma.cc/GMU9-AV4B; *Police Use Tear Gas Again to Disperse Crowd During Second Day of Protests*, WANE 15 (May 30, 2020), https://perma.cc/3H2G-98UQ; Scripps station WRTV, *see* Andrew Smith, *Here's What Happened with Protests and Demonstrations this Weekend in Downtown Indianapolis*, WRTV (June 1, 2020), https://perma.cc/5B8L-AG2M; Bob Blake, *Police, Protesters Have Moment of Unity During Protest Near Governor's Residence*, WRTV (June 2, 2020), https://perma.cc/3AAJ-7E4W; and TEGNA's WTHR, *see* WTHR, *2nd Night of Protests in Indianapolis*, YouTube (May 30, 2020), https://perma.cc/VW42-26K8. That reporting required Plaintiffs' journalists to be within close proximity to members of law enforcement officers in Indianapolis and it often relied on videos or photographs that were captured within twenty-five feet of officers performing their official duties.  *See, e.g.*, Elizabeth DePompei, *'Highly Upsetting': Report*

*Says IMPD Was Unprepared in George Floyd, Dreasjon Reed Protests*, IndyStar (Feb. 26, 2021), https://perma.cc/6NMJ-TYEQ.  Blake, *Police, Protesters Have Moment of Unity*, *supra*; Rowley, *Protests Turn Violent*, *supra*.

A broad range of assemblies, rallies, and public events bring Plaintiffs' journalists into close contact with law enforcement on a regular basis.  *See, e.g.*, John Doran, *City Leaders, Police Call on Public's Help to Reduce Violent Crime*, WTHR (Apr. 27, 2023), https://perma.cc/CYN7-JL3X; Kayla Molander, *Thousands Rally in Indianapolis Following Roe v Wade Decision*, WRTV (June 26, 2022), https://perma.cc/C543-6MJ6; Kelly Wilkinson, *K-9 Parade for Immunocompromised Child Is Like Being with Family*, IndyStar (Apr. 14, 2020), https://perma.cc/P22W-B692.  Plaintiffs' journalists also gather the news and report from a close distance from law enforcement officers performing official responsibilities in other journalistic contexts, including when covering fires and crime scenes,[1] and in interviews and press conferences held by public officials.[2]

---

[1]    *See, e.g.*, WXIN, *Live Interview: Update on Two Officers Shot in Mitchell, Indiana*, YouTube (Feb. 5, 2023), https://perma.cc/8ZCH-F727; Matt McKinney, *WATCH: IMPD Officer Gets Emotional After 1-Year-Old Shot and Killed*, WRTV (Mar. 29, 2018), https://perma.cc/8Q4P-6HFQ.

[2]    *See, e.g.*, WXIN, *MCSO Press Conference into Deputy Durm's Death Investigation*, YouTube (Aug. 30, 2023), https://perma.cc/UNW7-F5T7; Cierra Putman, *IMPD Chief Believes Crackdown on Violent Crime is Working*, WTHR (Dec. 15, 2022), https://perma.cc/P444-299B.

In the course of their work, journalists employed by Plaintiffs come into close contact with law enforcement officers "three or four times" a week, Decl. of Ryan Thedwall ("Thedwall Decl.") ¶ 4, sometimes as often as "multiple times a day" depending on the news cycle, Decl. of Robert Scheer ("Scheer Decl.") ¶ 2. Scott Hums, Content Director for WTHR, estimates that journalists across his newsroom "come into close contact with law enforcement officers multiple times every day."  Decl. of Scott Hums ("Hums Decl.") ¶ 4.  And while Plaintiffs' journalists "make a point of avoiding interfering" with officers, Scheer Decl. ¶ 7; *see also* Hums Decl. ¶ 5, doing their jobs as reporters frequently requires them to "get as close as [they] can—well within twenty-five feet—to capture high-quality sound and video, speak to law enforcement officers about what's going on, and hear what people on the scene are saying to each other."  Thedwall Decl. ¶ 5.

Based on their professional experience, Plaintiffs' journalists—whether they are taking photographs, recording video, or visually observing newsworthy events so that they can report on them accurately—"often need to be within 15–20 feet, if not closer, to get a clear picture" or "to avoid an obstructed view[.]"  *Id.* ¶ 6; *see also* Scheer Decl. ¶ 8.  Obtaining audio "that is consistently acceptable for broadcast" typically requires being "within 5-10 feet away," and "even closer" where background noise is present.  Hums Decl. ¶ 6; *see also* Thedwall Decl. ¶ 7; Scheer Decl. ¶ 9. In the experience of Hums, Director of Content at WTHR, high-

quality audio and visual recordings and photographs are "uniquely valuable" to journalistic work because they "help transport viewers to what is happening on the scene," especially in the context of "breaking news." Hums Decl. ¶ 7.

Even when Plaintiffs' journalists are not taking photographs or recording video or audio, proximity is frequently necessary for them to do their jobs effectively. Plaintiffs' journalists need to be within twenty-five feet to conduct on-the-scene interviews; they are "able to gather more information at a scene when [they] ask questions of law enforcement or witnesses from a close distance because it feels more conversational." Thedwall Decl. ¶ 8. And as Hums, Director of Content at WTHR, notes, "if our reporters are too far away to get a clear view of the scene, they have no way of knowing what questions to ask." Hums Decl. ¶ 8.

In addition to publishing images and videos taken by their own journalists, Plaintiffs also receive videos of newsworthy events taken by bystanders. Plaintiffs frequently report on and air bystander-contributed video taken within twenty-five feet of law enforcement. *See* Decl. of Rex Smith (hereinafter "Smith Decl.") ¶ 7. For example, in January, WANE 15 received a video from a bystander showing a police officer body slamming a man at a traffic stop. Smith Decl. ¶ 8. WANE 15 not only aired the video but also continued to investigate and report on the story further. *See, e.g.*, Lydia Reuille and Clayton McMahan, *Court Docs: Officer Performed 'Hip Toss,' Man 'Fell to the Ground' in Viral Video*, WANE 15 (Jan.

24, 2023), https://perma.cc/2VZC-RQSU; Clayton McMahan, *Fort Wayne Police Department Releases Bodycam Footage From Viral 'Hip Toss' Arrest in Late January*, WANE 15 (May 23, 2023), https://perma.cc/VY49-BATX.  As one of Plaintiffs' journalists explained, without "bystander-contributed videos, our team would often have no way of covering the key, early moments of a newsworthy event before our reporters are able to reach the scene."  Smith Decl. ¶ 7.

### III.    The Act's impact on Plaintiffs.

In mid-October 2023, after the Act's effective date, Ryan Thedwall—a photojournalist at WTHR—was called "in the middle of the night to report from the scene of a shooting at a bar involving an off-duty law enforcement officer." Thedwall Decl. ¶ 11.  Once Thedwall arrived, an officer told him "to move back to where other journalists had been crowded into an area roughly the size of a parking space" that, he estimates, was at least twenty-five feet away from where he had positioned himself.  *Id.*  From that vantage point, his view was obscured; Thedwall recalled "a police car blocked me from having a clear view of what was going on outside the bar."  *Id.* ¶ 12.  Although Thedwall wanted "to get a better view of the scene" to better inform the public, he "also didn't want to spend the night in jail" for violating HB 1186.  *Id.*  Accordingly, even though he was "not in law enforcement's way or obstructing their investigation," he moved.  *Id.*

Because Plaintiffs' journalists routinely gather and report the news from within twenty-five feet of law enforcement, Hums, Director of Content at WTHR, estimates "that a member of the WTHR newsroom is asked to step back or move away from a law enforcement officer as often as once a day." Hums Decl. ¶ 11. Journalists employed by Plaintiffs who regularly cover police also are often told to move to a "media staging area," which is often far from the scene. Thedwall Decl. ¶ 13; Scheer Decl. ¶ 13. Plaintiffs' reporters find that being confined to these areas "deprives [them] of the ability to document the scene effectively." Scheer Decl. ¶ 13; *see also* Thedwall Decl. ¶ 14. And, in their experience, members of the press are told to work from those distant staging areas "even when members of the public who are not there as journalists are allowed to get closer," because "law enforcement will single out people . . . that they can see have television cameras and require them to stand further away." Thedwall Decl. ¶ 13. When Plaintiffs' journalists are not interfering with law enforcement but are nonetheless asked to move—now under the threat of criminal liability posed by HB 1186—they do so at the cost of their "access to newsworthy information," Thedwall Decl. ¶ 15, and "any images I wouldn't be able to capture from that distance," Scheer Decl. ¶ 14.

Plaintiffs' journalists have expressed concerns that they will be unable to comply with HB 1186. When the Act first passed, for instance, IndyStar's Robert Scheer and his colleagues "attempted to guess how far 25 feet was without

measuring"—but, as he recalls, "[n]o one was able to estimate that distance correctly," and "25 feet was farther away than any of us had estimated."  Scheer Decl. ¶ 11; *see also* Smith Decl. ¶ 11.  WTHR's Hums repeatedly has been "asked for guidance" from reporters he supervises about complying with the law, and has found it "challenging to give journalists workable guidance on how to estimate twenty-five feet when out in the field, what to do if an officer walks towards you after asking you to step back, what to do if you don't have enough space to back up, and what to do when officers give conflicting orders."  Hums Decl. ¶ 10.  Plaintiffs' journalists must now necessarily go about their work "conscious of the risk" of not only uncertain but also in some cases unavoidable criminal liability under HB 1186, Scheer Decl. ¶ 15, because they often report from situations "where it would be virtually impossible to comply" with an order to move at least twenty-five feet away from an officer, including in confined spaces and at scenes with agitated crowds, *id.*, "when law enforcement officers are stationed throughout a large crowd" such that reporters cannot "move at least 25 feet away from one officer without ending up within 25 feet of another officer," Thedwall Decl. ¶ 18, or when different officers on the scene "give contradictory guidance," *id.* ¶ 19.

Because of the obstacles the Act poses to working journalists in Indiana, those Plaintiffs whose mission it is to defend the newsgathering and publication rights of the press have been forced to redirect resources to address its effects.  For

instance, the Reporters Committee for Freedom of the Press ("Reporters Committee") regularly conducts trainings and publishes legal resources to inform journalists of their rights and aid them in complying with relevant laws. *See, e.g.*, Reporters Comm. for Freedom of the Press, *Police, Protestors and the Press* (2022), https://perma.cc/4FWX-Q9NJ; Reporters Comm. for Freedom of the Press, *Trainings* (last visited Sept. 5, 2023), https://perma.cc/DND2-3RXT. The Reporters Committee already has published new material to educate journalists about the Act,[3] *see* Decl. of Lisa Zycherman ("Zycherman Decl.") ¶ 7; intends to update its existing resources to address the Act's impact on newsgathering in Indiana, *see id.*; and also intends to conduct trainings for journalists and newsrooms operating in Indiana to address the effects of the Act, *see id.*

In addition, as a result of the Act, Reporters Committee attorneys anticipate an increased need for legal advice and representation for journalists working in Indiana. In jurisdictions with similar laws, the Reporters Committee has observed an increase in arrests of individuals documenting law enforcement. In Miami Beach, for instance, enforcement of a comparable—but narrower—ordinance was suspended less than three months after its enactment because arrest data showed that the majority of arrests that were made under the ordinance "were of people

---

[3]     *See, e.g.*, Emily Hockett, *Efforts to Criminalize 'Encroachment' on Police Encroach on First Amendment Rights*, Reporters Comm. for Freedom of the Press (June 26, 2023), https://perma.cc/8S68-9L22.

who'd been using their phones to record officers."  Martin Vassolo & David Ovalle, *Miami Beach Suspends Law Used by Cops to Arrest People Who Film Them. Training Ordered*, Miami Herald (Aug. 20, 2021), https://bit.ly/3sGpzgF.

In the past, the Reporters Committee has seen an increase in calls to its legal hotline, *see* Reporters Comm. for Freedom of the Press, *Legal Hotline* (last visited Sept. 5, 2023), https://perma.cc/HH7J-DY22, whenever newsworthy events bring journalists into close contact with law enforcement.  *See* Zycherman Decl. ¶ 8. The Reporters Committee anticipates increased use of its hotline by Indiana journalists as a result of the risks and burdens created by the Act.  *See id.*  For much the same reason, the Reporters Committee has assigned staff attorneys to address legal needs created by the Act—including through this suit.  *See id.* ¶ 6.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction prohibiting enforcement of the Act.  "[I]n First Amendment cases, 'the likelihood of success on the merits will often be the determinative factor,'" *Alvarez*, 679 F.3d at 589 (quoting *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)), because "even short deprivations of First Amendment rights constitute irreparable harm," *Higher Soc'y of Indiana v. Tippecanoe County,* 858 F.3d 1113, 1116 (7th Cir. 2017), and "injunctions protecting First Amendment freedoms are always in the public interest," *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

Here, Plaintiffs are likely to succeed in demonstrating the Act violates their rights under the First and Fourteenth Amendment, and a preliminary injunction would serve the public interest by safeguarding the function of a free press in Indiana.

**I.    Plaintiffs are likely to succeed on the merits of their arguments that HB 1186 violates the First and Fourteenth Amendments.**

The Act violates the First Amendment, both as applied to the Plaintiffs who regularly gather and report the news—because the Act's scope is untethered from any judgment whether their newsgathering "risk[s] substantial harm or if dispersal is otherwise *necessary*," *Bell v. Keating*, 697 F.2d 445, 459 (7th Cir. 2012)—and on its face, because the Act "vests unbridled discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood*, 486 U.S. at 755.  The Act also is unconstitutionally vague:  Not only does it provide no "warning about the behavior that [can] prompt[] a lawful dispersal order," *Bell*, 697 F.3d at 462, but also it "is so standardless that it authorizes or encourages seriously discriminatory enforcement," *United States v. Williams*, 553 U.S. 285, 304 (2008).  On each basis, Plaintiffs' claims are likely to succeed on the merits.

A.    Plaintiffs have standing to challenge HB 1186.

As a threshold matter, Plaintiffs have standing to challenge the constitutionality of the Act.  Those Plaintiffs who regularly gather and report the news in Indiana face "an immediate risk of injury" because they "wish[] to engage in conduct arguably protected by the Constitution, but proscribed by a statute."

14

*Bell*, 697 F.3d at 451. The Seventh Circuit has made clear that a statute that "interferes with the gathering and dissemination of information about government officials performing their duties in public" unquestionably "burdens speech and press rights." *Alvarez*, 679 F.3d at 600; *see also Brown*, 2023 WL 7489920, at *10 (finding standing to challenge restriction on knowingly approaching hunters because maintaining physical and visual proximity is "so closely tied to expression"). And, here, just as in *Alvarez*, the Act "flatly prohibits" newsgathering from within twenty-five feet of law enforcement officers "absent officer consent," thereby "exposing [Plaintiffs] and [their] employees to arrest." *Alvarez*, 679 F.3d at 594. The threat of receiving an order under HB 1186 is a classic Article III injury, and Plaintiffs' journalists already have been "told to move back to a distance that got in the way of or prevented [them] from doing their job effectively" since HB 1186 went into effect. Thedwall Decl. ¶ 10; Hums Decl. ¶ 11 (estimating "that a member of the WTHR newsroom is asked to step back or move away from a law enforcement officer as often as once a day").

The Seventh Circuit has made clear, too, that Plaintiffs "need not risk arrest before bringing a pre-enforcement challenge under the First Amendment," *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010), or "show that the authorities have threatened to prosecute [them]" in particular because "the threat is latent in the existence of the statute," *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir.

15

2003); *see also City of Lakewood*, 468 U.S. at 755–56 (pre-enforcement facial challenge appropriate where a law "allegedly vests unbridled discretion . . . over whether to permit or deny expressive activity" regardless whether officials have yet denied permission). Nor do Plaintiffs "need to show or confess that [their] intended conduct will actually violate the statute in question if enforcement is likely against [them]." *Brown*, 2023 WL 7489920, at *8 (citation omitted). But the fact that the Act has *already* led to the arrest of *other* individuals gathering information about law enforcement officers performing their official duties makes the threat the Act poses to Plaintiffs all the more clear. *See Alvarez*, 679 F.3d at 591 ("information about recent prosecutions . . . on like facts" relevant to standing); Complaint, *Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Aug. 8, 2023) (alleging that "citizen-journalist" plaintiff was threatened with arrest under the Act while recording South Bend police); Doran, *supra*.

This showing would suffice for standing on its own terms, but Plaintiffs and journalists employed by Plaintiffs also have "adjusted behavior" because of the Act's chilling effect on their constitutionally protected newsgathering activities. *Brown*, No. 21-1042, 2023 WL 7489920, at *13 (standing based on reluctance "to send his reporters" into situations where they would risk liability for approaching hunters); *see also Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (noting that a credible threat of enforcement and a chilling effect are independently

adequate theories of injury).  Plaintiffs' journalists now err on the side of caution, for fear of arrest, when gathering and reporting newsworthy information about law enforcement officers performing official duties.  Thedwall Decl. ¶ 16; Scheer Decl. ¶ 14.  In other words, "they have resorted to self-censorship out of an actual and well-founded fear that the law will be enforced against them."  *Brown*, No. 21-1042, 2023 WL 7489920, at *8 (internal citations and quotation marks omitted).

Plaintiffs also are injured by HB 1186 because it infringes their "right to receive information," *Bond v. Utreras*, 585 F.3d 1061, 1077 (7th Cir. 2009), from bystanders who record law enforcement officers and provide those recordings to Plaintiffs to broadcast.  Those bystander-sources are willing speakers who regularly contribute to Plaintiffs' journalism.  *See* Smith Decl. ¶ 7.  But as discussed above, HB 1186 already has been enforced against bystanders for recording law enforcement officers, chilling the flow of information from such sources to Plaintiffs—and thus to the public.  *See, e.g.*, Doran, *supra*.

Finally, the statute has "compel[ed]" Plaintiffs "to devote resources to combatting the effects of that law that are harmful to [their] missions."  *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (internal citations and quotation marks omitted); *see* Hums Decl. ¶¶ 9–10; Zycherman Decl. ¶ 5–9.  Even burdens that are "not large," *id.* at 953 (quoting *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017)), amount to injury so long as the challenged law

costs an organization "time and money they would have spent differently or not spent at all," *id.* at 954. TEGNA's station WTHR, for example, has devoted time and resources to educating the newsroom about HB 1186 and responding to journalists' concerns about the law's impact on their ability to do their jobs. Hums Decl. ¶ 10. The Act's drain on Plaintiffs' resources is especially salient for Plaintiff the Reporters Committee, whose mission is to defend the newsgathering rights of journalists, including in Indiana. The Reporters Committee has already, among other things, dedicated scarce "staff time and legal fees" to challenging the Act, *Meyer v. Walthall*, 528 F. Supp. 3d 928, 953 (S.D. Ind. 2021); created new educational resources to inform journalists about the Act, *see Lawson*, 937 F.3d at 950; and anticipates increased demand for its attorneys' services from journalists in Indiana as a result of the Act, *see id.* at 952; *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 887 (N.D. Ill. 2020). Those injuries, too, easily satisfy Article III.

All of these injuries are fairly traceable to Defendants, who are charged by state law with enforcing the Act, and a preliminary injunction would redress Plaintiffs' injuries for much the same reason. As Attorney General of Indiana, Defendant Todd Rokita has "broad powers in the enforcement of the criminal laws of the state," *Arnold v. Sendak*, 416 F. Supp. 22, 23 (S.D. Ind. 1976), *aff'd*, 429 U.S. 968 (1976), including HB 1186, and is "bound up with criminal enforcement at every stage after the initial charges are laid—at his option at trial, and by

statutory command on appeal," *Whole Woman's Health All. v. Hill*, 377 F. Supp.

3d 924, 936 (S.D. Ind. 2019) (Indiana Attorney General a proper defendant in suit

"challeng[ing] the constitutionality of criminally enforceable statutes," *id.* at 935).

Defendant Ryan Mears has principal authority to "conduct all prosecutions for

felonies, misdemeanors, or infractions" in Marion County. Ind. Code. § 33-39-1-

5(1). And Defendant Kerry Forestal, as Marion County Sheriff, is the "final

policymaker for law enforcement" in his jurisdiction, charged with enforcing the

Act. *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995) (citing Ind. Code §§ 36-

2-13-1–14). Prospective equitable relief against each Defendant in his official

capacity would therefore redress the Act's infringement on Plaintiffs' rights.

> B.    HB 1186 violates the First Amendment as applied to Plaintiffs'
>       <u>peaceful, nonobstructive newsgathering in public places.</u>

As detailed above, those Plaintiffs who regularly gather and report the news

routinely and necessarily observe and document how officers perform their official

duties from within a distance of twenty-five feet. The Act violates the First

Amendment as applied to their peaceful, nonobstructive newsgathering.

The First Amendment protects "the gathering and dissemination of

information about government officials performing their duties in public," *Alvarez*,

670 F.3d at 600, including the making of photos and audio or visual recordings that

document the performance of those duties, *see id*. And because "the First

Amendment protects conduct and activities necessary for expression," it also

protects "approaching" newsworthy events in order to observe and document them. *Brown*, 2023 WL 7489920, at *23; *see also Jordan v. Jenkins*, 73 F.4th 1162, 1169–70 (10th Cir. 2023) (same).  Accordingly, as the Seventh Circuit has explained, "when individuals ordered to disperse or move along manifest a bona fide intention to exercise a constitutional right"—including the right to gather and report the news—the government "may criminalize their refusal only when its interest so clearly outweighs the individuals' interest sought to be asserted that the latter must be deemed insubstantial." *Bell*, 697 F.3d at 459 (internal citation, quotation marks, and alterations omitted).  Indiana cannot make that showing here.

For one, as detailed below, the Act on its face is a content-based restriction subject to strict scrutiny:  Its "only evident purpose" is "to reach expressive activity that does not involve physical interference" with law enforcement, *Brown*, 2023 WL 7489920, at *26 (emphasis added), and its "inevitable effect" will be to deter newsgathering and reporting about police in particular.  *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011).  But this Court need not reach that issue in order to enjoin HB 1186 because even if application of the law to Plaintiffs could be characterized as content neutral, the Act still does not pass constitutional muster.

Even content-neutral orders restricting newsgathering must, at minimum, be "narrowly tailored to serve a significant government interest," *Reed v. Lieurance*, 863 F.3d 1196, 1211 (9th Cir. 2017), and must leave open "alternative observation

opportunities" to document the event at issue, *id.* at 1212; *see also Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011) (applying intermediate scrutiny to "officers' directives to keep moving").  What's more, whether content-based or content-neutral, HB 1186—as applied to Plaintiffs—independently implicates the rights of members of the press to access public places in which law enforcement officers perform their duties for the purpose of gathering and reporting the news. *See Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 830 (9th Cir. 2020); *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 116–17 (D. Minn. 2021). For "dispersal orders limiting the press's access" under those circumstances "to be constitutional," it must be shown that excluding the press *in particular* from those public spaces is "essential to preserve higher values and [are] narrowly tailored to serve that interest."  *Goyette*, 338 F.R.D. at 116–17 (internal citation omitted) (emphasis added); *see also Index Newspapers LLC*, 817 F.3d at 834 (same).

The Act fails either analysis as applied to the Plaintiffs who—as a necessary part of their journalistic work—regularly document public officials performing their official responsibilities in public places.  For one, application of the Act to such newsgathering advances no legitimate government interest whatsoever.  The state has no power to restrict newsgathering that is "not disruptive of public order or safety, and carried out by people who have a legal right to be a particular public location and to watch and listen to what is going on around them."  *Alvarez*, 679

F.3d at 606; *accord Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) ("[P]eaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation.").

Nor is the Act narrowly tailored. The First Amendment prohibits the government from "regulat[ing] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals," *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (internal citation and quotation marks omitted), but the Act's scope does not consider whether a journalist's reporting "risk[s] substantial harm or if dispersal is otherwise *necessary*," *Bell*, 697 F.3d at 459; *see also Brown*, No. 21-1042, 2023 WL 7489920, at *22 (restriction on approaching hunters that did not require physical interference unconstitutionally overbroad). On the contrary, the Act empowers officers to order Plaintiffs' journalists to move for any reason or no reason at all—including simply because those officers want to control or curtail the content of plaintiffs' reporting. And the statute is doubly overinclusive because twenty-five feet is far further away than necessary to protect any legitimate interest. As other courts have explained, even an individual recording from "roughly ten feet away," *Glik*, 655 F.3d at 80, is operating at "a comfortable remove," *id.* at 84 (internal citation omitted). Indiana lawmakers made no findings to explain their choice of a much more sizeable, sweeping prohibition—a problem compounded by the fact that multiple officers on the same

scene may issue conflicting orders.  *See Schenk v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 378 (1997) (overlapping 15-foot bubbles around visitors to clinics created "a substantial risk that much more speech will be burdened").

Finally, as the legislative history confirms, and the practical experience of Plaintiffs' journalists underline, the Act's 25-foot perimeter does not leave open "alternative observation opportunities."  *Reed*, 863 F.3d at 1212.  Legislators intended for the statute to impose liability even where an order leaves an individual with no other means of observing law enforcement officers performing their official duties in public.  *See* Proposed Amendment #4 to HB 1186, S. Mot. MO118604, Ind. Gen. Assemb., 2023 Sess., https://perma.cc/R5VB-RGZH (rejecting an amendment that would have created a defense when complying with an order would leave an individual "unable to observe the law enforcement officer executing the officer's duties").  And that will often—or even typically—be the case.  Twenty-five feet is frequently too far for journalists to obtain a clear line of sight to observe and record newsworthy events, especially in crowded, tumultuous situations like protests, parades, or major sporting events.  *See* Thedwall Decl. ¶ 6; *see also* Scheer Decl. ¶ 8.  That distance is likewise far too great to reliably capture audio or interview officials.  *See* Hums Decl. ¶ 6; Thedwall Decl. ¶ 7; Scheer Decl. ¶ 9; *Schenk*, 519 U.S. at 377–78 (15-foot buffer is beyond "normal conversational

distance"). The effect will be to foreclose newsgathering and reporting about newsworthy matters in a broad range of situations involving law enforcement.

For each of these reasons, Plaintiffs are likely to succeed on the merits of their claim that the Act violates the First Amendment as applied to their peaceful, nonobstructive efforts to observe and document officers performing their duties.

C.    HB 1186 is facially overbroad.

The Act also violates the First Amendment because the statute on its face is patently overbroad. "[A] statute is facially invalid if it prohibits a substantial amount of protected speech" relative to its "legitimate sweep." *Williams*, 553 U.S. at 292. Here, in both its "inevitable effect" and "stated purposes," the Act is a content-based restriction on newsgathering that prevents members of the press and public from exercising the right to document policing, and it cannot hope to survive strict scrutiny. *Sorrell*, 564 U.S. at 565 (citation omitted). But even if viewed as a time, place, and manner restriction, or as a law that primarily targets conduct, the Act is still overbroad, as Seventh Circuit precedent striking down a much narrower dispersal-order ordinance makes clear. *See Bell*, 697 F.3d at 457.

a.    The Act prohibits a substantial amount of protected speech and newsgathering and is not susceptible to a narrowing construction.

The analysis whether a statute is substantially overbroad begins with "constru[ing] the challenged statute." *Williams*, 553 U.S. at 293. Here that inquiry is straightforward: HB 1186 prohibits being within twenty-five feet of an officer

after an order to move, and the statute has nothing more to say "about the behavior that [can] prompt[] a lawful dispersal order," or the standard that should guide an officer when deciding whether to issue one. *Bell*, 697 F.3d at 462. And the Act unquestionably applies even to journalists and others engaged exclusively in otherwise lawful First Amendment activity, since, "[o]n its face, the text of the statute carves out no exemptions for monitoring and recording activities that aim to contribute to public discourse." *Brown*, 2023 WL 7489920, at *21.

The Act's legislative history underlines the point. The Indiana Supreme Court has cautioned against importing narrowing constructions where the legislature has expressly considered and rejected such language. Where the "legislature could have readily adopted" a narrowing element or standard "but omitted it instead," Indiana law instructs courts to "conclude that rejection was intentional, not accidental." *Mi.D. v. Indiana*, 57 N.E.3d 809, 812–13 (Ind. 2016). Here, lawmakers rejected an amendment that would have limited the discretion officers are afforded under HB 1186 by limiting liability to individuals who "engage[] in conduct that would cause a reasonable person to believe that the person intends to interfere with the execution of [a law enforcement] officer's duties." Proposed Amendment #6 to HB 1186, S. Mot. MO118606, Ind. Gen. Assemb., 2023 Sess., https://perma.cc/594W-G8ZQ. That lawmakers considered and rejected that limit makes clear that the Act requires no nexus to obstruction.

b.    <u>The Act is a content-based prohibition that fails strict scrutiny.</u>

As the statute's plain text confirms, the Act is manifestly overbroad.  In both its "inevitable effect" and its "stated purposes," HB 1186 is a content-based restriction on newsgathering and reporting—designed to prevent coverage of police activity in particular—that cannot survive strict scrutiny.  *Sorrell*, 564 U.S. at 565; *see Bell*, 697 F.3d at 453 n.2 (noting that "a content-based regulation [that] fails strict scrutiny" is always overbroad because it has no valid applications).

As the law's author explained, the statute was passed to prevent members of the public from "getting more and more involved in a situation"—by observing and documenting how police perform their official duties—that is purportedly "none of their business."  Corrections and Criminal Law Hearing on HB 1186 (Mar. 7, 2023).   And because Indiana law already prohibits conduct that in fact interferes or threatens to interfere with law enforcement, *see* Ind. Code § 35-44.1-3-1(a)(1), the Act's "only evident purpose" is "to reach expressive activity that does *not* involve physical interference" on a specific topic: the public duties of law enforcement officers.  *Brown*, 2023 WL 7489920, at *26 (emphasis added); *see also City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (rejecting characterization of ordinance prohibiting interference with police as "content-neutral" where "the *enforceable* portion of the ordinance" in practice "prohibit[ed] verbal interruptions

of police officers" (emphasis added)).  The Act must therefore confront strict scrutiny—and cannot withstand it.  *See Brown*, 2023 WL 7489920, at *26.

The Act cannot survive that rigorous scrutiny because the statute is not "narrowly tailored" to "a compelling governmental interest."  *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).  To survive that review, a law must "target[] and eliminat[e] no more than the exact source of the 'evil' it seeks to remedy," *Frisby v. Schultz*, 486 U.S. 474, 485 (1988), and must represent "the least restrictive means available to achieve the stated objective," *Ind. C.L. Found., Inc. v. Indiana Sec'y of State*, 229 F. Supp. 3d 817, 825 (S.D. Ind. 2017) (internal citation and quotation marks omitted).  But whatever interest Indiana intended to advance, the statute contains no standards that would channel officers' discretion toward that interest.  Instead, the Act "vests unbridled discretion in a government official over whether to permit or deny expressive activity."  *City of Lakewood*, 486 U.S. at 755.  And as already explained above, the Act's 25-foot perimeter is far broader than necessary to accommodate any legitimate governmental interest.

Neither can Indiana demonstrate that the Act is the least restrictive means of achieving any legitimate goal.  To the extent the law is justified by concerns about safety or obstruction, Indiana has a raft of other statutes on the books that make interfering with or disrupting police engaged in official business a crime.  Existing law already prohibits "forcibly resist[ing], obstruct[ing], or interfer[ing] with a law

27

enforcement officer" who is engaged in official duties, Ind. Code § 35-44.1-3-1(a)(1); "knowingly or intentionally enter[ing] an area that is marked off with barrier tape or other physical barriers," after being denied entry by a public safety officer, Ind. Code § 35-44.1-3-1(b); and "knowingly or intentionally interfer[ing] with or prevent[ing] an individual from . . . making a report to a law enforcement officer," among other things.  Ind. Code § 35-45-2-5(3).  Defendants cannot explain why those "available generic criminal statutes" fail to address whatever government interest the Act notionally serves, *McCullen*, 573 U.S. at 492, because there are few (if any) scenarios in which the statute would "constitutionally prohibit conduct not already criminalized."  *Brown*, 2023 WL 7489920, at *22.

    c.    <u>The Act would also fail intermediate scrutiny.</u>

Even if HB 1186 were construed as a time, place, or manner restriction, or a law that also targets conduct,[4] it would remain overbroad for much the same reason:  It sweeps in an enormous breadth of protected expressive activity that poses no risk of obstruction.  *See Bell*, 697 F.3d at 456–57 (even where "triggering

---

[4]    As the Seventh Circuit has explained, the distinction between laws "enacted to regulate conduct" but that "could be seen as having the incidental effect of burdening speech" and laws "regulat[ing] the time, place, and manner of speech" has "no real effect on the outcome of the case."  *Hodgkins ex rel Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004).  In either event, the statute must confront intermediate scrutiny.  *See Goldhamer v. Nagode*, 611 F. Supp. 2d 784, 791 (N.D. Ill. 2009), *vacated on other grounds*, *Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) (same in the context of a challenge to a dispersal-order statute).

conduct cannot be an act constituting protected expression," a lawful-order statute "still implicate[s] protected expression" where, "once triggered, it may be applied to disperse people engaged in peaceful speech or expressive conduct").

For one, the Act is broader in every respect than the content-neutral dispersal statute the Seventh Circuit invalidated for overbreadth in *Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012). The ordinance in that case criminalized "knowingly . . . [f]ail[ing] to obey a lawful order of dispersal" by a law enforcement officer "where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm." *Id.* at 450 (quoting Chi. Municipal Code § 8–4–010(d)). The Seventh Circuit determined that the provisions of the ordinance authorizing orders to disperse due to "serious inconvenience" or "alarm" were overbroad because they could be issued "to individuals exercising protected First Amendment rights" without any showing that dispersal would be "necessary." *Id.* at 458–59.

HB 1186 goes even further than the ordinance held unconstitutional in *Bell*. It contains no standard whatsoever—not even one as vague as "serious inconvenience"—that might limit when an officer may issue an order. And where the Seventh Circuit faulted the ordinance in *Bell* for requiring "inconvenience" without clarifying the *kind* of inconvenience that might give rise to a valid order to disperse, the Act does not require *any* disruption to law enforcement activities

before an order can issue. *Id.* at 459.  It is triggered simply by a law enforcement officer's say-so.  Accordingly, to an even greater degree than the ordinance the Seventh Circuit struck down in *Bell*, the Act "lacks the necessary specificity and tailoring to pass constitutional muster, and . . . substantially impacts speech." *Id.*

More recently, in *Brown v. Kemp*, the Seventh Circuit invalidated as overbroad a Wisconsin statute that purported to prohibit "maintaining a visual or physical proximity" to, or otherwise "approaching," a hunter.  2023 WL 7489920, at *1 (quoting Wis. Stats § 29.083(2)(a)(7)).  The Seventh Circuit found that provision manifestly overbroad because it criminalized otherwise-lawful First Amendment activity that "[did] not physically interfere with hunting or trapping" and, as a result, had virtually no "effect other than to chill First Amendment activities." *Id.* at 22.  That holding is squarely on point here:  HB 1186 is triggered merely by approaching within twenty-five feet of a member of law enforcement— irrespective whether that fact presents any bona fide risk of physical interference.

Finally, even setting aside the controlling force of *Bell* and *Brown*, for all of the reasons discussed above in connection with Plaintiffs' as-applied claim, the Act cannot survive intermediate scrutiny.  In sum, whether reviewed as a content-based restriction on newsgathering and reporting subject to strict scrutiny (which it is), a content-neutral restriction on newsgathering, or a restriction on the press's right of access, the Act cannot pass constitutional muster.  The law is clear that statutes

"vest[ing] unbridled discretion in a government official over whether to permit or deny expressive activity" violate the First Amendment—period. *City of Lakewood*, 486 U.S. at 550. HB 1186 does just that. For all these reasons, Plaintiffs are likely to succeed in demonstrating that the Act is facially overbroad.

      D.    <u>HB 1186 is void for vagueness under the Due Process Clause.</u>

The Act also is unconstitutionally vague in two fatal respects. First, it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Morales*, 527 U.S. at 56. Second, the Act "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *Id*.

As to fair notice, the Seventh Circuit has explained—in the context of liability for failure to obey a law enforcement order—that due process requires a law to provide "warning about the behavior that [can] prompt[] a lawful dispersal order." *Bell*, 697 F.3d at 462. But HB 1186 authorizes officers to order an individual to withdraw for any reason (or no reason). As such, it is impossible for reporters to know how to conduct themselves to avoid receiving an order to move.

The Act likewise fails to provide fair notice and an opportunity to comply because reporters cannot workably determine whether they are within twenty-five feet of law enforcement, especially when gathering news at a crowded, fast-evolving public event. *See* Scheer Decl. ¶ 11; Hums Decl. ¶ 10*; see also Schenk*, 519 U.S. at 378 n.9 (noting that it would be "quite difficult" to tell whether speaker

attempting to obey 15-foot buffer zone "actually strayed to within 14 or 13 feet"). And that difficulty is compounded by the fact that the prohibited zone "floats." *Schenk*, 519 U.S. at 377. Indeed, compliance may often be impossible when there is no practical way for a reporter to retreat through a dense crowd, where there is not enough space on a sidewalk for a journalist to withdraw without trespassing on private property, or where multiple officers issue overlapping or contradictory orders. *See* Scheer Decl. ¶ 15; Thedwall Decl. ¶ 17; Hums Decl. ¶ 10; *Schenk*, 519 U.S. at 378 (noting the difficulty speakers would face in "know[ing] how to remain in compliance" with floating 15-buffer zones around multiple moving individuals).

The Act is independently void for vagueness because it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. The Act contains no standards of any kind to guide officers in deciding who should be ordered to move and under what circumstances. In other words, it "delegates basic policy matters to policemen," who decide whether to issue an order or make an arrest "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Indeed, as the Supreme Court explained in *Morales*, any law that purports to grant officers the authority "to decide arbitrarily which members of the public they will order to disperse . . . becomes

indistinguishable from the law we held in invalid in *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90 (1965)." 527 U.S. at 58–59 (parallel citations omitted).

Because HB 1186 lacks any standards to guide law enforcement discretion, journalists employed by Plaintiffs are "treading carefully," *Brown*, 2023 WL 7489920, at *19, to avoid running afoul of it, *see* Thedwall Decl. ¶ 16; Scheer Decl. ¶ 14. "Such chilling effects are a clear sign that the statute's vagueness pushes people who monitor and document" law enforcement officers in Indiana "to engage in reasonable self-censorship," and that the Act is impermissibly vague. *Brown*, 2023 WL 7489920, at *19. And, indeed, as Plaintiffs' own experiences show, officers have used their limitless and standardless authority to "single out" journalists for orders to move "even when members of the public who are not there as journalists are allowed to get closer." Thedwall Decl. ¶ 4. Indeed, Hums identified a number of "stories broadcast by WTHR since HB 1186 was enacted in which viewers can clearly see that members of the public have been allowed to get closer to an event than where our reporters were directed to stand." Hums Decl. ¶ 12 (citing *Arrest Made in Officer-Involved Shooting on Indy's East Side*, WTHR (Oct. 16, 2023), https://www.youtube.com/watch?v=SWU-ztyHCVc).

Because the Act fails to provide fair notice of the conduct that may invite an order to move, and because it permits a reporter to gather the news in Indiana

"only at the whim of any police officer" present, *Shuttlesworth*, 382 U.S. at 90, Plaintiffs are likely to succeed in demonstrating that the Act is void for vagueness.

## II.    The remaining factors favor injunctive relief.

Plaintiffs will suffer irreparable harm unless a preliminary injunction is granted.  In cases involving a chilling effect on the exercise of First Amendment rights, the irreparable harm factor is necessarily satisfied when plaintiffs can show a likelihood of success on the merits, because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Alvarez*, 679 F.3d at 589 (internal citation omitted).  So too here, where— for all of the reasons given above—Plaintiffs are likely to succeed on the merits of their claims that the Act violates the First and Fourteenth Amendments.

The public interest and balance of equities, too, are tied to the merits of Plaintiffs' claims, since "if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Alvarez*, 679 F.3d at 588–90 (citing *Joelner*, 378 F.3d at 620).  In other words, "injunctions protecting First Amendment freedoms are always in the public interest." *Walker,* 453 F.3d at 859.  Here, an injunction that shields the press from the Act's chilling effects would do no harm to any legitimate government interest and would serve the

"cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." *Alvarez*, 679 F.3d at 601 (internal citation and quotation marks omitted). A preliminary injunction should therefore be granted.[5]

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting Defendants from enforcing the Act.

Dated: December 1, 2023               Respectfully submitted,

/s/ *Katie Townsend*
Katie Townsend
Gabe Rottman*
Grayson Clary*
Emily Hockett*
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org

*Counsel for Plaintiffs*

* Admitted *pro hac vice*

---

[5] Plaintiffs also respectfully request waiver of a bond. *See* Fed. R. Civ. P. 65(c). Defendants will suffer no damages from an injunction against enforcement of an unconstitutional statute, *see All-Options, Inc. v. Att'y Gen. of Indiana*, 546 F. Supp. 3d 754, 770–71 (S.D. Ind. 2021), while requiring the posting of a bond would "impact negatively on [Plaintiffs'] exercise of their constitutional rights," *Smith v. Bd. of Elec. Comm'rs*, 591 F. Supp. 70, 72 (N.D. Ill. 1984).