## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| **Reporters Committee for Freedom of the Press**, **Indiana Broadcasters Association**, **Indiana Professional Chapter of the Society of Professional Journalists**, **Indianapolis Star**, **Nexstar Media Inc.**, **Scripps Media, Inc.**, and **Tegna Inc.**, | **Case No. 1:23-cv-1805** |
| *Plaintiffs*, | **Defendants' Joint Response in Opposition to Plaintiffs' Motion for Preliminary Injunction** |
| *v.* | |
| **Todd Rokita**, in his official capacity as Attorney General of Indiana, **Ryan Mears**, in his official capacity as Marion County Prosecutor, and **Kerry Forestal**, in his official capacity as Marion County Sheriff, | |
| *Defendants.* | |

## Defendants' Joint Response in Opposition to Plaintiffs'
## Motion for Preliminary Injunction

Plaintiffs Reporters Committee for Freedom of the Press, Indiana Broadcasters Association, Indiana Professional Chapter of the Society of Professional Journalists, Indianapolis Star, Nexstar Media, Inc., Scripps Media, Inc., and Tegna Inc. ("**Media Organizations**") seek a preliminary injunction ("**PI**") against Ind. Code § 35-44.1-2-14 ("**Buffer Law**" or "**the Bill**"/ "**HB 1186**"). Dkt. 21 ("**Motion**"). For the reasons explained below, the Motion should be denied.

## Introduction

The plain text of the Buffer Law, which permits law enforcement officers ("**LEOs**") engaged in lawful duties to order a person to stop approaching within 25 feet, is unrelated to "press rights as such," *ACLU v. Alvarez*, 679 F.3d 583, 601 (7th Cir. 2012). Its purpose is strikingly clear: preventing interference with LEO duties. The law's substance cannot reasonably be said to address anything *other* than such interference, and its very title is "unlawful encroachment on an investigation." Ind. Code § 35-44.1-2-14. Despite this clarity, Media Organizations invite the Court to "peer[] past the text . . . to infer" ill intent. *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 649–50 (7th Cir. 2013). Their efforts are "not only . . . unconvincing, [but] extraneous" since the statute is clear. *United States v. Jones*, 372 F.3d 910, 913 n.2 (7th Cir. 2004). Nonetheless, should the Court find it appropriate to consider the hearing comments that Plaintiffs adduce, they show *only* intent to advance constitutional interests. Because the Buffer Law does not regulate First Amendment activity, and as further explained below, it passes all levels of scrutiny.

## Facts

Because the Buffer Law does not address press activity, legislative intent is not relevant.

Nonetheless, Media Organizations argue extensively concerning legislative motives, despite the fact that the video record of the statements they adduce does not evince legislative intent, Ind. Code § 2-5-1.1-16. Accordingly, for the Court's reference, should it find consideration of such evidence appropriate, Indiana corrects the record with the following facts and, below, supports its arguments with same where necessary to disprove Media Organizations' characterizations.

The Buffer Law was passed with the purpose of making "the public [] and the [LEO] safe[.]" *Hr'g on HB 1186, H. Comm. on Cts. and Crim. Code*, 123rd Gen. Assemb., 1st Regular Sess. (Feb. 8, 2023) ("**H. Comm. Hr'g**") https://iga.in.gov/session/2023/video/committee_courts_and_criminal_code_0300/, 1:57:06–1:57:53 (statement of Bill's author, Rep. McNamara); *Hr'g on HB 1186, S. Comm. On Corrections and Crim. Law* (Mar. 7, 2023) ("**S. Comm. Hr'g**"), https://iga.in.gov/session/2023/video/committee_corrections_and_criminal_law_3000, 6:19–6:23.

The harsh realities faced by law enforcement ("**LE**") show plainly that the Buffer Law *does* advance this interest in actuality. Indiana Sheriff's Association Executive Director Stephen Luce testified of suffering a blown out eye socket from an altercation while on duty, and that the law would have allowed him to position himself to avoid this and would advance citizen safety. H. Comm. Hr'g 1:55:41– 1:56:28. And Rep. McNamara testified that a police sergeant who had been "beaten ferociously by someone who interfered with his investigation" expressed to her that the Buffer Law would have prevented "escalat[ion] to that point[.]" S. Comm. Hr'g 15:48–16:15.

It advances many other interests, as well. It advances crime prevention: the Howard County Sheriff's Office Patrol Division Commander testified the law would prevent distractions that allow suspects "to flee or . . . fight." S. Comm. Hr'g 31:00–31:23. It advances privacy rights: the Plainfield Police Department Chief testified that witnesses "no longer want to cooperate" when others are "close enough" to hear, which the Buffer Law prevents. *Id.* at 32:56–33:20.

Captain Lewis Perrine, of the Marion County Sheriff's Office ("**MCSO**"), similarly testifies that a 25-foot buffer law "decreases the likelihood of interference with a scene and reduces the risks to officer and public safety, while still allowing bystanders the ability to safely observe," Aff. of Capt. Perrine ¶ 10, noting in particular witness privacy and evidence preservation needs and the unpredictable, attention-dividing nature of safety needs that may arise. *Id*. at ¶¶ 5–6. Indeed, two recent "examples of a recurring problem," in which wanton, wandering bystanders near an "armed seriously violent felon" placed "themselves and officers at risk," and a bystander's interference permitted a suspect to attempt escape twice, highlight the need for the Buffer Law. *Id.* at ¶¶ 7–10. All of the foregoing interests are compelling. *Infra* Part VI.B.1.

The Buffer Law's actual enforcement, meanwhile, shows *no* anti-press application. It has never been enforced against Plaintiffs, who complain only of the long-used media staging areas[1] and of LE's common-law discretion in requiring space when necessary. Compl. ¶ 52; MTD Reply 3–4, 6–8; *infra* Parts II.A.2, II.B. Even if their speculation that the law is their woes' cause did have merit, the facts show those woes are not First Amendment-related. The question is plain in right-to-record cases: does the law *prevent* such recording? Anywhere a substantial answer can be found in the evidence, the answer is, "No." *E.g.*, Decl. of Ryan Thedwall ("**Thedwall Decl.**"), Dkt. 27-1, ¶ 12[2]; Decl. of Scott Hums ("**Hums Decl.**"), Dkt. 27-2, ¶¶ 5–7 (desired quality is the issue, not ability to record LEO activity at all); Decl. of Robert Scheer ("**Scheer Decl.**"), Dkt. 27-3, ¶ 8 (same). Instead of developing claims of inability to record LE, they speak of wishes to

---

[1] The use of staging areas, which *aid* the media by providing necessary space to set up, is no new phenomenon. Reply Supp. Mot. Dismiss ("**MTD Reply**"), Dkt. 33, 3. They have nothing to do with the Buffer Law.

[2] Although WTHR's Thedwall alleges a vehicle made the view less "clear," *id.*, WTHR video of the "mid-October" bar shooting with an off-duty LEO (*id.* at ¶ 11) shows *many* clear angles, including the full facade; crisp close-ups of LEOs and an evidence marker; clear shots (including close-up) of the bar's doors, and an interview with an LEO at ordinary distance. https://www.wthr.com/article/news/crime/off-duty-officer-full-uniform-shoots-suspect-indys-east-side-indianapolis/531-c587ec6d-e70b-4ffb-af5c-2618968358d6 (00:27–00:56; 1:22–1:27).

capture angles that best "transport viewers," to be as "close" as desired, to speak quietly—when they *are* recording LE. PI Mem., Dkt. 27, 15–16. In short, they *admit* they are not prevented from same. *See also* MTD Reply 4. So there is little First Amendment connection: there is no right to subjectively favored technical specifications when recording.

## Legal Standards

**Preliminary Injunction Standard:** To obtain a PI, one must show irreparable harm absent same, inadequacy of legal remedies, and likely success on the merits. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016). If so, the court weighs the balance of harms to the parties the decision would have and the effect it would have on the public. *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1024–25 (S.D. Ind. 2014) (citation omitted).

**Facial Challenge Standard:** A facial First Amendment challenge will stand only if the challenged  law lacks a "plainly legitimate sweep" or if "a substantial number of its applications are unconstitutional" relative to its "legitimate sweep." *Washington State Grange v. Washington State Repub. Party*, 552 U.S. 442, 450 n.6 (2008). The court must avoid speculation—"facial challenges are disfavored," especially due to the frequent need for same. *Id.* at 449–50.

**As-Applied Standard:** In an as-applied challenge, analysis is limited to the law's application to the plaintiff's activity, *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758–59 (1998), "based on a developed factual record" of such application. *Fusaro v. Howard*, 19 F.4th 357, 368 (4th Cir. 2021) (cleaned up). The constitutional standard, however, is the same as a facial challenge. *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010).

## Argument

It is a basic common-law principle that law enforcement officers ("**LEOs**") are "entitled to

enforce [the law] free from possible interference . . . even [from] those claiming a[n] . . . interest in the transaction." *Colten v. Kentucky*, 407 U.S. 104, 109 (1972); *Lund v. City of Rockford*, 956 F.3d 938, 947 (7th Cir. 2020) ("clear right to  . . . direct [third parties] to cease" activity jeopardizing investigation). The Buffer Law only limits this discretion ("**common law perimeter discretion**"). As construed by the legislature that enacted it and the LEOs who need it, the law permits such orders—limited to 25 feet—only for weighty interests. Ironically, Media Organizations, who wish to film as close as possible to LE, seek to enjoin Defendants Todd Rokita, Ryan Mears, and Kerry Forestal (collectively, "**Indiana**") from enforcing this discretion limitation.

Three fundamental issues render their claims infirm. First, they ask this Court to subject the Buffer Law—which has no relation to press activity facially, by legislative design, or in actual use—to strict scrutiny, a standard reserved for laws that *do* target content. Second, the law and related policies *limit* discretion. Third, even if the law were subjected to First Amendment scrutiny despite merely incidental effects, the right to *record* LE does not include a right to do so in precisely the manner desired. For these reasons and others, the Buffer Law is constitutional.

## I. The legislative intent of HB 1186 is plainly not directed at First Amendment activities.

At the outset, the Court should note that one of Media Organizations' essential claims is verifiably incorrect. They claim the Buffer Law is "aimed at curtailing" press freedom—that that is its "stated purpose," PI Mem. 9, 10, 32, 34 (citations omitted). But the Bill's author testified it "would not prevent . . . filming . . . whatsoever," S. Comm. Hr'g, 11:41–11:45, and stated its purpose repeatedly: "[T]his bill is about creating life-saving space . . . [and] offer[s] officers the fraction of a second necessary to react and also provide public safety while . . . deescalati[ng]." *Id.* at 8:58–9:15; *supra* Facts; *see also id.* at 6:55–7:52 (discussing objective basis for distance, based on response time), 8:17–8:32 (same); *infra* Part VI.B.1 (discussing response time further).

Although Media Organizations suggest that Rep. McNamara stated it is "none of [anyone's] business" to *record* LE, the actual discussion (focusing on needs when someone is "getting involved" in LE activity and "in [a LEO's] face") was unrelated to recording. *Compare* PI Mem. 9 (claiming Buffer Law is "aimed at curtailing the . . . right . . . to record . . . [LE] duties that are, in the words of the Act's sponsor, 'none of their business'") (citing, with no timestamp,[3] S. Comm. Hr'g) *with* S. Comm. Hr'g 9:30–10:43 (question about impetus for legislation, followed by Rep. McNamara's answer—including the decontextualized quote—referring to "de-escala-tion, because any time anybody's going to be in your face, it's going to escalate," and noting that the Bill provides opportunity to create de-escalating space; no mention of recording).

Relying on this amputated quote alone, Media Organizations incorrectly claim, persistently, that the "stated purpose" of the Buffer Law is to curtail the press, *e.g.*, PI Mem. 10, 32, 34 (citations omitted), and that its "'only evident purpose' is 'to reach expressive activity[.]'" *Id.* at 28 (citation omitted); *id.* at 10, 34. However, *in context*—including precisely the language quoted—the hearing tells a different story. This "quotation" is the *only* explicit evidence Media Organizations provide concerning the Bill's purpose, and in context it shows that the Bill's purposes relate only to weighty interests that have nothing to do with recording LE. Thus, the *only* extrinsic evidence of the Bill's purpose demonstrates that it was passed for a lawful purpose.

**II. Media Organizations lack Article III standing to challenge the Buffer Law.**

In seeking a PI, a plaintiff's burden to demonstrate standing is "at least as great as the burden of resisting a summary judgment motion." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (citation omitted). This requires "specific facts" by affidavit or other evidence rather than "general factual allegations." *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795,

---

[3] Under the local rules, "citation[s] must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." S.D. Ind. L.R. 56-1(e).

801–02 (7th Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). The injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560; *Speech First, Inc.*, 968 F.3d at 638, and must be real and immediate. *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012). To obtain a PI, a "plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the . . . conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (citations omitted); *see also Beley v. City of Chi.*, No. 12 C 9714, 2015 U.S. Dist. LEXIS 18590, at *17 (N.D. Ill. Feb. 17, 2015). Prospective relief this requires a showing of "reasonable probability" of injury absent the requested relief. *Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir. 1995).

Media Organizations request a PI against Buffer Law enforcement, making First and Fourteenth Amendment claims. They allege "immediate risk" because the law "prohibits news-gathering from within twenty-five feet of law enforcement officers," thereby "exposing [them] to arrest," PI Mem. 22–23, and assert "inten[t] to engage in peaceful, nonobstructive newsgathering within 25 feet of [LEOs,]" Compl. ¶ 65, and that they face "the threat of receiving an order under [the law]," PI Mem. 23. They further allege they "have adjusted behavior because of the" law, PI Mem. 24. Finally, they claim the Buffer Law "infringes their right to receive information" "from bystanders who record [LEOs]" and that it "compelled [them] to devote resources to combating the" law's effects. PI Mem. 25–26 (cleaned up; citation omitted). Their allegations fail to establish any concrete injury sufficient for Article III standing in this pre-enforcement challenge.

**A. There is no likelihood of arrest or prosecution.**

Absent particularized enforcement, *see* Br. Supp. Mot. Dismiss ("**MTD Br.**"), Dkt. 26, 3–5, a plaintiff may establish standing by showing intent to engage in conduct implicating "a constitu-tional interest, but proscribed by a statute," combined with "credible threat of prosecution[.]"

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). This requirement echoes the requirements of concreteness, reasonable probability, and immediacy of injury absent relief.

**1. Media Organizations fail to allege intent to engage in prohibited conduct.**

Unlike the statute at issue in *Brown v. Kemp*, the vagueness of which created "risks" "in exercising [] First Amendment rights," No. 21-1042, 2023 U.S. App. LEXIS 30112, at *34 (7th Cir. Nov. 13, 2023),[4] the Buffer Law clearly details the conduct that triggers enforcement. While Media Organizations incorrectly claim the Buffer Law "flatly prohibits" newsgathering from within 25 feet of law enforcement officers "absent officer consent," PI Mem. 23, the statutory text makes clear that proximity alone neither constitutes an offense nor requires consent: the law triggers only "after the [LEO] has ordered the person to stop." Ind. Code § 35-44.1-2-14.

Plaintiffs who allege "only an injury at some indefinite [] time" have not shown an injury in fact, particularly where "the acts necessary [for injury] are at least partly within [their] control." *Lujan*, 504 U.S. at 557. Media Organizations cannot establish "intent to engage" without pleading with specificity an intent to "knowingly or intentionally" engage in the conduct forbidden, yet they pled intent "to engage in peaceful, nonobstructive newsgathering within 25 feet of [LEOs] . . . ." Compl. ¶ 65; *see also* PI Mem. 18–19, but they do not intend to do so if that would violate police orders. *E.g.*, Hums Decl. ¶ 10; MTD Resp., Dkt. 32, 26. Buffer Law violation requires not simply *being* within 25 feet of a LEO, but defying *orders*, so Media Organizations' alleged harm requires noncompliance before materializing. Since they intend only to engage in behavior *not* triggering the law's enforcement, their allegations fall squarely within *Lujan*'s definition of self-inflicted speculative injury. *See infra* Parts II.A.2, II.B (alleged chill is purely speculative). Therefore, they fail to show the intent necessary for a credible enforcement threat.

---

[4] Under Wis. Stat. § 29.083(2)(a)(7), "maintaining a visual or physical proximity" to a hunter, i.e., following a hunter, and "recording the activities" of that hunter, can amount to a crime. *Id.* at *28–29.

**2. Media Organizations fail to show a reasonable fear of enforcement.**

Even if Media Organizations *did* have the requisite intent, they still cannot demonstrate a likely threat of Buffer Law arrest or prosecution. *See Goldhamer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010). Instead, they rely on hypothetical and speculative fears that cannot be reasonably inferred from the facts. "Allegations of a subjective 'chill' are not an adequate substitute for . . . present objective harm or a threat of specific future harm," *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). Simply put, Media Organizations "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 978 (7th Cir. 2023) (quoted source omitted).

Media Organizations provide no allegations that the Buffer Law has been enforced against anyone simply for exercising press rights, MTD Br. 5–10; MTD Reply 3–4, 6–8, nor that it has been invoked against them in any way. *Johnson v. City of Rock Island* is instructive here. The plaintiff there alleged he was threatened with arrest while street preaching, claiming that on one occasion, a LEO told him he could be arrested for disorderly conduct if he continued "raising his voice" or saying "alarming" things, and on another occasion, a different LEO made a flippant remark about putting him in jail. No. 4:11-cv-04058-SLD-JEH, 2014 U.S. Dist. LEXIS 126948, at *36–38 (C.D. Ill. Sep. 11, 2014). These two isolated incidents did not establish standing, as the LEOs did not "actually arrest Johnson, indicate that they could arrest him . . . but were letting him off . . . , or vow to arrest him should he ever preach there again." *Id.* at *36.

The facts here are even less conducive to standing. Media Organizations point to various requests by LEOs for reporters to reposition without any reference to arrest or even to the Buffer Law. *See, e.g.*, Thedwall Decl. ¶ 11 (relocation request with no mention of Buffer Law); Hums Decl. ¶ 11 ("Journalists I supervise are often asked to stay back or move to a different area"—no

mention of Buffer Law); MTD Reply 6. Even if a threat of future arrest for hypothetical violation *had* been made, this would *still* fall short: in *Johnson,* the relevant statute was mentioned by LEOs only regarding "hypothetical . . . behavior." *Id.* at *35 n.5. Since Media Organizations do not claim LEOs ever referenced the Buffer Law to them *at all*, there is even less connection to the statute, further emphasizing the lack of objective fear of enforcement.

This simply shows further the basic, overarching issue: Media Organizations have not pled a single fact in which a LEO even referenced the law against them. MTD Reply 3-4, 6-8. They cannot rely on invocation against third parties, particularly when that invocation showed only deference to the press. *See* MTD Br. 5–10. Raising two isolated, constitutional invocations of the law, PI Mem. 12, cannot excuse their burden to demonstrate a credible threat of *unconstitutional* enforcement against *them*. *See Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 490 (7th Cir. 2004) (several examples of past enforcement failed to show credible threat); MTD Br. 5-10.

Accordingly, the alleged threat of enforcement remains purely hypothetical, far from concrete. None of the evidence Media Organizations cite can be reasonably construed to create the credible threat required for standing. Therefore, the Motion should be denied.

**B. The alleged chilling effect is contradicted by the facts and remains speculative.**

The second way a plaintiff may establish standing absent enforcement, much like the "credible threat" prong of the first, requires showing a reasonable chilling effect resulting in self-censorship. *Speech First, Inc.*, 968 F.3d at 638. Media Organizations claim the Buffer Law chills protected functions, yet assert no facts showing abandonment or modification of reporting out of "well-founded fear" of its enforcement. *Brown*, 86 F.4th at *36–41; MTD Br. 11– 12; MTD Reply 6–7. Indiana has demonstrated their failure to prove any actual threat; beyond this, they do not even proffer any instances where they failed to capture footage or abandoned opportunities to

document events due to credible threats of Buffer Law enforcement. *Id.* at 6-7.

Media Organizations' allegations of a subjective "chill" are not an adequate substitute for a threat of specific harm. *Laird*, 408 U.S. at 11, 13–14. Their decision to "err on the side of caution" over hypothetical enforcement, when actual enforcement shows only extraordinary deference to the press, cannot sustain standing. MTD Br. 11-12; MTD Reply 2, 6-7.

**C. The alleged discretionary resource expenditures do not support standing.**

While organizational standing is established by showing a "concrete" "injury to the organization's activities—with the consequent" resource drain, *Keep Chi. Livable v. City of Chi.*, 913 F.3d 618, 625 (7th Cir. 2019) (quoted source omitted), mere "setback[s]" to its "abstract social interests" are not "injuries" sufficient for standing. *Id.*; *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* No. 09 C 5619, 2010 U.S. Dist. LEXIS 49151, at *58 (N.D. Ill. May 17, 2010) (citing *Sierra Club v. Morton*, 405 U.S. 727, 749 (1972)). Organizations may not rely on "ordinary expenditures as part of an organization's purpose" to allege "the necessary injury-in-fact." *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001).

In *Common Cause Ind. v. Lawson*, the court found standing because the exact-match voter registration law demonstrably "disrupted" operations by compelling concrete modifications to proprietary databases along with heightened education programs responding to new burdens. 937 F.3d 944, 949–957 (7th Cir. 2019). *Common Cause* cites *OCA-Greater Houston*, *id.* at 955, to show that *specific harms* in connection with voter education—rather than focusing on other matters—established injury. *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017). The ruling recited the injuries in detail: translation difficulties when explaining certain legal requirements, the extended time required for conversations with non-native voters, and the budgetary effects of hiring more staff instead of the ordinary use of mailers and phone banks.

On the other side of the coin, *Common Cause* cites *Fair Elections Ohio v. Husted* to distinguish *lack* of standing due to no concrete injury. 937 F.3d at 955. That court found that needing "to instruct [] volunteers about absentee voting procedures when [they] [we]re being trained" already in a regular meeting failed to establish standing. 770 F.3d 456, 459–61 (6th Cir. 2014). So the simple fact that, but for a challenged law, "time and money . . . would have [been] spent differently" does not constitute injury, *contra* PI Mem. 26 (quoting *Common Cause*, 937 F.3d at 954). Instead, injury requires concrete "reduc[tion] or eliminat[ion] of work in certain areas," *Common Cause*, 937 F.3d at 954, based on reasonable fear, and more than minor inconvenience, so mere setbacks—as alleged here—do not suffice. *See Antonyuk v. Bruen*, 624 F. Supp. 3d 210, 241 (N.D.N.Y. 2022) (answering greater number of calls and e-mail than usual little more than a "setback" to organizations' "abstract social interests").

Here, Media Organizations fail to demonstrate burdens arising from the Buffer Law that compel meaningful work reductions or new expenditures. Reporters Committee's alleged harm involves no deviation from its ordinary practice. MTD Reply 10–11. And while WTHR Director of Content Hums may have decided to allocate his time "to educating" employees about the Buffer Law and "responding to journalists' concerns about the law[]," he does not assert he reallocated resources in doing so. Decl. of Scott Hums ("**Hums Decl.**") ¶ 10; PI. Mem. 26. Further, he oversees the long-term strategy for the newsroom.[5] Strategizing how to adhere to laws that affect operations is likely within his ordinary job functions. Unlike the challenging language barriers which caused difficulties in *OCA-Greater Houston*, newsroom directors speak the same language to convey the Buffer Law to experienced[6] photojournalists.

---

[5] https://www.listennotes.com/podcasts/media-in-minutes/scott-hums-director-of-bipTjh3FDIA/
[6] https://tegna.jobs.net/jobs-in-indianapolis Job Posting for Photographer at WTHR-TV, the TEGNA-owned NBC affiliate in Indianapolis, IN, requiring College Degree or equivalent experience with a minimum of three years as a TV photojournalist and news editor.

The asserted use of "staff time and legal fees" to challenge the Buffer Law, PI Mem. 26 (cleaned up; citation omitted), is not comparable to the drastically needed staff hired in *OCA-Greater Houston*. Media Organizations have not had to increase the budget, but merely reallocate it. PI Mem. 25–26. Their allegations speak of Reporters Committee's "staff attorneys," not attorneys newly-hired in response of the Buffer Law—nor is there any assertion of matters these attorneys were unable to address as a result. *See* PI Mem. 21. Similarly, Media Organizations do not allege an actual increase in time invested for internal or external education. Like the plaintiffs in *Fair Elections*, Media Organizations fail to allege an actual injury to operations resulting from the Buffer Law, nor are voluntary resource shifts in response to a law that is not likely to affect them at all "compel[ed]," PI Mem. 25, so these facts are not sufficient to confer standing.

Media Organizations' remaining resource-use claims allege only "possible," not "certainly impending," harms; this is insufficient. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). This includes anticipation of increased demand for attorneys, PI Mem. 26, and of increased calls, *id.* at 21, which are premised on hypothesizing about applications of the Buffer Law to third parties and would not constitute injury in any event, since these services are their reason for existing. MTD Reply 10. These irrational fears are based on enforcement of a Miami Beach ordinance[7] that was suspended less than three months after enactment because most arrests "were of people . . . record[ing] officers." PI Mem. 20–21. This cuts *against* Media Organizations' fears: *more* time has passed here, and they cannot produce even *one* instance of an unconstitutional application of the Buffer Law, nor any pattern of enforcement against the press. This striking difference shows the irrationality of their fears. Moreover, under *Mitchell v. Keenan*, 50 F.3d 473, 475 (7th Cir. 1995), "[e]ven on-going prosecutions under a previous version of [a] statute

---

[7]Indiana does not concede that this ordinance is narrower than the Buffer Law. *See id.* at 20.

do not . . . render possible prosecutions under the new statute 'real and immediate.'" Media Organizations are not challenging a Florida ordinance, so any enforcement of same is irrelevant.

Here, as in *Fair Elections*, the lack of any "injury" beyond voluntary choices to adjust operations in response to hypotheticals undermines standing. Because Media Organizations fail to show how the Buffer Law impaired their operations or compelled mitigation efforts, presenting no factual nexus between expenditures and injuries directly tied to the Buffer Law, authority dictates they cannot bootstrap standing through discretionary choices alone.

**D. Media Organizations cannot base standing on a purely hypothetical loss of information.**

"[P]leading is not like playing darts: a plaintiff can't keep throwing claims at the board until she . . . hits the mark." *Doe v. Howe Military Sch.*, 227 F.3d 981, 990 (7th Cir. 2000). Media Organizations did not allege any infringement of a "right to receive information" from bystanders in their Complaint. The Motion is not a proper avenue to allege new claims. *Clark v. Smith*, No. 19-cv-932-RJD, 2020 U.S. Dist. LEXIS 133313, at *7 (S.D. Ill. July 28, 2020). Thus, this unpled injury claim introduced mid-stream should not factor into the standing determination.

Regardless, Indiana has established that even now Media Organizations fail to allege anything regarding third-party recordings sufficient to establish standing, and raise self-contradictory allegations concerning the Buffer Law's impact on bystanders. MTD Reply 9. Further, these hypothetical third-party recordings cannot show a concrete, imminent injury when Media Organizations do not even (**1**) allege lost access to videos of newsworthy events or show that (**2**) bystander recordings have historically affected coverage or provided information unobtainable through Media Organizations' own documenting capabilities, or (**3**) existing reporting now suffers deficits without content from hypothetically chilled sources. Therefore, this unpled bystander-injury theory fails to establish standing to challenge the Buffer Law.

**E. No Redressability Against Attorney General Rokita**

Attorney General Rokita cannot be sued solely for "his duty to support the constitutionality of a challenged state statute." *Doe v. Holcomb*, 883 F.3d 971, 976 (7th Cir. 2018). In order to overcome sovereign immunity, the sued official must play some role in enforcing, not just defending, the law at issue. While the Court once suggested that the Attorney General holds "broad powers" over criminal law enforcement, *Arnold v. Sendak*, 416 F. Supp. 22, 23 (S.D. Ind. 1976), more recent authority confirms the Attorney General lacks independent authority to initiate prosecutions. *See* Ind. Code § 4-6-1-6 (2023); *Doe*, 883 F.3d at 977. County prosecutors retain primary control. Despite the Buffer Law's criminal penalties, Attorney General Rokita's connection is too attenuated. Naming him as a co-defendant goes beyond what *Ex Parte Young* permits and, for the same reason, would in no way redress the injuries alleged.

Because Media Organizations do not have standing, the Motion should be denied.

### III. The Buffer Law is constitutional under all levels of scrutiny.

**A. Constitutional claims cannot stand against neutral, generally applicable laws.**

Laws that neither restrict press rights directly, nor act as a "total ban" on a common means of communication, do "not trigger [] First Amendment scrutiny," but are constitutional if they have a rational basis and are neutral. *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 948–49 (7th Cir. 2015); *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 648–52 (7th Cir. 2013).

**1. Incidental First Amendment burdens do not render a law non-general.**

A law "not aimed at the exercise of speech or press rights as such" does not give rise to First Amendment claims simply because it incidentally burdens conduct—including a burden on the "ability to gather . . . news." *Alvarez*, 679 F.3d at 601 (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991)). It is for this reason that, despite recognizing a right to record LEOs, the

7th Circuit explicitly distinguished such neutral laws. *Id.* at 595, 601; *see also id.* at 608 ("privacy interests . . . may justify banning audio recording[.]").

These principles remain authoritative. *Spiegel v. McClintic* reiterated that a "'nonspeech' element" of expressive conduct may constitutionally be targeted, including "disruptive" recording. 916 F.3d 611, 618 (7th Cir. 2019) (quoting 679 F.3d at 602). *Lund*'s note that LEOs may properly require press to "move along" and "cease" impeding them, 956 F.3d at 947, made this even clearer. So *Alvarez* did not create a near-limitless right to record LEOs. Instead, *Cohen* has always controlled: incidental press burdens do not give rise to First Amendment scrutiny.

**2. Minimal discretion does not render a law unrelated to press activity non-neutral.**

Limited discretion cannot render a law non-neutral, nor can unfettered discretion do so unless the law has "a 'close enough nexus to . . . conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship . . . '" to begin with. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1044 (7th Cir. 2002) (quoting *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 759 (1988)). Laws "not aimed at conduct commonly associated with expression and" rarely "permit[ting] . . . determinations to be made on the basis" thereof lack a *nexus* to censorship risk. *Lakewood*, 486 U.S. at 760–61 (constitutionally permissible if "on rare occasion" censorship opportunities exist). So no "nexus" exists in laws that are "too blunt a censorship instrument to warrant" review absent "actual misuse," "such as when an unpopular newspaper seeks . . . building permits.", *id.*, or even permit laws for billboards not distinguishing between speech types. *Gen. Auto Serv. Station v. City of Chi.*, No. 00 C 368, 2006 WL 1460017, at *5 (N.D. Ill. May 23, 2006). Laws meant to "protect . . . urban life" serve interests "unrelated to" suppressing expression. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986).

Notably, as Media Organizations' use of *Lakewood*—a licensing case—as the sole authority

for this theory suggests, the unbridled discretion analysis is usually confined to such cases. *See* PI Mem. 10, 22, 24, 35. Permit denial wholly prevents conduct in a given area, while a law unrelated to speech *cannot* be used to prevent it (e.g., press activity cannot be prevented by a law requiring those wishing to record LE duties to provide space *for* duties). *See Ward v. Rock Against Racism*, 491 U.S. 781, 793–94 (1989).[8] This shows the "nexus" rule's basis: if a statute has little speech-nexus in the first place, it *cannot* be enforced in a speech-discriminatory way.

This highlights the fact that the issue in unbridled discretion cases is how the discretion affects a *right*. In *Wisconsin Intersch. Athletic Ass'n v. Gannett Co.*, despite recognizing a "right to 'report on' . . . an event," the court found no "right to broadcast an entire event." 658 F.3d 614, 624–25 (7th Cir. 2011). The court thus found "unbridled discretion" cases inapposite in a challenge relating to discretion whether an *entire event* could be broadcast, which did not affect the right to simply *report* on the event. Similarly, a law permitting discretion to prevent recording LEOs in *immediate proximity* has little effect on the right to simply *record* LEOs.

Finally, LE "interpretation" is "highly relevant": courts "must consider" the limitations "enforcement agenc[ies]" adopt. *Ward*, 491 U.S. 781 at 795–96. Discretion is properly limited by "interpret[ation]," "policy," "practice," and "goal[s]" for a regulation. *Id.*; *see also infra* Part VI.A.2. Regarding *implementation*, a plaintiff alleging improper LEO discretion must show "he was arrested when [] similarly situated individuals not engaged in the same sort of [] speech" were not. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019); *Lund*, 956 F.3d at 945.

**3. Rational basis review.**

Under the deferential standard afforded to neutral laws triggered by "nonspeech," *Alvarez*,

---

[8] *Ward* noted unbridled discretion claims "generally involve[]" discretion to wholly "deny express[ion]," so it was "far from clear" that claim was adequate against regulations affording discretion only to "provide inadequate sound" equipment, rather than deny permits "altogether," being "of an entirely . . . lesser[] order of magnitude." *Id.*

679 F.3d at 602; *Spiegel*, 916 F.3d at 618, a law that is rationally related to a legitimate interest "avoids . . . scrutiny." *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653 (7th Cir. 2013). A plaintiff must "negative every . . . basis"—every "reasonably conceivable state of facts"—that "might support the law." *Id.* (quoted source omitted). The Buffer Law is a neutral law, triggered by non-speech violative conduct, with a rational basis. It is constitutional.

**B. Time, place, and manner regulations: intermediate scrutiny.**

Neutral laws regulating only "the time, place, or manner" of speech ("**TPM regulations**") trigger intermediate scrutiny. *Ward*, 491 U.S. at 791. They "need not be the least restrictive" means, but only narrowly tailored to substantial interests "achieved less effectively" absent the law. *Id.* at 798–99 (cleaned up); *HH-Indianapolis, LLC v. City of Indianapolis & Cnty. of Marion*, 889 F.3d 432, 438 (7th Cir. 2018). This includes the "interest in enforcing . . . laws," in which LEOs are entitled to their common-law perimeter discretion. *Colten*, 407 U.S. at 109.

This standard flows from the strong rejection of the idea that free speech means speech must be permitted "however and wherever [one] please[s]." *Adderley v. Florida*, 385 U.S. 39, 48 (1966). For example, the right of access to judicial proceedings does not require "instantaneous access," *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021), and speech *volume* may be regulated. *Saia v. New York*, 334 U.S. 558, 562 (1948). Even a law banning "raucous" noise was permissible as its "obvious purpose" was preserving "the quiet[.]" *Kovacs v. Cooper*, 336 U.S. 77, 78, 81 (1949). And expressive businesses and billboards need not be allowed wherever is most economically viable, *Renton*, 475 U.S. at 53–54, or "most desirable," *Prime Media, Inc. v. City of Franklin*, 181 F. App'x 536, 541 (6th Cir. 2006) (citing *id.*).

Because the Buffer Law, even if considered to regulate speech, is neutral, imposes only TPM regulations, and is narrowly tailored to weighty interests, it is constitutional. *Infra* Part VI.B.1–2.

**Defs.' Joint Resp. in Opp'n
to Mot. for Prelim. Inj.**                    18

**C. Laws narrowly drawn to compelling interests pass strict scrutiny.**

Finally, content-based laws are subject to strict scrutiny. *HH-Indianapolis*, 889 F.3d at 438. Necessary non-neutral restrictions on expression, including 100-foot zones restricting political speech, are upheld if narrowly drawn to compelling interests. *Burson v. Freeman*, 504 U.S. 191, 198 (1992). While this test once required that the law "target . . . no more than the exact source of the" problem, PI Mem. 35 (quoting *Frisby v. Schultz*, 486 U.S. 474, 485 (1988)) (cleaned up), that standard was overruled—at least in buffer law cases—when the Court found a buffer-zone law affecting a broad range of speech to be narrowly tailored. 530 U.S. 703, 729 (2000).

In that case, *Hill v. Colorado*, the Court reasoned that although the law would, by forbidding

all [] demonstrators to come closer, . . . sometimes inhibit a demonstrator who[] would have proved harmless[,] . . . [its] prophylactic aspect is justified by the great difficulty of protecting [state interests] with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the [] boundary.

*Id.* The Court thus rejected the strict *Frisby* requirement. *Id.* at 758–59 (Scalia and Thomas, JJ., dissenting). So the often-impossible "exact source" test is inapplicable to laws establishing buffer zones in which "rules that focus exclusively on the individual impact of each instance of behavior" would present "great difficulty" in protecting compelling interests. *Id.* at 729.[9]

The Buffer Law is narrowly drawn to compelling interests. *Infra* Part VI.B.1, 3.

Of course, requiring LEOs to keep track of "the individual impact of each . . . behavior" by any number of people within 25 feet is precisely what the Court sought to avoid in *Hill*. 530 U.S. at 729. Such hardship would be compounded by the numerous interests the Buffer Law protects,

---

[9]Although *Hill* has been "eroded," it "still binds," *Price v. City of Chi.*, 915 F.3d 1107, 1111 (7th Cir. 2019), particularly in regards to buffer laws serving compelling interests. "*Hill*'s narrow-tailoring analysis . . . did not rest on the specific facts of the case or an evaluation of Colorado's evidentiary showing. Accordingly, [requiring a differing] . . . analysis would effectively deny *Hill*'s controlling force" in buffer zone cases. *Id.* at 1119.

such that the LEO would have to keep track of whether such movements would present danger or privacy risks, or interfere with lawful duties, or disrupt a crime scene, or discourage reporting, and so on. The need, absent the Buffer Law, for "an accurate characterization" of each potential harm puts *Hill*'s rationale in full force here. In short, LEOs would face an exponential burden if required to evaluate every movement of an indefinite number of people in reference to up to ten differing compelling or substantial state interests, *infra* Part VI.B.1, to determine precisely when those interests were endangered. Such exponential challenges would, quite literally, make enforcement—and thus preservation of interests—impossible, not just a "great difficulty." As such, the Buffer Law would satisfy even the least-restrictive-means test. *Infra* Part VI.B.3.

Notably, *Hill*'s concerns overlap significantly with the fact that virtually all duties of LEOs— whether investigation, protecting citizens from likely dangers, or speaking with witnesses or arrestees who have privacy interests implicating the First Amendment—uphold compelling governmental interests, and thus courts will uphold laws that the government, in its discretion in how to achieve legitimate interests, has drafted broadly enough to reasonably permit enforcement of *plausible* risks without any additional justification concerning how "directly" the law "advances a substantial . . . interest." *Marcavage v. City of N.Y.*, 689 F.3d 98, 105 (2d Cir. 2012).

> We have held that no express threat . . . is required before we may accord great weight to the government's interest . . . . *MacWade v. Kelly*, 460 F.3d 260, 272 (2d Cir. 2006). . . . These principles [] apply in the First Amendment context. . . . [I]t is appropriate for governments to consider possible [] threats and the role that protesters may play in . . . inadvertently preventing [response]. *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1223–24 (10th Cir. 2007). "As long as a . . . security protocol reduces a plausible and substantial safety risk, it directly and effectively advances a substantial [] interest." *Id.* at 1224; *see also Bl(a)ck Tea Soc'y*, 378 F.3d [8,] 13 [(1st Cir. 2008)] . . . .
> *Id.* (cleaned up).

### IV. The Buffer Law is neutral and easily passes rational basis scrutiny.

Rational basis scrutiny applies to the Buffer Law. It plainly applies to *anyone* who "intention-

ally" disobeys an order. IC § 35-44.1-2-14. As it is "not aimed at the exercise of . . . press rights as such," any incidental effects thereon do not "offend the First Amendment." *Alvarez*, 679 F.3d at 601 (citations omitted); *see also Spiegel*, 916 F.3d at 618. Media Organizations' claims of explicit non-neutrality falter, *supra* Part I, and their other legislative claims are equally unavailing, since neither any proposed amendment nor existing law, PI Mem. 33–36, sufficiently address the interests advanced by the Buffer Law, *infra* Part VI.A.2. Claims of "inevitable effect" rendering the law non-neutral are undeveloped, *see* PI Mem. 34. Not only has there been not even one unconstitutional application of the law, but its many constitutional applications are clear. *Supra* Facts; *infra* Part VI.B.1. Thus, *City of Hous. v. Hill*, PI Mem. 26–27, is not on point. It dealt with a law that applied to speech but *not* criminal conduct. 482 U.S. 451, 460 (1987). The opposite is the case here, especially since policy requires permitting recording, as shown below.

Media Organizations' claim that the Buffer Law affords too much discretion also fails. Not only does policy preclude discretion, but even absent that, the sort of discretion alleged is not speech-related. *Supra* Part III.A.2 ("discretion" must have nexus to censorship). Common law perimeter discretion shows there is no right to be within 25 feet of LE, and Media Organizations do not argue that doing so *after* being ordered back is "commonly associated with" press activity, *Lakewood*, 486 U.S. at 760. In fact, the very "staging areas" they reference show a history of press/LE cooperation. So the Buffer Law poses no "real and substantial" threat, *Weinberg*, 310 F.3d at 1044, thus has no "nexus." Indeed, not only is any perceived threat not "substantial," the nexus is not even close, *see id.* The law permits neither demanding that recording cease nor ordering *anyone* to retreat beyond an easy recording distance. *Supra* Facts (declarations focus on being unable to achieve favored specifications, *not* being unable to capture footage at all). So expressive activity is not affected. Finally, there is no nexus since the interests the law supports,

*infra* Part VI.B.1, are "unrelated to the suppression of" speech, *Renton*, 475 U.S. at 48.

Even if there were a nexus, LE agencies prohibit LEOs from "interfer[ing] with the recording of [LE] activities," resolving the issue. MCSO Training Academy, *Recording Police Activity*, Defs.' Ex. E, Dkt. 26-6; South Bend Police Department ("**SBPD**") Policy Manual, Policy 425.2, Defs.' Ex. F, Dkt. 26-7 ("[SBPD] recognizes the right of persons to lawfully record [LEOs] . . . . [LEOs] will not . . . interfere[.]"). Such policies exist throughout the nation. *E.g.*, Dr. Richard Celeste, Expert Report, Police Practices and Procedures Analysis Regarding Indiana Code § 35-44.1-2-14 [hereinafter "**Celeste Report**"], Celeste Decl. Ex. A, 18 (same policy in New Jersey). The fact that the LE agencies of both municipalities that have been sued concerning this law have them suggests most in Indiana do too, rendering Media Organizations' unbridled discretion theory unavailing. Nor do they show press members were arrested while similarly situated (but non-press) individuals were not, as required, *supra* Part III.A.2. *See* MTD Br. 9–10.[10]

Because Media Organizations fail to (**1**) show a nexus to censorship, (**2**) account for policies that remove discretion to target recording, and (**3**) show any such targeting in actuality, unbridled discretion claims fail. Further, Media Organizations give no reason to doubt LE construes the Buffer Law as enforceable only during investigations (the most likely construction, since the crime is called "unlawful encroachment on an investigation," IC § 35-44.1-2-14), limiting discretion. That the law will be abused is hollow speculation. Since Media Organizations cannot show the law *permits* unbridled discretion, *a fortiori*, they cannot show a substantial number of its applications will use discretion unconstitutionally, as required. It therefore need only have a rational basis. The law achieves many compelling interests, *infra* Part VI.B.1, so this is met.

---

[10] Media Organizations complain that the Buffer Law could prevent "interview[ing] officials." PI Mem. 31. But they do not show that an official *consenting* to an interview would conceivably order the reporter 25 feet back. Because this scenario is wholly implausible, it is not relevant. Claims concerning interviewing witnesses at crowded events also fail: if a reporter cannot move through a *crowd* to an interviewee, that cannot be blamed on the law.

### V. As-applied claims, including the putative "as-applied overbreadth" claim, fail.

The Buffer Law also survives the other levels of scrutiny. As it is only a "place" restriction, intermediate scrutiny is the more appropriate alternative. *Hill* controls regarding "bubble zone" laws, *supra* Part III.C, so it binds, rather than cases on more restrictive "dispersal" orders, *see* PI Mem. 29, 32–33, 37–38. Under *Hill*, buffer zones are "not . . . content-based," so strict scrutiny does not apply. *Price*, 915 F.3d at 1109. Being narrowly tailored to interests otherwise "achieved less effectively," *Ward*, 491 U.S. at 791, 798–99 (citations omitted), the law withstands this test.

Media Organizations cast no doubt on this. An essential issue plagues their as-applied claims. Despite suggesting various rubrics, all seem to be mere attempts to shoehorn facial challenges into as-applied analysis. They theorize that their as-applied claims mean the Buffer Law must be analyzed as if it *were enforced* against *all* press members within 25 feet of a lawfully-engaged LEO. This mistakes a fundamental principle of as-applied challenges, which analyze the law's *actual effect* on a group. *HH-Indianapolis, LLC v. Consol. City of Indianapolis*, 889 F.3d 432, 439 (7th Cir. 2018). Neither facial nor as-applied analysis permits a purely speculative claim, so it is "uncontroversial . . . that a plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). Absent a showing of reasonable chill or a pattern of selective enforcement (neither of which Media Organizations have shown, *supra* Part II; MTD Br. 9–10), a challenge based on merely theoretical enforcement, at LEO discretion, requires an "unbridled discretion" claim—which is facial.

Quoting *Bell*, 697 F.3d at 459, Media Organizations claim Indiana must show their interests "must be deemed insubstantial" relative to Indiana's. PI Mem. 28. But this quote concerns overbreadth, which is facial, considering *all* legitimate applications of a law. *United States v.*

*Hansen*, 599 U.S. 762, 143 S. Ct. 1932, 1948 (2023) ("[Plaintiff] asks us to throw out too much of the good based on a speculative shot at the bad. This is not the stuff of overbreadth—as-applied challenges can take it from here."); *Lubavitch Chabad House, Inc. v. Chicago*, 917 F.2d 341, 346 n.7 (7th Cir. 1990) ("'overbroad' language" is "facial"). Overbreadth analysis does not fit as-applied claims. Instead, because the substantive law for as-applied and facial challenges is the same, this Court must simply determine and apply the proper scrutiny level.

Media Organizations present two as-applied theories. They suggest that if the law is neutral, it "must . . . be narrowly tailored to serve a significant [] interest . . . and [afford] alternative observation opportunities . . . " or, alternatively, as applied to "dispersal orders limiting the press's access," Indiana must show "that excluding the press *in particular* from [] public spaces is essential to preserve higher values and [] narrowly tailored . . . ." PI Mem. 28–29 (cleaned up).

Assuming *arguendo* the Buffer Law has more than an incidental effect on speech, it is still content-neutral, so the first theory is the more appropriate. The second puts the cart before the horse, arguing the state must show that a *neutral* law—which neither targets the press nor, absent a specific order, applies to *anyone*—is supported by values that *justify* "excluding the press *in particular*." PI Mem. 29 (citing *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 117 (D. Minn. 2021)). This is neither logical nor the law. Logically, "press right of access" analysis applies only to laws which, as applied to the press, affect all press members. Put another way, as Media Organizations' own words suggest, for this analysis to apply there must actually *be* a so-called general "dispersal" order, not simply a law empowering issuance of a *non-general* order. *See Goyette*, 338 F.R.D. at 117 (law at issue was a "general dispersal order," applying to *all* press). Absent this factual showing, the analysis for laws that may be enforced against the press *only* upon an order remains the unbridled discretion analysis. Otherwise, any law that *could* be

enforced against the press merely in theory would require such analysis, which is untenable.

Two more reasons support declining "right of access" analysis here. First, the test employed to determine whether a right of access exists demonstrates that, although the press generally has a right of access to record LE, this does not extend to immediate physical presence about a LEO engaged in lawful duties. The contours of a right of access may be determined by whether access has "historically been open to the press." *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986). As explained, *supra* Facts, the press has never been permitted to be in the immediate physical presence of duty-engaged LEOs. Second, even if such a right existed, the Buffer Law would not affect it. As discussed, Media Organizations' claims are not meaningfully seated in the notion that the law prevents them from recording LE, but that it may hinder the artistic or technical specifications they prefer. These are not sufficient "right of access" claims. *Compare Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (a right of access "does not require perfect or instantaneous access"; minor impositions on access are treated as TPM regulations).

The Buffer Law is narrowly tailored to compelling state interests and leaves ample alternative avenues, *infra* Part VI.B.1–2. This satisfies the more appropriate test Media Organizations cite.

Therefore, neither of these as-applied theories viably challenges the Buffer Law.

### VI. The Buffer Law is not susceptible to a facial challenge.

**A. Construing the Buffer Law shows it is not technically overbroad: it prohibits no speech.**

Construing the Buffer Law to determine whether it prohibits substantial speech shows it prohibits *none*. Even if it did, its "unconstitutional applications"—which "must be realistic," *Hansen*, 143 S. Ct. at 1939—still would not "outnumber [its] legitimate ones," *Bell*, 697 F.3d at 453, 453 n.2, as technical overbreadth requires, so Media Organizations' facial challenge fails.

**1. The Buffer Law is entirely unlike the *Bell* ordinance.**

Media Organizations suggest any law suffers from overbreadth if it does not specify the behaviors permitting orders or the standards guiding orders. PI Mem. 26–27. True though this may be at times, the essential first question is whether the law's plain meaning applies in a manner that prohibits protected activity "as such." *Supra* Part III.A.1. If not, a court need not determine whether it is non-specific or standardless. Three facts show the *Bell* ordinance was vastly more susceptible to anti-speech use than the Buffer Law. Thus, while that ordinance was technically overbroad, the Buffer Law suffers neither from technical nor substantive overbreadth.

First, the *Bell* ordinance required "dispersal," without limitation. *Id.* at 450. This empowered LEOs to wholly prevent speech. To the extent the Buffer Law can effect speech at all, it is wholly different, since it restricts orders to 25 feet—a far cry from an orders to leave an area entirely, thus wholly preventing protected activity there. Second, the *Bell* ordinance applied directly to the right of assembly, specifically addressing situations where "three or more persons" were together "in the immediate vicinity." The Buffer Law does not directly apply to First Amendment conduct. Third, the *Bell* ordinance applied to any individual near *others* engaging in certain conduct, regardless of the individual's actions. The Buffer Law does not apply to passive presence and is not triggered by third parties. Instead, it is limited to those who *act* by continuing to "approach[]" after being ordered "to stop." Ind. Code § 35-44.1-2-14. This limits the range of speakers to whom it can be applied to a much smaller group than the *Bell* ordinance.[11]

Indiana has shown the profuse constitutional applications of the Buffer Law, which plainly outweigh its vanishingly unlikely unconstitutional applications, so it is not technically overbroad. The *Bell* ordinance is eminently different than the Buffer Law, so *Bell* does not change that.

---

[11]Further, although this Court need not engage in construction, one plain facial reading of the law is that it is limited to "encroachment on an investigation," the crime's title. Ind. Code § 35-44.1-2-14.

## 2. Pro-recording policy shows Buffer Law does not, in practice, apply against same.

Plain language aside, the Buffer Law *still* does not apply to those "engaged exclusively in . . . lawful First Amendment activity," *contra* PI Mem. 33 (citing *Brown*, 2023 U.S. App. LEXIS at \*63). As *Brown* itself observes, courts must consider guidance concerning enforcement, including enforcement authority guidance. 2023 U.S. App. LEXIS 30112, \*35–36, \*53–54; *Wis. Right to Life v. Paradise*, 138 F.3d 1183, 1185 (7th Cir. 1998) (even non-binding opinion showed law did not apply as alleged); *supra* Part III.A.2. LE policies show plain intent not to enforce the Buffer Law against First Amendment conduct, *supra* Part IV, so it will not likely be enforced unconstitutionally, much less significantly so, relative to legitimate enforcement.

The law's intent is facially plain, but Media Organizations nonetheless cite extraneous history (although it is not evidence of legislative intent, *see* Facts) to argue it is content-based. PI Mem. 33–34. That history, to the extent the Court considers it, reveals the opposite. The Bill's purpose was clear. *Supra* Part I. Proposed Amendment #6, PI Mem. 33, was plainly insufficient, requiring "conduct that would cause a reasonable person to believe that the person intends to interfere[.]" S. Mot. MO118606, Ind. Gen. Assemb., 2023 Sess., https://iga.in.gov/pdf-documents/123/2023/house/bills/HB1186/amendments/HB1186.03.COMS.AMS006.pdf. This would *not* cover acts that, regardless of intent, *would* likely interfere with LE. It would not have covered non-interfering acts that would endanger the person or violate privacy rights. So the amendment was rejected for insufficiency, not ill intent. The best extrinsic evidence of the conduct the Buffer Law was intended to cover, then, is the statements by its author regarding safety concerns.

Nor does the existence of a law prohibiting conduct that interferes with LE demonstrate ill legislative intent, *contra* PI Mem. 34 (citing Ind. Code § 35-44.1-3-1(a)(1)).[12] Public safety does

---

[12] Ind. Code § 35-44.1-3-1(a)(1) does not address conduct that merely "threatens to interfere with law enforcement," *contra* PI Mem. 34.

not hinge on "interference." A person's presence near a dangerous scene might not interfere with LEOs addressing it, but that does not negate the need to ensure that person's safety. Similarly, a person close enough to record a LEO's conversation with a witness might not interfere with the conversation, but that does not negate the need to preserve the witness's privacy rights. So the mere existence laws against interference does not show ill legislative intent. The same is true of laws relating to the limited scenarios in which LE has had an opportunity to and has in fact erected barrier tape and laws concerning interference with crime-reporting, *contra id.* at 36.

The foregoing shows the Buffer Law has no applicability to press activity. But it is applicable to myriad non-speech activities. As shown, Media Organizations cannot provide one example of the law being enforced unconstitutionally. The insubstantiality of the Buffer Law's potential "unconstitutional applications against [] protected expression" relative to "legitimate ones," 697 F.3d at 453, is the plain reason for this. The "technical overbreadth" analysis Media Organizations invoke does not apply. As they cannot provide any evidence of intent other than preservation of weighty interests, nor of enforcement aimed at protected activity, these arguments fail.

**3. Media Organizations' arguments under the technical overbreadth standard fail.**

Even under technical overbreadth analysis, the Buffer Law is properly tailored. First Amendment activity is excluded from "the behavior that can prompt a lawful [] order" per LE policy. And, *contra* PI Mem. 33, the law has one of the essentials that *Brown* noted as marks of "specificity of the laws upheld" by the Court: fixed distance. 2023 U.S. App. LEXIS 30112, *51–52 (citing *McCullen v. Coakley*, 573 U.S. 464, 471–72 (2014)). The law's 25-foot zone is well under the 35-foot zone upheld in *McCullen* and only a fraction of the content-based 100-foot zone upheld in *Burson*, 504 U.S. at 198. And the LE policies provide specific protection, mentioning not only the First Amendment, but the specific right to record LE. *Supra* Part IV.

The Buffer Law is specific and is limited by policy, which expresses appropriate standards to prevent targeting First Amendment activity. Accordingly, it is well within constitutional bounds.

**B. The Buffer Law satisfies both intermediate and strict scrutiny.**

**1. The Buffer Law is neutral, *de minimus*, and advances compelling state interests.**

As established, the Buffer Law is neutral. It also has an unusually minimal effect. Its indirect brushing on press activity differs in kind from TPM regulations, another reason to apply only rational basis scrutiny, since the law has only incidental press effects, *Lund*, 956 F.3d at 947. Place-oriented TPM regulations *directly* and *wholly prevent* expressive activity in a given place. The Buffer Law affects only 25 feet, the short distance between two highway lanes. Celeste Rep. 19. But even under intermediate scrutiny, this *de minimus* restriction easily passes muster.

This restriction serves at least ten weighty interests. Dr. Celeste, whose expert report supports this, is an expert in LE "training, criminal justice, [and] police practices and procedures[.]" Celeste Rep., 3.[13] His report shows the following interests are well-served by buffer laws:

**State Interest:**

**(1)** Compelling: Public safety. *United States v. Bonin*, 932 F.3d 523, 535 (7th Cir. 2019). The Buffer Law serves this interest by providing safety to arrestees, victims, other citizens at active crime scenes, and LEOs themselves. Celeste Rep. 5, 6, 18–19.

**(2)** Compelling: "[P]rotecting the integrity of government processes." *Bonin*, 932 F.3d at 535. Essential to this interest, the Buffer Law preserves crime scenes. *See* Celeste Rep. 7–8.

**(3)** Compelling: "encouraging citizens to report criminal activity." *Petr ex rel. Est. of Burton v. J.C. Penney Corp.*, No. 1:11-CV-00825-RLY, 2012 WL 3052840, at *3 (S.D. Ind.). The

---

[13]Dr. Celeste's credentials are detailed in his C.V., but include, *inter alia*, directing a lauded police academy for over 30 years, Dr. Richard Celeste C.V., Celeste Decl. Ex. B., 4, 6, teaching graduate courses, *id.* at 1, and numerous honors, *id.* at 9–10. He has served as an expert in over 200 cases. Celeste Decl. Ex. B, *passim*.

Buffer Law does so by preventing others from being "at a distance that embarrasses . . . or marginalizes the victim." Celeste Rep. 6. It also prevents dissuasion from doing so due to nearby filming that could capture embarrassing or endangering disclosures. *See id.* at 20.

**(4)** Compelling: Finding and convicting criminals. *Howes v. Fields*, 565 U.S. 499, 514 (2012). The Buffer Law serves this interest by preserving LEO safety, Celeste Rep. 8–16; and ensuring LEOs do not hesitate, due to uncertainty, to establish a perimeter when necessary for apprehension, as it *removes* discretion and the fear of a challenge to the use of discretion, preventing LEO second-guessing whether a perimeter would be legally challenged, *see id.* at 18.

**(5)** Compelling: investigation. *United States v. Blackman*, No. 18-CR-00728, 2023 WL 3346822, at *4 (N.D. Ill. 2023) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175–76 (1991)). The Buffer Law serves this interest as discussed in State Interests 2–4, *supra*.

**(6)** Substantial: "[R]educing crime." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 435 (2002). The Buffer Law serves this interest as discussed in State Interests 2–4, *supra*. By establishing a buffer from would-be assailants, it also prevents additional crimes against those who might otherwise become victims, Celeste Rep. 18–19; *see also id.* at 8–16.

**(7)** "Significant"[14]: office safety. *Bauer v. Armslist, LLC*, 572 F. Supp. 3d 641, 666 (E.D. Wis. 2021), *aff'd*, 70 F.4th 945 (7th Cir. 2023). The Buffer Law advances same. Celeste Rep. 16.

This concern cannot be overstated. A 25-foot buffer between a LEO and someone running leaves under three seconds to prepare, *id.* at 14, with reduced reaction time, rendering that time critical, *id.* at 14–16. In 2021, "43,649 [LEOs] were assaulted," usually while pursuing compelling interests—responding to disturbances, attempting arrests, maintaining custody. Celeste Rep. 11–12. Violence leads to many deaths in the line of duty—in 2019, for example, "46 officers

---

[14]The terms significant interest, important interest, and substantial interest are equivalent. *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 189 n.14 (1st Cir. 1996) (citation omitted).

died as a result of felonious acts." *Id.* at 10. Nearly 75% of such assaults are bodily, *id.* at 12, so a buffer zone could prevent them. These shocking statistics continue yearly. *Id.* at 8–13.

**(8)** Substantial: "making [] arrest[s] safely and without interference." *United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013). Beyond the established ways in which the Buffer Law promotes safety, it serves the "without interference" facet of this interest by assuring that press members do not hinder LEOs moving arrestees to medical or LE transport. Celeste Rep. 19.

**(9)** Substantial: the "privacy interest" in protecting the information of "part[ies] who may wish to keep secret the fact that they were" investigated, or who were "witnesses [or] informants[.]" *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 978 F. Supp. 2d 1, 9 (D.D.C. 2013) (cleaned up). The Buffer Law plainly serves this interest. Celeste Rep. 6, 20.

**(10)** Substantial: "administrative efficiency[.]" *Dixon v. Love*, 431 U.S. 105, 114 (1977). Were LEOs required, whenever needing space, to consider myriad laws each relating to one of the state interests their duties constantly intersect, and *then* to determine how many feet would serve that interest, they would have no time to perform the duty. *See* Celeste Rep. 18. By removing these questions and the discretion that comes with them, the Buffer Law helps LEOs efficiently administer duties. Notably, this dovetails plainly with *Hill*, avoiding a litany of "rules that focus exclusively on the individual impact of each instance of behavior," 530 U.S. at 729.

25 feet is the bare minimum necessary to preserve safety, since an individual can cover "25 feet in just over 3 seconds" when *walking*, much less running. Celeste Rep. 14 (citation omitted). So safety interests demand at least this minimal space. *Id.* at 19. The suggestion that it is "broader than necessary to accommodate any legitimate [] interest," PI. Mem. 35, is simply divorced from reality. Moreover, this enumeration shows how grievously Media Organizations err in asserting the Buffer Law can only be aimed at preventing speech. It prevents manifold ills.

**2. The Buffer Law is properly tailored under intermediate scrutiny.**

The Buffer Law is narrowly tailored: it "sweeps in" very little "protected . . . activity," PI

Mem. 36, burdening no more than necessary and providing ample alternative avenues. *Ward*, 491

U.S. at 799. Though it "need not be the least restrictive" means, *id.* at 798, it presents only *a de*

*minimus* burden, *supra* Facts, Part IV. *At least* this is necessary to achieve the interests above.[15]

As such, the statute would pass muster even if it established a larger buffer. 25 feet, however,

is the *minimal* distance to protect (**1**) LEOs from violent parties, (**2**) the privacy of a witness

wishing not to be heard; (**3**) citizens who would be in danger; and (**4**) the integrity of crime

scenes (whose perimeter may not be known initially). Thus, the Buffer Law burdens no more

press activity than necessary. Indeed, 25 feet will almost never prevent the press from capturing

the desired footage,[16] Celeste Rep. 17, 23; *see also supra* Facts (Media Organizations present no

facts showing such prevention), so there will almost always be many alternative avenues. The

law does not prevent the press recording LE activity since it does not involve visual barricades or

permit commanding press to go around a tight corner. Thus, *every square inch* of public space

that is more than this short distance from a LEO—and only one who has invoked the Buffer

Law—is an alternative avenue. *E.g.*, *supra* n.2. "The more [alternative avenues], the more likely

the restriction is reasonable," *Stokes v. City of Madison*, 930 F.2d 1163, 1172 (7th Cir. 1991), so

this is satisfied. The frequent availability of "body cam" footage provides yet another avenue.

*Brown v. Kemp* does not change this. The law at issue there directly targeted expressive

activity, prohibiting "[p]hotographing, videotaping, audiotaping, or through other electronic

---

[15]The Buffer Law is narrower, not broader, than the ordinance at issue in *Bell. Supra* Part VI.A.1 Media Organizations' protestations to the contrary, PI Mem. 37, are unavailing, including its arguments regarding specificity and tailoring, which Media Organizations have amply addressed above. The Buffer Law is analogous to other buffer laws, such as the one upheld in *Price*, 915 F.3d at 1119, not dispersal order laws.

[16]"[T]he protection of personal conversational privacy" "serves First Amendment interests because fear of public disclosure of private conversations might well have a chilling effect . . . ." *Alvarez*, 679 F.3d at 605; *see also* State Interests 3, 9. Thus, the fact that 25 feet may prevent recording private conversations is not relevant.

means, monitoring or recording the activities of the person. . . . regardless of where the act occurs." *Brown*, 2023 LEXIS 30112, at \*14; there was evidentiary "certainty" that it was "specifically intended to target . . . expressive activities," *id.* at \*69, \*78. These extraordinary issues, plainly triggering strict scrutiny, render that law wholly incomparable to the Buffer Law. Further, its vague terminology, *supra* n.4, is wholly in contrast to the Buffer Law's specificity, which ensures alternative avenues are clear and cannot be removed by discretion.

### 3. The Buffer Law is properly tailored under strict scrutiny.

Even under strict scrutiny, proposed less-restrictive alternatives must be reasonable. *CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) (citing *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183; *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). Virtually *all* LE duties serve compelling state interests, *see supra* Part VI.B.1; it would not be reasonable to have a litany of statutes that each relate to one particular interest. *See Hill*, 530 U.S. at 729. Indeed, such a scheme would render enforcement impossible, *supra* Part III.C, which is likely why LEOs are simply "entitled to enforce [laws] free from possible interference," *Colten*, 407 U.S. at 109; *Lund*, 956 F.3d at 947. The Buffer Law hems this right in, *preventing* discretion. Deference is granted to lawmakers on *what* distance is needed for such zones. *Burson*, 504 U.S. at 208–09.

As shown, Media Organizations fail to (**1**) establish that the Buffer Law lacks a "plainly legitimate sweep," *Washington State Grange*, 552 U.S. at 450, (**2**) demonstrate that "a substantial number of its applications are unconstitutional" relative to its "legitimate sweep," *id.* at 450 n.6 (cleaned up; citations omitted), and (**3**) to base unbridled discretion claims on anything more than speculation shown that both policy and actual enforcement show to be purely fanciful. This Court should decline to entertain such speculation. For this and all foregoing reasons, Media Organizations' First Amendment challenges are unlikely to succeed on the merits.

**C. The Buffer Law is not vague under *Hill*, which controls here.**

*Hill*'s buffer-law vagueness analysis is directly controlling on Media Organizations' Due Process Clause claims. *Price*, 915 F.3d at 1119; *see Hill*, 530 U.S. at 732–33. The Buffer Law "provide[s] people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Id.* at 732. In short, the Buffer Law has a "discernable core," which is all that is required to survive a facial, Fourteenth Amendment vagueness challenge. *Planned Parenthood of Ind. & Ky., Inc. v. Marion Cty. Prosecutor*, 7 F.4th 594, 603–04 (7th Cir. 2021).

Like the law in *Hill*, it has a scienter requirement[17] and contains no words likely to be misunderstood. Vagueness requires vague terminology. When terms like "serious inconvenience" trigger a law, the law may be found vague. *Bell*, 697 F.3d at 462 (cited at PI Mem. 39). But "25 feet," "approaches," and "stop," Ind. Code § 35-44.1-2-14, are clear. *Accord* 530 U.S. at 732. The law here prohibits continuing to approach after an order to stop. There is nothing vague: "it is clear what the [law] . . . prohibits." *Id.* at 733 (quoted source omitted).

"For the same reason," the Buffer Law "give[s] adequate guidance to [LE]" so as to avoid "discriminatory enforcement." *Id.* at 732–33. As in *Hill*, the zone's "specificity" is "one of the [law's] virtues." *Id.* at 733. And although enforcement "always" requires "some" discretion, *id.*, policy prohibiting enforcement against recording cures concerns based on theoretical vagueness.

Although Media Organizations allege chill arising from the Buffer Law, Indiana has shown their "chill" is purely speculative. Their self-censorship is *not* reasonable and does not evince vagueness. *Contra* PI Mem. 41. Their vagueness claim is unlikely to succeed on the merits.

---

[17]This renders all of Media Organizations' purported concerns about not knowing where 25 foot boundary lies or not being able to retreat through a crowd irrelevant. *See* PI Mem. 31–32; *see also Marion Cty. Prosecutor*, 7 F.4th at 601 (intent requirement helps prevent vagueness).

**VII. The remaining factors favor denying the Motion.**

The other PI factors compel denying the Motion. Media Organizations' low likelihood of merits success requires the balance of harms to favor them. *Jones*, 842 F.3d at 1060. It does not.

As discussed, Media Organizations have not shown press activity is likely to be meaningfully hindered by the Buffer Law. To the contrary, their experience, detailed in the record, shows they remain able to capture the footage they wish to capture; and when unable, their own declarations show this is a result not of the Buffer Law, but of practices long predating it, *supra* pp. 3, 4–5. Any need, arising from a hypothetical future application of the law, to relocate in order to capture a better angle would not implicate a First Amendment right, but simply a desire for certain artistic or technical merits. Further, their many lengthy delays in seeking an injunction, *see* Dkt. 28, ¶¶ 8–11, waive any presumption of urgent need, severely undermining any claim of imminent harm absent immediate relief. *See Ty, Inc. v. Jones Grp. Inc.*, 237 F.3d 891, 903 (7th Cir. 2001). No constitutional harm will befall Media Organizations if the Motion is denied.

Indiana, however, would be harmed. The Buffer Law supports no less than ten weighty interests, including public safety, LEO safety, and privacy rights. The state's concern in upholding these, and the public's concern in seeing duly enacted laws enforced, would be gravely harmed were the Buffer Law enjoined. Accordingly, the balance of harms falls strongly against enjoining the Buffer Law. As the PI Motion could only survive upon an extremely strong showing of the opposite since it has little likelihood of success on the merits, there is no remaining rationale for granting same. As such, the Motion should be denied.

## Conclusion

For all of the foregoing reasons, the Motion should be denied.

Dated: January 5, 2024

Respectfully Submitted,

OFFICE OF CORPORATION COUNSEL
John P. Lowrey, Ind. Bar No. 29349-53
Deputy Chief Litigation Counsel
200 E. Washington Street, Suite 1601
Indianapolis, Indiana 46204
T: (317) 327-4055
F: (317) 327-3968
john.lowrey@indy.gov
*Counsel for Kerry Forestal*

Theodore E. Rokita
Indiana Attorney General
Ind. Bar No. 18857-49

By:
/s/ James Bopp, Jr.
James Bopp, Jr., Ind. Bar No. 2838-84
Taylor Shetina, Ind. Bar No. 37887-45
THE BOPP LAW FIRM, PC
The National Building
1 South Sixth Street
Terre Haute, Indiana 47807
Telephone: 812/232-2434
Facsimile: 812/235-3685
jboppjr@aol.com
tshetina@bopplaw.com
*Attorneys for Defendants Todd Rokita and Ryan Mears*