UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |
|---|---|
| REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, INDIANA BROADCASTERS ASSOCIATION, INDIANA PROFESSIONAL CHAPTER OF THE SOCIETY FOR PROFESSIONAL JOURNALISTS, INDIANAPOLIS STAR, NEXSTAR MEDIA INC., SCRIPPS MEDIA, INC., and TEGNA INC.,<br><br>                 *Plaintiffs*,<br><br>    v.<br><br>TODD ROKITA, *in his official capacity as Attorney General of Indiana*, and RYAN MEARS, *in his official capacity as Marion County Prosecutor*, and KERRY FORESTAL, *in his official capacity as Marion County Sheriff*,<br><br>                 *Defendants*. | CASE NO. 1:23-cv-1805-JRS-MG<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

SUMMARY OF ARGUMENT ........................................................................................ 1

ARGUMENT ................................................................................................................. 3

    I.    HB 1186 authorizes every law enforcement officer in Indiana to order Plaintiffs' journalists to stop approaching for any reason—or for no reason.................................... 3

    II.   Plaintiffs have standing to challenge HB 1186. ................................................. 6

        A.   Plaintiffs' journalists face a credible threat of enforcement. ..................... 7

        B.   Plaintiffs have established a chilling-effect injury.................................... 10

        C.   Plaintiffs' injury can be redressed by relief against Attorney General Rokita. ....... 11

    III.  HB 1186 violates the Constitution. ................................................................ 12

        A.   HB 1186 is void for vagueness. ............................................................ 12

        B.   HB 1186 violates the First Amendment as applied to Plaintiffs' peaceful, non-obstructive newsgathering in public places. ....................................... 15

        C.   HB 1186 is facially overbroad. .............................................................. 19

        D.   The Celeste Report provides no relevant or reliable evidence to support the Act. ................................................................................................. 21

    IV.  The remaining preliminary injunction factors favor Plaintiffs........................ 24

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Am. C.L. Union of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ............................................................................. *passim*

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
572 F.3d 440 (7th Cir. 2009) ..................................................................................... 7

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012) ............................................................................. *passim*

*Benham v. City of Charlotte*,
635 F.3d 129 (4th Cir. 2011) ................................................................................... 11

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*,
331 U.S. 519 (1947) ................................................................................................... 4

*Bourgeois v. Peters*,
387 F.3d 1303 (11th Cir. 2004) ............................................................................... 21

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023) ............................................................................. *passim*

*Buquer v. City of Indianapolis*,
797 F. Supp. 2d 905 (S.D. Ind. 2011) ....................................................................... 4

*City of Chicago v. Morales*,
527 U.S. 41 (1999) ............................................................................................. *passim*

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ................................................................................... 2, 6, 20, 21

*Colten v. Kentucky*,
407 U.S. 104 (1972) ............................................................................................ 4, 20

*Crandon v. United States*,
494 U.S. 152 (1990) ................................................................................................... 5

*Ctr. for Individual Freedom v. Madigan*,
697 F.3d 464 (7th Cir. 2012) ..................................................................................... 6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ................................................................................................. 24

*Doe v. Holcomb*,
883 F.3d 971 (7th Cir. 2018) ................................................................................... 12

*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992) .................................................................................... 18

*Gaudiya Vaishnava Soc'y v. City & Cnty. of San Francisco*,
    952 F.2d 1059 (9th Cir. 1990) ................................................................... 20

*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011) .................................................................. 19, 21

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .............................................................................. 14, 15

*Hill v. Colorado*,
    530 U.S. 703 (2000) .............................................................................. 15, 17

*Hodgkins ex rel. Hodgkins v. Peterson*,
    355 F.3d 1048 (7th Cir. 2004) ............................................................. 16, 21

*Hulbert v. Pope*,
    70 F.4th 726 (4th Cir. 2023) ...................................................................... 17

*Ideal Indus., Inc. v. Gardner Bender, Inc.*,
    612 F.2d 1018 (7th Cir. 1979) ................................................................... 26

*Ind. Right to Life Victory Fund v. Morales*,
    66 F.4th 625 (7th Cir. 2023) ............................................................... 1, 2, 5

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*,
    56 F.4th 437 (7th Cir. 2022) ............................................................... 11, 25

*Jordan v. Jenkins*,
    73 F.4th 1162 (10th Cir. 2023) .................................................................. 17

*Kirk v. Clark Equip. Co.*,
    991 F.3d 865 (7th Cir. 2021) ............................................................... 23, 24

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ........................................................................... 2, 4, 15

*Laird v. Tatum*,
    408 U.S. 1 (1972) ....................................................................................... 11

*Lang v. Kohl's Food Stores, Inc.*,
    217 F.3d 919 (7th Cir. 2000) ..................................................................... 23

*Lund v. City of Rockford*,
    956 F.3d 938 (7th Cir. 2020) ....................................................................... 4

*Majors v. Abell*,
  317 F.3d 719 (7th Cir. 2003) ........................................................................ 9

*Marcavage v. City of Chicago*,
  659 F.3d 626 (7th Cir. 2011) ...................................................................... 17

*McCullen v. Coakley*,
  573 U.S. 464 (2014)........................................................................... 3, 16, 22

*Michigan v. U.S. Army Corps of Eng'rs*,
  667 F.3d 765 (7th Cir. 2011) ...................................................................... 22

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007).......................................................................................6

*Nieves v. Bartlett*,
  139 S. Ct. 1715 (2019) ................................................................................ 18

*Pass & Seymour, Inc. v. Hubbell Inc.*,
  532 F. Supp. 2d 418 (N.D.N.Y. 2007)......................................................... 22

*Perkins v. Hart*,
  No. 22-30456, 2023 WL 8274477 (5th Cir. Nov. 30, 2023) ................... 19, 21

*Price v. City of Chicago*,
  915 F.3d 1107 (7th Cir. 2019) ................................................................ 15, 17

*Randall v. Sorrell*,
  548 U.S. 230 (2006)..................................................................................... 22

*Reed v. Lieurance*,
  863 F.3d 1196 (9th Cir. 2017) .................................................................... 17

*SCCI Hosps. of Am., LLC v. Home-Owners Ins. Co.*,
  571 F. Supp. 3d 942 (N.D. Ind. 2021) ........................................................ 22

*Schenck v. Pro-Choice Network of W. N.Y.*,
  519 U.S. 357 (1997)..................................................................................... 19

*Schirmer v. Nagode*,
  621 F.3d 581 (7th Cir. 2010) ...................................................................... 10

*Shuttlesworth v. City of Birmingham*,
  382 U.S. 87 (1965)............................................................................ 1, 14, 15

*Sly v. State*,
  387 So. 2d 913 (Ala. Crim. App. 1980) ....................................................... 10

*Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n,*
   742 F.3d 282 (7th Cir. 2014) ........................................................ 18

*Speech First, Inc. v. Killeen,*
   968 F.3d 628 (7th Cir. 2020) ........................................................ 11

*State v. Clark,*
   No. A-5065-13T1, 2017 WL 2730258 (N.J. Super. Ct. App. Div. June 26, 2017) ................. 23

*Stenberg v. Carhart,*
   530 U.S. 914 (2000) .................................................................. 5

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) .................................................................. 8

*Teel v. Lozada,*
   826 F. App'x 880 (11th Cir. 2020) ................................................. 25

*Thornhill v. Alabama,*
   310 U.S. 88 (1940) ............................................................. 13, 21

*Ty, Inc. v. Jones Grp., Inc.,*
   237 F.3d 891 (7th Cir. 2001) .................................................... 25, 26

*United States v. Sinclair,*
   74 F.3d 753 (7th Cir. 1996) ........................................................ 23

*Uzuegbunam v. Preczewski,*
   141 S. Ct. 792 (2021) .............................................................. 12

*W. Ala. Women's Ctr. v. Williamson,*
   900 F.3d 1310 (11th Cir. 2018) ..................................................... 5

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ................................................................. 6

*Weinberg v. City of Chicago,*
   310 F.3d 1029 (7th Cir. 2002) ..................................................... 19

*Whole Woman's Health Alliance v. Hill,*
   377 F. Supp. 3d 924 (S.D. Ind. 2019) .............................................. 12

*Wis. Right to Life, Inc. v. Paradise,*
   138 F.3d 1183 (7th Cir. 1998) ...................................................... 6

*Wis. Right to Life, Inc. v. Barland,*
   751 F.3d 804 (7th Cir. 2014) ...................................................... 18

**Statutes**

Ind. Code § 35-44.1-2-14 ................................................................................................ 1, 4, 5, 10

Ind. Code § 35-44.1-3-1 ........................................................................................................... 6

Ind. Code § 35-44.1-4-1.5 ........................................................................................................ 6

Ind. Code § 35-44.1-4-5 ............................................................................................................ 6

**Other Authorities**

Christian Sheckler, *South Bend Police Has No Mandatory De-escalation Training, but 7
    'Combat Shoots' Each Year*, S. Bend Trib. (July 8, 2020),
    https://perma.cc/E8N9-ZDKD ........................................................................................ 24

Dave Brown & Randy LaHaie, *The Myth of the '21-Foot' Rule*,
    Blue Line (Dec. 28, 2020),
    https://perma.cc/X2YP-CU86 ........................................................................................ 24

David Jones, *Edwards Vetoes Bill Creating 25-Foot Buffer Zone for Police Officers*,
    Fox8 (June 29, 2023),
    https://perma.cc/G4S5-2FF9 ......................................................................................... 22

Devon Maloney, *The 5 Biggest Tech Myths Perpetuated by TV Shows and Movies,
    According to Experts*, Vulture (Sept. 30, 2015),
    https://perma.cc/FGA9-T8P9 ........................................................................................ 23

*Encroach*, The Britannica Dictionary,
    https://perma.cc/ZF99-XMA9 (last visited Jan. 18, 2024) ........................................... 5

Kelly McLaughlin, *Police Training Programs Have a Pseudoscience Problem*,
    Business Insider (June 17, 2020),
    https://perma.cc/6SMX-7UV8 ....................................................................................... 24

Mem. of Law in Supp. of Mot. for Prelim. Inj.,
    *Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Aug. 22, 2023)................... 16

Police Exec. Rsch. Forum, Guiding Principles on Use of Force (2016),
    https://perma.cc/46R9-XE7N........................................................................................... 24

Proposed Amendment #6 to HB 1186, S. Mot. MO118606, Ind. Gen. Assemb.,
    2023 Sess.,
    https://perma.cc/594W-G8ZQ ..................................................................................... 6, 7

Reply in Supp. of Mot. for Prelim. Inj.,
    *Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Oct. 5, 2023)..................... 16

Richard A. Webster, *Video of Mother's Arrest Raises Questions About 25-Foot Buffer Law*, La. Illuminator (June 9, 2023), https://perma.cc/L4TC-YADT ............................................................................................... 19

Slip Opinion, *Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Jan. 12, 2024), https://perma.cc/AT7D-JGUD ........................................................................... 2, 3, 16

## SUMMARY OF ARGUMENT

Defendants' opposition attempts to defend a statute very different than the one the State of Indiana actually passed, and it attempts to do so under the law as Defendants wish it were rather than the law the Supreme Court and Seventh Circuit have established.  None of that misdirection can cure the obvious "constitutional vice" of Ind. Code § 35-44.1-2-14 ("HB 1186" or the "Act"):  Under its plain text, journalists may "stand on a public sidewalk" to gather news "only at the whim of any police officer."  *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965).  Plaintiffs' motion for an injunction against the Act's enforcement should be granted.

As to both standing and the merits, Defendants rely on essentially the same argument. They contend the Act conforms with the Constitution and will not be enforced against Plaintiffs' journalists because officers may order them to stop approaching "only for weighty interests." Defs.' Joint Resp. in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Opp'n") at 5 (ECF No. 34). But the law says no such thing; it states in full:

> A person who knowingly or intentionally approaches within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching commits unlawful encroachment on an investigation, a Class C misdemeanor.

Ind. Code § 35-44.1-2-14.  None of the "at least ten" interests that Defendants claim an officer's orders must be tethered to appear in the Act; there is no reference to safety, interference, crime scenes, arrests, privacy, witnesses, or any of the supposed limiting principles Defendants proffer. Defs.' Opp'n at 29.  But this Court "cannot adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent . . . even at the behest of state officials."  *Ind. Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023) (citation and internal quotation marks omitted).  And the claim that every officer and prosecutor in

Indiana "will act in good faith and adhere to standards absent from the ordinance's face . . . is the very presumption that the doctrine forbidding unbridled discretion disallows," *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988). Plaintiffs' journalists already have been injured by the "substantial power to discriminate" conferred by the Act, and this Court "must entertain an immediate facial attack on the law" without waiting still more harm. *Id.* at 759.

Defendants' remaining arguments fare no better. While the Act's burdens on Plaintiffs' First Amendment rights are grave, the most straightforward basis for enjoining its enforcement is its vagueness. The Act "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat" in violation of the Due Process Clause. *Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (citation and internal quotation marks omitted). All Defendants have to say on that issue is that the Act clearly prohibits "continuing to approach after an order to stop." Defs.' Opp'n at 34. True, but beside the point. The statute "does not provide any guidance to the officer deciding whether such an order should issue" in the first place, *City of Chicago v. Morales*, 527 U.S. 41, 62 (1999) (majority opinion), and is therefore void for vagueness.

The First Amendment likewise condemns the statute's burdens on Plaintiffs' ability to gather and report the news.[1] Defendants attempt to rescue the Act on the theory that it regulates

---

[1]    As discussed in more detail below, the U.S. District Court for the Northern District of Indiana recently rejected a facial First Amendment challenge to the Act. *See Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Jan. 12, 2024), slip op. at 6, https://perma.cc/AT7D-JGUD. Even assuming the correctness of that result, the *Nicodemus* Court expressly "offer[ed] no views on any other constitutional analysis because none other ha[d] been argued," including whether the Act is unconstitutionally vague, *id.* at 6 n.4, or unconstitutional as applied to individuals engaged in non-obstructive newsgathering, *see id.* at 7. In other words, it addressed only questions this Court need not reach. Importantly, though, the Northern District's overbreadth analysis turned on the erroneous conclusion that the law was "directed to conduct" rather than speech, *id.* at 11, a result that precedent cannot support. *See McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (abortion clinic buffer-zone law that "sa[id] nothing about speech on its face" was nevertheless "subject to First Amendment scrutiny").

conduct rather than newsgathering or speech, *see* Defs.' Opp'n at 15–17, but the Seventh Circuit in *Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023), squarely held otherwise: "Because the First Amendment protects conduct and activities necessary for expression," it extends to "approaching" a newsworthy event in order "to carry out plaintiffs' protected monitoring and recording," *id.* at 779.  And Defendants cite no case supporting the proposition that the Act is adequately tailored.  Nor could they; HB 1186 authorizes officers to issue a 'stay back' order for any reason or no reason, regardless whether a reporter's presence in fact "risk[s] substantial harm or if dispersal is otherwise *necessary*."  *Bell v. Keating*, 697 F.3d 445, 459 (7th Cir. 2012).

At base, any law that allows officers "to decide arbitrarily which members of the public they will order to disperse"—including journalists engaged in non-obstructive newsgathering—is "indistinguishable from the law [the Supreme Court] held invalid in *Shuttlesworth*."  *Morales*, 527 U.S. at 58–59 (plurality opinion).  Indiana has enacted that law.  This Court should enjoin it.

## ARGUMENT

I. **HB 1186 authorizes every law enforcement officer in Indiana to order Plaintiffs' journalists to stop approaching for any reason—or for no reason.**

Defendants' remarkable opening gambit in defense of HB 1186 is that the statute is a nullity; the Act, they argue, limits officers' "**common law perimeter discretion**" and proscribes nothing.  Defs.' Opp'n at 5.  That interpretive claim—upon which Defendants' standing and merits arguments hinge—is meritless.  The law's plain text regulates citizens, not officers, by creating a new criminal offense:  Any "person" who approaches after being told not to "commits unlawful encroachment on an investigation, a Class C misdemeanor."  Ind. Code § 35-44.1-2-14. Neither *Colten v. Kentucky*, 407 U.S. 104 (1972), nor *Lund v. City of Rockford*, 956 F.3d 938 (7th Cir. 2020)—both of which involved the enforcement of specific statutory offenses— recognized anything like a free-floating common-law power to give such orders.  *See Colten*, 407

U.S. at 108 (disorderly conduct); *Lund*, 956 F.3d at 947 (obstruction of justice).  That should be no surprise, because the Supreme Court has long held that entrusting "lawmaking to the moment-to-moment judgment of the policeman on his beat" would violate the Constitution, *Kolender*, 461 U.S. at 360 (citation and internal quotation marks omitted), and that officers do not have a free hand "when individuals ordered to disperse or move along manifest a 'bona fide intention to exercise a constitutional right,'" *Bell*, 697 F.3d at 459 (quoting *Colten*, 407 U.S. at 111).

Defendants' related suggestion that "the law permits such orders . . . only for weighty interests" cannot be reconciled with its text.  Defs.' Opp'n at 5.  Reading the Act to apply "only in circumstances in which the officer has a separate, lawful reason" to issue a 'stay back' order, "apart from being based on nothing within the text of the statute itself, would render [the Act] completely meaningless." *Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905, 918–19 (S.D. Ind. 2011).  The only textual hook Defendants identify for that claim is the Act's title, "encroachment on an investigation," but it is hard to see how any limiting principle can be derived from that phrase.  For one, "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947).  And in any event, here the Act itself defines the meaning of the title phrase:  A person "commits unlawful encroachment on an investigation" if they "knowingly or intentionally approach[] within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop."  Ind. Code § 35-44.1-2-14.  The ordinary meaning of "encroach"—"to gradually move or go into an area that is beyond the usual or desired"—likewise communicates nothing about what, in particular, makes a journalist's proximity to an officer unusual or undesired. *Encroach*, The Britannica Dictionary, https://perma.cc/ZF99-XMA9 (last visited Jan.

4

18, 2024).  Put simply, the Act's title provides none of the limiting detail Defendants claim.

Defendants' representations about how they plan to enforce the Act—also discussed in Plaintiffs' Opposition to Defendants' Motion to Dismiss at 16–18 (ECF No. 32) (hereinafter "Plaintiffs' Opposition")—add nothing to the analysis.  The Supreme Court has "never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference," *Stenberg v. Carhart*, 530 U.S. 914, 941 (2000) (quoting *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment)), and has warned, in particular, "against accepting as 'authoritative' an Attorney General's interpretation of state law" where the Attorney General lacks authority to bind local law enforcement and prosecuting authorities, *id.* at 940–41.  Those principles are fully applicable here.  "Mid-litigation assurances are all too easy to make and all too hard to enforce," *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018), especially where "district attorneys in every county" and "[s]heriffs' deputies all over the state" can enforce the statute's plain text against Plaintiffs regardless of what Defendants say here, *Brown*, 86 F.4th at 768; *see also Ind. Right to Life Victory Fund*, 66 F.4th at 631 (noting that "[i]t is only when a state agency acknowledges that it will not enforce a statute because it is *plainly* unconstitutional that such statements might mean anything at all" (citation and internal quotation marks omitted)).  None of the authorities Defendants cite for the claim that their interpretation is relevant to the Act's meaning involved government defendants who lacked the authority to bind the relevant enforcement authorities.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989) (city's interpretation of its *own* ordinance relevant to its meaning).[2]

---

[2]       Indeed, Defendants' argument is contrary to the holdings of the cases they cite. *Wisconsin Right to Life, Inc. v. Paradise*, 138 F.3d 1183 (7th Cir. 1998), does not say that "even [a] non-binding opinion" can show that a law "did not apply as alleged."  Defs.' Opp'n at 27. The enforcement agency in that case—an election board—also had "promulgated a rule" that barred the enforcement action plaintiffs feared.  *Paradise*, 138 F.3d at 1185.  The Seventh

Only interpretations that have "virtually the force of a judicial construction" can limit a statute's text, and Defendants have offered no binding limit here.  *City of Lakewood*, 486 U.S. at 770 n.11.

Finally, Defendants object to reading HB 1186 in light of other Indiana law, but "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (citation and internal quotation marks omitted).  Defendants claim, for instance, that the Act is tailored to "preserv[ing] crime scenes" and safeguarding investigations or arrests, Defs.' Opp'n at 29, but lawmakers know how to tailor a law to those "emergency incident area[s]" because they have already done so elsewhere, *see* Ind. Code § 35-44.1-4-5; *see also* Ind. Code § 35-44.1-4-1.5 (defining "emergency incident" to include "a crime scene," "a police investigation," and "a location where an individual is being arrested").  And while Defendants insist that the law prohibits only "interference with LEO duties," Defs.' Opp'n at 1, Indiana lawmakers know how to prohibit "interfer[ing] with a law enforcement officer"—by saying so.  Ind. Code § 35-44.1-3-1(a)(1).  In HB 1186, they chose not to.  *See* Proposed Amendment #6 to HB 1186, S. Mot. MO118606, Ind. Gen. Assemb., 2023 Sess., https://perma.cc/594W-G8ZQ (rejected amendment that would have required proof of real or apparent intent to interfere with officers' duties).  The Act means what it says:  Any officer in Indiana can order Plaintiffs' journalists to stop approaching for any reason—or no reason at all.

## II.    Plaintiffs have standing to challenge HB 1186.

"As a general matter, a plaintiff who wishes to engage in conduct arguably protected by the Constitution, but proscribed by a statute, successfully demonstrates an immediate risk of

---

Circuit has stated clearly that *Paradise* stands for the proposition that "*formal* determinations by the state authorities," not hortatory ones, can be relevant to interpreting a statute's scope.  *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 474 (7th Cir. 2012) (emphasis added).

injury." *Bell*, 697 F.3d at 451.  Defendants dispute only the second prong of that test, *see* Defs.'
Opp'n at 32–33 (conceding that "[p]hotographing, videotaping, audiotaping, or through other
electronic means, monitoring or recording" is "expressive activity" (quoting *Brown*, 86 F.4th at
757)); *see also Brown*, 86 F.4th at 779 (First Amendment "protects conduct and activities
necessary for expression," including "approaching" newsworthy subject matter "to carry out
plaintiffs' protected monitoring").  As the discussion above makes clear, however, the Act's text
does in fact authorize officers to proscribe Plaintiffs' constitutionally protected activities.

Defendants then offer a collection of rearguard arguments against reaching the merits
regardless.  To avoid excessive duplication of Plaintiffs' Opposition—in particular, Defendants
have offered no new arguments on listener or organizational standing that are not already
addressed in that Opposition—Plaintiffs briefly address only Defendants' new arguments here
and otherwise incorporate their Opposition by reference.  *See* Plaintiffs' Opposition at 12–22.[3]

A.    Plaintiffs' journalists face a credible threat of enforcement.

The most straightforward basis for Plaintiffs' standing is the fact their journalists face a
credible threat the Act will be enforced against them—as indeed it already has.  The record
before the Court demonstrates that Plaintiffs' journalists intentionally approach within 25 feet of
officers to gather the news nearly every day and already have been told, since the Act went into
effect, to back away at a cost to their newsgathering.  *See* Decl. of Ryan Thedwall ("Thedwall

---

[3]    While the two motions arise in different postures, the standard for this Court's decision is
substantially the same because Defendants' motion to dismiss introduced a grab-bag of "external
facts" beyond those in the Complaint in an effort to "call[] the court's jurisdiction into question."
*Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009).  On that footing,
the Court "may properly look beyond the jurisdictional allegations of the complaint and view
whatever evidence has been submitted on the issue to determine whether in fact subject matter
jurisdiction exists."  *Id.* (citation omitted).  There is, accordingly, no merit to Defendants'
objection that Plaintiffs have relied on the same declarations in the context of both motions.

Decl.") ¶ 10 (ECF No. 27-1); Decl. of Scott Hums ("Hums Decl.") ¶ 12 (ECF No. 27-2).

Defendants insist, in response, that Plaintiffs must plead not only an intent to approach law enforcement officers but also an intent to "violate police orders." Defs.' Opp'n at 8. The Supreme Court has settled, however, that "[n]othing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014); *see also Brown*, 86 F.4th at 765 ("The Supreme Court and this court have repeatedly held that plaintiffs can show standing for pre-enforcement challenges even where they disclaim the intent needed to violate a challenged statute."). It suffices for standing that Plaintiffs' reporters are "subject to a statute that [is] vague and likely to be pushed to the outer limits of constitutionality and beyond," even though those reporters take pains to avoid obstructing officers' duties. *Brown*, 86 F.4th at 766.

Defendants next object that the law cannot be challenged unless an officer specifically "reference[s] the Buffer Law" when issuing an order to one of Plaintiffs' journalists. Defs.' Opp'n at 10. Article III requires no such thing. First, even if none of Plaintiffs' reporters had ever been ordered to stop approaching, Plaintiffs would still have standing; Article III does not require that Plaintiffs show that the authorities have threatened to enforce the Act against them, in particular, because that "threat is latent in the existence of the statute." *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003). The Seventh Circuit has held as much in the very context at issue here: standing to challenge a statute that imposes liability only after "[f]ail[ure] to obey a lawful order." *Bell*, 697 F.3d at 450 (first alteration in original) (citation omitted). As the Seventh Circuit explained, "that the ordinance applies only if triggered does not attenuate [plaintiff's] likelihood of prosecution under [it] or subvert the concreteness of [plaintiff's] chilling injury," because "when one cannot know what triggers the ordinance such that it will be enforced, he

8

may fairly assume that it can and will always be enforced." *Id.* at 455. So too here. Because reporters cannot know when officers will opt to trigger the prospect of criminal liability if they approach, the Act threatens their journalism *whenever* they decide to cover events that can only be documented from within 25 feet. *See also Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012) (finding standing on the basis of "planned recording" because statute would "flatly prohibit[]" that recording "absent officer consent" that had not yet been sought or denied).

Second, even if Plaintiffs needed to present evidence of having received such orders to establish standing (they don't), Plaintiffs have done so. Defendants speculate that the order that WTHR photojournalist Ryan Thedwall received and complied with might have been issued pursuant to an Indiana statute that allows officers to establish crime-scene perimeters, *see* Defs.' Opp'n at 9–10, but the record belies that assertion: Thedwall averred that officers were *not* establishing a perimeter and, in fact, "were allowing bystanders who were not working as journalists to get closer," Thedwall Decl. ¶ 12. Regardless, nothing in the Act's text or otherwise requires that an order use any particular magic words—or rely on authority under HB 1186 in particular, as opposed to any of the other Indiana statutes that authorize officers to issue binding orders—to trigger the threat of criminal penalties under the Act. If the substance of an order is "stop approaching," any person who nevertheless approaches "commits unlawful encroachment on an investigation" under HB 1186, period. Ind. Code § 35-44.1-2-14; *see also, e.g.*, *Sly v. State*, 387 So. 2d 913, 915–16 (Ala. Crim. App. 1980) (though phrased as a "request," officer's asking for driver's license was a binding order because backed by statutory authority to arrest for failure to comply). As a result, even if it were true that the order to Thedwall also relied on authority under the crime-scene buffer statute—it isn't—Thedwall faced the threat of additional fines and additional jail time because of the Act. Defendants' approach, which would require

working journalists to defy police orders to learn precisely which statute an officer had in mind, cannot be reconciled with the rule that a plaintiff "need not risk arrest before bringing a pre-enforcement challenge." *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010). Because Plaintiffs' journalists have unquestionably been "told by law enforcement to move back" while gathering the news since the Act went into effect, it has been enforced against them. Thedwall Decl. ¶ 10; *see also* Hums Decl. ¶ 11 (estimating "that a member of the WTHR newsroom is asked to step back or move away from a law enforcement officer as often as once a day").

Finally, that officers would sometimes ask Plaintiffs' reporters to stay back before the Act was adopted does Defendants no good. As Plaintiffs' declarants explain, the key difference is that those instructions are now backed by the threat of criminal liability; Plaintiffs' reporters are "more likely to comply" with what they may previously have understood as a voluntary request "in order to avoid the risk of being arrested under HB 1186, at the cost of any images or audio" they can no longer obtain. Decl. of Robert Scheer ("Scheer Decl.") ¶ 14 (ECF No. 27-3); *see also* Thedwall Decl. ¶¶ 11–12 (journalist complied after officer "told [him] to move back," despite obstructed view, because he "didn't want to spend the night in jail"). Because all such interactions are now necessarily "regulatory, proscriptive, or compulsory in nature," *Laird v. Tatum*, 408 U.S. 1, 11 (1972), Plaintiffs are injured by the Act whenever they are put to the choice—as they have already been—between obeying a request to back up and gathering news.

> B.    Plaintiffs have established a chilling-effect injury.

The Act's present chilling effect on Plaintiffs' journalists' ability to exercise their First Amendment rights provides an independent basis for standing. Plaintiffs' Opposition at 19–20; *see Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (noting that a credible threat of enforcement and a chilling effect are independently adequate theories of Article III injury).

To their prior arguments on that front, Defendants add the suggestion that Plaintiffs cannot demonstrate a cognizable chilling effect because they have not completely abandoned newsgathering and reporting.  But the Seventh Circuit has already held otherwise.

The fact that Plaintiffs "continued to engage in *some* [protected] activity does not foreclose their contention that they were deterred from engaging in other activities"; Plaintiffs are not required to demonstrate a "total deprivation."  *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 451 (7th Cir. 2022); *accord Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (plaintiff alleging chilling effect "need not show she ceased those activities altogether to demonstrate an injury in fact" (citation and internal quotation marks omitted)).  Indeed, *Brown* squarely forecloses Defendants' argument.  In that case, the Seventh Circuit held that a news organization's desire to report "more than it currently does" on a given topic demonstrated its standing to challenge a statute that ratcheted up the risk of "obtain[ing] the necessary firsthand documentation."  86 F.4th at 767.  Plaintiffs need not abandon the First Amendment function of the press entirely to challenge the Act's unlawful burdens on their work.

C.     Plaintiffs' injury can be redressed by relief against Attorney General Rokita.

Defendants contend that Attorney General Rokita is immune from suit.  *See* Defs.' Opp'n at 15 (citing *Doe v. Holcomb*, 883 F.3d 971, 976 (7th Cir. 2018)).  He is not.  *Doe* held that the Attorney General of Indiana could not be named in a challenge to a statute that had "no criminal penalties."  883 F.3d at 977.  No surprise, then, that courts in this District have found *Doe* inapposite where—as here—"the challenged statutes are directly criminally enforceable," because it would be "incredible and unsustainable to hold that the state officer responsible for defending criminal convictions secured under a statute does not have 'some connection' with the statute's enforcement."  *Whole Woman's Health Alliance v. Hill*, 377 F. Supp. 3d 924, 936 (S.D.

Ind. 2019) (quoting *Doe*, 883 F.3d at 975).  Neither does the fact that Attorney General Rokita shares prosecutorial authority with county prosecutors defeat redressability.  Plaintiffs' requested relief against him need not "provide full redress," because "the ability to effectuate a partial remedy satisfies the redressability requirement."  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (citation and internal quotation marks omitted).  And it should go without saying that preventing the Attorney General from cooperating in any effort to enforce the Act against Plaintiffs would provide at least partial relief.  *Brown*—which found redressability satisfied in a suit that, as discussed above, did not name anywhere near the full set of officials who could enforce the statute—is once again directly on point.  86 F.4th at 770.  Plaintiffs can secure effective relief through an injunction against Attorney General Rokita, and he is a proper party.

### III.    HB 1186 violates the Constitution.

The Act violates the Due Process Clause and the First Amendment for related but ultimately independent reasons:  It "does not provide any guidance to the officer deciding whether such an order should issue," *Morales*, 527 U.S. at 62 (majority opinion), and it "lends itself to harsh and discriminatory enforcement" against "activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press," *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  Because the Fourteenth Amendment vagueness question can be resolved without the need to address the parties' (many) disputes about the relevant First Amendment standards that govern this challenge, this Court can most straightforwardly enjoin the Act on that basis.

### A.    HB 1186 is void for vagueness.

Defendants' brief dedicates only the thinnest, one-page defense to the charge the Act is void for vagueness under the Due Process Clause, *see* Defs.' Opp'n at 34—an issue not addressed in *Nicodemus*.  They agree, as they must, that a statute may be void for vagueness on

either of two grounds: (1) if it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or (2) if it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *Morales*, 527 U.S. at 56 (plurality opinion); *see* Defs.' Opp'n at 34. Defendants do not explain why they believe the Act can survive either test.

As to notice, Defendants assert that the words "'25 feet,' 'approaches,' and 'stop,' are clear." Defs.' Opp'n at 34 (internal citation omitted). But, under the Act, approaching within 25 feet becomes criminal only *after* an officer makes the wholly discretionary decision to issue an order, and the statute gives members of the public—Plaintiffs' journalists included—no notice whether and when such an order will in fact issue if they approach within 25 feet. And the Seventh Circuit has made clear, in the specific context of a facial vagueness challenge to a lawful-order statute, that due process requires "warning about the behavior that *prompts* a lawful dispersal order," not just notice of what to do after the order is given. *Bell*, 697 F.3d at 462 (emphasis added); *see also Morales*, 527 U.S. at 59 (plurality opinion) ("Because an officer may issue an order only after prohibited conduct has already occurred, it cannot provide the kind of advance notice that will protect the [individual] from being ordered to disperse."). Were it otherwise, a criminal statute reading "do what any officer tells you to do" would provide fair notice despite affording citizens no ability to conduct themselves to avoid receiving an order.

As to whether the Act authorizes arbitrary enforcement, the analysis is even clearer. In *Morales*, a majority of the Supreme Court squarely held that a lawful-order statute "violates the requirement that a legislature establish minimal guidelines to govern law enforcement," 527 U.S. at 60 (citation and internal quotation marks omitted), if it "does not provide any guidance to the officer deciding whether such an order should issue" in the first place, *id.* at 62; *see also Shuttlesworth*, 382 U.S. at 90 (ordinance that "says that a person may stand on a public sidewalk

. . . only at the whim of any police officer" would be so obviously unconstitutional as to "need[] no demonstration"). HB 1186 is precisely so standardless. Officers may choose to disperse some, all, or none of the individuals who approach within 25 feet, for any reason or no reason.

Defendants' only response is that "policy prohibiting enforcement against recording cures concerns based on theoretical vagueness." Defs.' Opp'n at 34. The cited policies provide no guidance for applying the Act, as discussed in Plaintiffs' Opposition, but regardless the Court in *Morales* "refused to accept the general order issued by the police department as a sufficient limitation on the vast amount of discretion granted to the police." 527 U.S. at 63 (majority opinion) (internal quotation marks omitted). And for good reason: It would make little sense to allow a police agency's own policies to defeat a claim that lawmakers unlawfully "delegate[d] basic policy matters to policemen." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

These basic principles decide this case—even without reference to the statute's First Amendment harms. *See Morales*, 527 U.S. at 52–53 (plurality opinion) (noting that the ordinance invalidated as void-for-vagueness in *Morales* did not, as construed by the Illinois Supreme Court, regulate First Amendment activity and was not overbroad in a First Amendment sense). The Act's chilling effect does, of course, exacerbate the matter. *See Brown*, 86 F.4th at 772 (heightened vagueness standards apply in First Amendment cases). But whether or not this Court concludes that the Act regulates First Amendment activity, Indiana lawmakers cannot abdicate their duty to "establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358 (citation omitted). The Act, which does just that, is unconstitutionally vague.[4]

---

[4]     Defendants' unexplained reliance on *Hill v. Colorado*, 530 U.S. 703 (2000), is misplaced. As discussed below, *Hill* has been limited to its facts and is relevant only to challenges to "carbon cop[ies]" of the abortion-related law at issue in that case. *Price v. City of Chicago*, 915 F.3d 1107, 1119 (7th Cir. 2019). It has nothing to say about vagueness challenges to lawful-order statutes, on which question *Bell*—decided after *Hill*—and *Morales* are directly on point.

B.    HB 1186 violates the First Amendment as applied to Plaintiffs' peaceful, non-
obstructive newsgathering in public places.

For related but ultimately independent reasons, the Act is unconstitutional because it

poses an "ever-present potential for arbitrarily suppressing First Amendment liberties,"

*Shuttlesworth*, 382 U.S. at 91, including the peaceful, non-obstructive newsgathering that

Plaintiffs' journalists carry out daily.  Defendants' arguments to the contrary are without merit.

Defendants' first line of defense is that the Act regulates conduct rather than speech or

press rights.  But that claim is flatly inconsistent with *Brown*, which held that "the First

Amendment protects conduct and activities necessary for expression," including "approaching"

an event in order "to carry out plaintiffs' protected monitoring and recording."  86 F.4th at 779.

Defendants' claim that *Brown*'s holding was limited to the portion of the statute at issue that

expressly referenced recording, *see* Defs.' Opp'n at 32, is simply wrong.  *Brown* separately

asked whether "the acts listed in clause (c)—photographing and otherwise recording hunting"

and the activities addressed by "the other clauses" of the statute, including the standalone clause

that prohibited "approaching," represented expression, and concluded they did.  86 F.4th at 779.

*Brown* hardly stands alone on the issue.[5]  In reviewing a curfew law, for instance, that on

---

[5]    As noted above, the plaintiff in *Nicodemus* "focuse[d] on recording police conduct,"
*Nicodemus*, slip op. at 11, and failed to highlight—as the below-cited authorities hold—that
statutes that regulate physical presence in public places directly regulate First Amendment
activity whether or not they reference speech or newsgathering.  Indeed, that plaintiff's briefing
did not cite the Seventh Circuit's leading case on First Amendment challenges to lawful-order
statutes, *Bell v. Keating*.  *See* Mem. of Law in Supp. of Mot. for Prelim. Inj., *Nicodemus v. City
of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Aug. 22, 2023); Reply in Supp. of Mot. for Prelim.
Inj., *Nicodemus v. City of South Bend*, No. 3:23-cv-00744 (N.D. Ind. Oct. 5, 2023).
Understandably, the Northern District resolved that case as the parties had framed it.  But, as a
result, its decision provides little guidance here.  *See Nicodemus*, slip op. at 15 n.8 (noting that,
because the plaintiff failed to show that a substantial number of the law's applications regulated
First Amendment activity at all, the court never reached the question of "the level of
constitutional scrutiny" that would apply or whether the Act satisfied the applicable scrutiny).

its face spoke only to regulated conduct, the Seventh Circuit held that First Amendment scrutiny was nevertheless triggered because "[b]eing out in public is a necessary precursor to almost all public forums for speech, expression, and political activity." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1059 (7th Cir. 2004); *see also McCullen*, 573 U.S. at 476 (abortion buffer-zone law that "sa[id] nothing about speech on its face" was nevertheless "subject to First Amendment scrutiny"). *Bell v. Keating* makes the same point, holding that a lawful-order statute whose "triggering conduct cannot be an act constituting protected expression . . . may still implicate protected expression because, once triggered, it may be applied to disperse people engaged in peaceful speech or expressive conduct." 697 F.3d at 456–57. And to Plaintiffs' knowledge, every court to address the question agrees that police orders to move—even when they make no reference to speech or recording—are nevertheless subject to at least intermediate scrutiny under the First Amendment.[6] But lawful-order statutes cannot escape First Amendment review entirely, because "[i]f police could stop criticism or filming by asking onlookers to leave, then this would allow the government to simply proceed upstream and dam the source of speech—*i.e.*, it would allow the government to bypass the Constitution." *Jordan v. Jenkins*, 73 F.4th 1162, 1170 (10th Cir. 2023) (citations, alterations, and internal quotation marks omitted).

Because the Act regulates First Amendment activity, the next question is whether it is content-based or content-neutral. Defendants tie themselves to *Hill v. Colorado*, 530 U.S. 703 (2000), for the proposition that laws regulating physical proximity are never content-based, *see* Defs.' Opp'n at 23. But the Seventh Circuit has explained that "*Hill* is incompatible with current First Amendment doctrine," *Price*, 915 F.3d at 1117, and relevant only when reviewing a

---

[6]     *See, e.g.*, *Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011) (intermediate scrutiny applied to "officers' directives to keep moving"); *Reed v. Lieurance*, 863 F.3d 1196, 1211–12 (9th Cir. 2017) (same); *Hulbert v. Pope*, 70 F.4th 726, 733–34 (4th Cir. 2023) (same).

"carbon copy" of the abortion-specific law "upheld in *Hill*," *id.* at 1119.  Indeed, if Defendants were right, the Seventh Circuit would have been bound to hold that the statute in *Brown*—which likewise regulated physical proximity—was content-neutral.  But the law at issue in that case was held to be not just content- but also *viewpoint*-based, because its "only evident purpose" in light of existing law was "to expand [liability] to reach expressive activity that does not involve physical interference."  86 F.4th at 782.  *Hill* is inapposite here, too, for the further reason that the statute in that case conferred no discretion on any government official, whereas the Seventh Circuit has made clear that, "[t]o qualify as content-neutral," a law "cannot invest unbridled discretion" that might be *used* to discriminate on the basis of content.  *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) (citation and internal quotation marks omitted); *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992) ("[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so.").  Here, the standardless discretion the statute extends officers is the Act's central defect.

Regardless, Defendants' erroneous contention that HB 1186 is not content-based and should not be evaluated as such is largely academic because the Act cannot survive any degree of First Amendment scrutiny.[7]  Even under intermediate scrutiny, Defendants would need to demonstrate that the Act—as applied to Plaintiffs' reporters' peaceful, non-obstructive

---

[7]      Defendants make an odd, passing suggestion that Plaintiffs cannot succeed on an as-applied challenge to the Act without demonstrating that they have been "arrested when similarly situated individuals not engaged in the same sort of speech were not."  Defs.' Opp'n at 17 (citing *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019) (alterations and internal quotation marks omitted).  *Nieves* describes the standard for a retaliatory arrest claim, *see id.* at 1723; it has nothing to do with the First Amendment tests relevant to the constitutionality of a statute.

newsgathering in public places—is "narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels for communication." *Alvarez*, 679 F.3d at 605 (citations and alterations omitted); *see also Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (even at the preliminary-injunction stage, government "bears the burden of justifying the regulatory scheme"). They cannot do so. For one, the Seventh Circuit has settled that the government has no legitimate interest in preventing newsgathering that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them." *Alvarez*, 679 F.3d at 606. And to Plaintiffs' knowledge, every court of appeals to address the question of 'how close is too close' when documenting law enforcement activities has concluded—absent some separate obstructing act—that the First Amendment protects the right to be as close as a few feet away.[8]

Further, the statute plainly fails to leave open adequate alternative channels of communication. The Seventh Circuit has stressed that "audio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news," such that it is "highly unlikely that other methods could be considered reasonably adequate substitutes," *Alvarez*, 679 F.3d at 607. Here, Defendants concede that 25 feet is too great a distance to record audio or conduct interviews. *See* Defs.' Opp'n at 32 n.16; *see also Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377–78 (1997) (noting that 15 feet is beyond "normal conversational distance"). And with respect to images or video, Defendants offer nothing but

---

[8]     *See Glik v. Cunniffe*, 655 F.3d 78, 80 (1st Cir. 2011) (individual filming from "roughly ten feet away" was at "a comfortable remove," *id.* at 84 (citation omitted)); *Perkins v. Hart*, No. 22-30456, 2023 WL 8274477, at *7 (5th Cir. Nov. 30, 2023); *see also* Richard A. Webster, *Video of Mother's Arrest Raises Questions About 25-Foot Buffer Law*, La. Illuminator (June 9, 2023), https://perma.cc/L4TC-YADT (noting that the prevailing plaintiff in *Perkins* was six feet from officers, and that the defendants had unsuccessfully proposed a 21-foot buffer).

*ipse dixit* for the proposition that Plaintiffs' newsgathering will not be impaired.  As discussed in more detail below, their purported expert, Dr. Richard Celeste, claims no expertise of any kind related to newsgathering, camera equipment, or videography—in short, no basis to gainsay Plaintiffs' experienced journalists on the constraints of their profession, *see* Thedwall Decl. ¶ 6; Scheer Decl. ¶ 8; *see also Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) ("Whether an alternative is ample should be considered from the speaker's point of view.").

To all of this, Defendants' only response is that they take issue with reviewing the Act "as if it *were enforced*" against Plaintiffs' proposed course of newsgathering and reporting. Defs.' Opp'n at 23.  That objection is meritless; measuring a statute's constitutionality against a proposed course of conduct is precisely what as-applied pre-enforcement challenges are for.  *See Alvarez*, 679 F.3d at 605 (asking whether statute would be narrowly tailored as applied to planned recording of officers that had not yet taken place, and dismissing government interests not implicated by that proposed course of conduct).  In this case, that analysis dooms the Act.

C.   HB 1186 is facially overbroad.

Finally, the Seventh Circuit has provided on-point guidance for facial First Amendment challenges to lawful-order statutes:  They survive only if the triggering conduct they address "risk[s] substantial harm or if dispersal is otherwise *necessary* to address the violations and transgressors."  *Bell*, 697 F.3d at 459.[9]  That standard is fatal to Defendants' defense of HB 1186; the Act permits officers to issue an order simply because someone has approached within 25 feet, regardless whether any of Defendants' long list of government interests is at stake.  That

---

[9]   *Bell* was not addressed in *Nicodemus* because the plaintiff there did not raise it, but it expressly speaks to the First Amendment test that governs when a plaintiff brings a facial First Amendment challenge to a statute that "criminalize[s] their refusal" to move when "ordered to disperse or move along."  *Bell*, 697 F.3d at 459 (citing *Colten*, 407 U.S. at 111).

facial defect is reinforced by the reality that a statute that "condition[s] the free exercise of First Amendment rights on the 'unbridled discretion' of government officials" is never narrowly tailored, even under intermediate scrutiny. *Gaudiya Vaishnava Soc'y v. City & Cnty. of San Francisco*, 952 F.2d 1059, 1065 (9th Cir. 1990) (quoting *City of Lakewood*, 486 U.S. at 755).

Defendants have three responses to the Act's overbreadth. First, they argue that the unbridled-discretion standard applies only to statutes with a "close enough nexus to expression[] or to conduct commonly associated with expression." *City of Lakewood*, 486 U.S. at 759. True enough, but as discussed above, the First Amendment protects "approaching" a newsworthy event "to carry out plaintiffs' protected monitoring and recording," *Brown*, 86 F.4th at 779, and "[b]eing out in public" is "intimately related" to expression, *Hodgkins*, 355 F.3d at 1058–59. Second, Defendants claim that the unbridled-discretion standard applies only to licensing and permitting schemes. *See* Defs.' Opp'n at 16–17. That is simply wrong. "Although this doctrine originated with cases involving . . . licenses to engage in expression at all, it has subsequently been held to apply to a wider range of burdens on expression." *Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004) (internal citation omitted). As relevant here, the Supreme Court explained as early as *Thornhill v. Alabama*, 310 U.S. 88 (1940), that the same considerations that forbid unbridled discretion in a "licensor" likewise forbid the unbridled discretion conferred by "a penal statute" that "readily lends itself to harsh and discriminatory enforcement," *id.* at 97.

Third and finally, Defendants insist that *all* orders under the Act are justified because being within 25 feet of a law enforcement officer is inherently a threat to officers' safety, on the theory that officers need time to draw their weapon on individuals charging them with a knife. *See* Defs.' Opp'n at 30–31. But as already noted above, every federal court of appeals to address the issue has rejected the claim that an individual's presence within *ten* feet of an officer—

20

without more—amounts to interference that would justify restricting First Amendment rights. *See Glik*, 655 F.3d at 80–84; *Perkins*, 2023 WL 8274477, at *7.  And while officers' safety is undoubtedly important, Defendants have not attempted to "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495.  Indeed, Defendants never try to explain how sworn officers across the nation perform their duties when Indiana is—to Plaintiffs' knowledge—the only state in the United States with a law like this one.  *See* David Jones, *Edwards Vetoes Bill Creating 25-Foot Buffer Zone for Police Officers*, Fox8 (June 29, 2023), https://perma.cc/G4S5-2FF9 (noting that Louisiana's governor vetoed as unnecessary and unconstitutional a similar proposal); *see also Randall v. Sorrell*, 548 U.S. 230, 253 (2006) (plurality opinion) (noting that the fact that there are no "comparable limits in other States" represents a "danger sign[]" that a statute "may fall outside tolerable First Amendment limits").  Even intermediate scrutiny would require Defendants to show that Indiana "seriously undertook to address the problem with less intrusive tools readily available to it" and "considered different methods that other jurisdictions have found effective"—hurdles that this statute cannot clear.  *McCullen*, 573 U.S. at 494.

In lieu of that showing, Defendants ultimately rest their explanation of the choice of a novel, 25-foot buffer entirely on the declaration of Dr. Richard Celeste.  *See* ECF No. 34-2 (the "Celeste Report").  But as detailed below, Dr. Celeste freely admits that he is "uncertain as to how the 25 foot distance was determined," *id.* at 18, and the report's speculative efforts to justify it bear none of the "hallmarks of reliability" that would justify assigning them any weight as expert testimony.  *SCCI Hosps. of Am., LLC v. Home-Owners Ins. Co.*, 571 F. Supp. 3d 942, 955 (N.D. Ind. 2021).  This Court should assign the Celeste Report no weight in the analysis here.

D.     <u>The Celeste Report provides no relevant or reliable evidence to support the Act.</u>

Even at the preliminary injunction stage, "a court must be guided by the evidentiary principles which would apply at trial and govern the admissibility of evidence, including in the form of expert testimony." *Pass & Seymour, Inc. v. Hubbell Inc.*, 532 F. Supp. 2d 418, 436–37 (N.D.N.Y. 2007); *cf. Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 783 (7th Cir. 2011) (upholding district court's resolution of dispute over admission of expert testimony at the preliminary injunction stage as "a proper application of Federal Rule of Evidence 702"). The Celeste Report—by turns irrelevant and unreliable—cannot be squared with those principles.

Much of the Celeste Report consists of "[t]alking off the cuff" about matters well beyond any plausible scope of Dr. Celeste's expertise, *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000), including broad generalizations about "our society," Celeste Report at 5; his speculative views on the quality of Plaintiffs' camera equipment, *see id.* at 16–17, 19;[10] and the morality of depicting individuals who have been injured, *see id.* at 20. The Report likewise repeatedly attempts to "offer[] opinions about legal issues that will determine the outcome of [the] case," *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996), including whether law-enforcement interests "outweigh[] any desire to be closer to a police event for the purpose of observing," Celeste Report at 19. Other courts have declined to consider Dr. Celeste's testimony for that very reason. *See State v. Clark*, No. A-5065-13T1, 2017 WL 2730258, at *5–6 (N.J. Super. Ct. App. Div. June 26, 2017) (affirming decision to bar Dr. Celeste from testifying to the constitutional reasonableness of police actions, which would "usurp the role" of the factfinder).

Importantly, the heart of the Report—its discussion of the so-called action-reaction gap

---

[10]     The suggestion that some unspecified form of "computer-zoom" would allow Plaintiffs to increase the amount of information captured by an image after the fact, Celeste Report at 17, is a well-known myth, *see* Devon Maloney, *The 5 Biggest Tech Myths Perpetuated by TV Shows and Movies, According to Experts*, Vulture (Sept. 30, 2015), https://perma.cc/FGA9-T8P9.

and 21-foot (notably, not 25-foot) rule—contains no discussion of the methodology underpinning its conclusion and no basis for this Court to assess "whether the reasoning or methodology underlying the testimony is scientifically valid." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993)).[11] Instead, in lieu of a methodology, the Report contains a series of unadorned and unexplained block quotes from the memoirs of former police officers. *See* Celeste Report at 15. That silence should be no surprise because the 21-foot 'rule' is widely considered "junk science"—including by the Utah police officer who originally coined the concept. Kelly McLaughlin, *Police Training Programs Have a Pseudoscience Problem*, Business Insider (June 17, 2020), https://perma.cc/6SMX-7UV8; *see also* Christian Sheckler, *South Bend Police Has No Mandatory De-escalation Training, but 7 'Combat Shoots' Each Year*, S. Bend Trib. (July 8, 2020), https://perma.cc/E8N9-ZDKD (describing the 21-foot rule as "discredited"). As other officers have explained, the bare insight that an individual can charge a given distance in a given time with a knife is "not relevant" to an officer's decisionmaking "without the known or believed presence of a deadly weapon," and without reason to think "the subject *intends* to attack a person with that weapon." Dave Brown & Randy LaHaie, *The Myth of the '21-Foot' Rule*, Blue Line (Dec. 28, 2020), https://perma.cc/X2YP-CU86 (emphasis added). Far from commanding acceptance in the expert community, then, police executives have urged agencies to "eliminate from their policies and training all references to the so-called '21-foot rule.'" Police Exec. Rsch.

---

[11]    The relevant factors are "[w]hether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." *Id.* (citations and internal quotation marks omitted).

Forum, Guiding Principles on Use of Force at 54 (2016), https://perma.cc/46R9-XE7N.  And federal courts, in turn, have concluded that—"[e]ven assuming the rationale for this 21-foot rule is accurate"—it does not provide a lawful basis for treating someone other than "a charging assailant" as an imminent threat.  *Teel v. Lozada*, 826 F. App'x 880, 889 (11th Cir. 2020).

Indiana lawmakers, for their part, deliberately omitted any consideration of an individual's actual or apparent intent, or their threat to officers, in drafting the Act.  The result is a statute that bears no relationship to any of the interests Defendants advance to support it.  The Celeste Report does nothing to close that gap between Defendants' claims and the Act as written.

## IV.   The remaining preliminary injunction factors favor Plaintiffs.

In First Amendment cases, where likelihood of success is shown, the remaining preliminary-injunction factors tilt in the same direction.  *See Alvarez*, 679 F.3d at 589.  The only new argument Defendants offer to the contrary is an assertion that Plaintiffs cannot show irreparable harm because they purportedly delayed in seeking relief.  The claim lacks merit.

For one, there was no delay.  Plaintiffs began working as soon as the Act was passed to understand and mitigate its impact on their journalists, *see* Hums Decl. ¶¶ 9–10, and it "do[es] not suggest lack of irreparable harm" to explore alternatives to costly and disruptive litigation before "resorting to the courts for relief," *Int'l Ass'n of Fire Fighters*, 56 F.4th at 451–52.  And as Defendants themselves have represented to this Court, identifying and conferring with appropriate declarants is time-consuming in a case like this one.  *See* Defs.' Mot. for Extension of Time at 2 (ECF No. 28).  Extensive work was required to identify representative journalists best positioned to speak to the range of First Amendment injuries the Act causes Plaintiffs.

But even if that time could be characterized as delay—it can't—"evidence of mere delay alone, without any explanation on [Defendants'] part of why such a delay negatively affected

them, would not lessen [Plaintiffs'] claim of irreparable injury." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001). Defendants have offered no such explanation here, and the Seventh Circuit has rejected claims of undue delay on timelines much longer than this one. *See id.* (eight months); *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979) (fifteen months, including eight months used to "accumulat[e] seven affidavits").

All of the relevant factors, then, counsel the same result. An injunction against the Act's chilling burdens would serve the "cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." *Alvarez*, 679 F.3d at 601 (citation and internal quotation marks omitted). Plaintiffs' motion for a preliminary injunction should be granted. [12]

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting Defendants from enforcing the Act.

Dated: January 19, 2024

Respectfully submitted,

By /s/ *Katie Townsend*
Katie Townsend
Gabe Rottman*
Grayson Clary*
Emily Hockett*
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org

*Counsel for Plaintiffs*

* Admitted *pro hac vice*

---

[12] Because Defendants did not respond to Plaintiffs' argument that any preliminary-injunction bond should be waived, they have forfeited any argument a bond should be required.