UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

REPORTERS COMMITTEE FOR            )
FREEDOM OF THE PRESS, INDIANA      )
BROADCASTERS ASSOCIATION,          )
INDIANA PROFESSIONAL CHAPTER OF    )
THE SOCIETY OF PROFESSIONAL        )
JOURNALISTS, INDIANAPOLIS STAR,    )
NEXSTAR MEDIA INC., SCRIPPS MEDIA, )
INC., and TEGNA INC.,              )
                                   )
            Plaintiffs,            )
                                   )
        v.                         )    No. 1:23-cv-1805-JRS-MG
                                   )
TODD ROKITA, in his official capacity as )
Attorney General of Indiana, RYAN  )
MEARS, in his official capacity as Marion )
County Prosecutor, and KERRY       )
FORESTAL, in his official capacity as )
Marion County Sheriff,             )
                                   )
            Defendants.            )

**Order on Motion to Dismiss and Motion for Preliminary Injunction**

This is a case regarding the constitutionality of a state statute.  An Indiana statute

(the "Buffer Law") makes it a misdemeanor to "knowingly or intentionally approach[]

within twenty-five (25) feet of a law enforcement officer lawfully engaged in the

execution of the law enforcement officer's duties after the law enforcement officer has

ordered the person to stop."  Ind. Code § 35-44.1-2-14.  Plaintiffs seek to enjoin it on

the grounds that it violates the First and Fourteenth Amendments.  Defendants filed

a joint Motion to Dismiss.  Defendants' Motion to Dismiss, (ECF No. 25), is **denied**.

Plaintiffs' Motion for Preliminary Injunction, (ECF No. 20), is **granted**.

## I.     Background

The Indiana General Assembly passed the Buffer Law in April 2023, and it went into effect that July.  If a person "knowingly or intentionally approaches within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop," that person has committed "unlawful encroachment on an investigation," a misdemeanor.  Ind. Code § 35-44.1-2-14.

Plaintiffs are various associations and corporations involved in news reporting and production.  Reporters Committee for Freedom of the Press ("Reporters Committee") "is a nonprofit association founded by journalists and media lawyers" that works to "provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms."  (Compl. ¶ 16, ECF No. 1.)  The Indiana Broadcasters Association is an association of radio and television broadcasters that employ "reporters who gather news on matters of public concern, including news about law enforcement gathered through the use of photography or audiovisual recording equipment, on a routine daily basis."  (*Id.* ¶ 17.)  The Indiana Professional Chapter of the Society of Professional Journalists ("IndianaProSPJ") is an organization that "works to promote and protect First Amendment freedoms . . . and conducts professional development programs."  (*Id.* ¶ 18.)  Members of IndianaProSPJ "include reporters who gather news on matters of public concern, including news about law enforcement gathered through the use of photography or audiovisual recording equipment, on a routine daily basis."  (*Id.*)

The remaining Plaintiffs are media companies. The Indianapolis Star "is an Indianapolis-based newspaper that delivers the latest news from the area in print, mobile, and online." (*Id.* ¶ 19.) Nexstar Media is a "diversified media company" that owns and operates several local news stations in Indianapolis, Terre Haute, Fort Wayne, and Evansville. (*Id.* ¶ 20.) Scripps Media and TEGNA own and operate several local television stations, including Indianapolis stations WRTV and WTHR, respectively. (*Id.* ¶¶ 21–22.) These four Plaintiffs (together, the "Media Company Plaintiffs") all "employ[] full-time reporters who gather news on matters of public concern, including news about law enforcement gathered through the use of audiovisual recording equipment, on a routine daily basis." (*Id.* ¶¶ 19–22.)

In Count I, Plaintiffs allege that the Buffer Law violates the First Amendment as applied to them because they "intend to engage in peaceful, nonobstructive newsgathering within 25 feet of law enforcement officers performing their duties in public spaces," (Compl. ¶ 65, ECF No. 1), which is protected by the First Amendment but has the potential to be criminalized by the Buffer Law. They argue that the Buffer Law "advances no legitimate [state] interest" and "is not narrowly tailored." (*Id.* ¶¶ 68–69.)

In Count II, Plaintiffs allege that the Buffer Law violates the First Amendment because it is facially overbroad, contending that it "contains no standards channeling officers' discretion" in whether or not an officer orders someone to step back, and it reaches protected speech that does not pose a threat to law enforcement's execution of their duties. (Compl. ¶¶ 76–78, ECF No. 1.)

In Count III, Plaintiffs allege that the Buffer Law violates the Fourteenth Amendment because it is void for vagueness. They contend the Buffer Law "provides no warning about the behavior" that may cause police to issue an order to move back and is "so standardless that it authorizes or encourages seriously discriminatory enforcement." (Compl. ¶¶ 82–84, ECF No. 1 (internal citation omitted).)

## II.    Motion to Dismiss

Defendants filed a Joint Motion to Dismiss for Lack of Jurisdiction under Fed. R. Civ. P. 12(b)(1), arguing that Plaintiffs do not have standing and that this case is not ripe for decision. (ECF No. 25.) Neither argument is persuasive.

### A. Legal Standard

A Rule 12(b)(1) motion "tests the jurisdictional sufficiency of the complaint," including whether the plaintiffs have standing. *Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017). Article III standing has three requirements. A plaintiff must show that they have (1) suffered an injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is likely to be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Where a statute allegedly impacts a plaintiff's First Amendment rights, pre-enforcement challenges are well within Article III's case or controversy requirement and a plaintiff "need not risk arrest before bringing" one. *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)). "To satisfy the injury-in-fact requirement in a preenforcement action, the plaintiff must show 'an intention to engage in a course of conduct arguably affected

4

with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder.'" *American Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 590–91 (7th Cir. 2012) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  A plaintiff "need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute." *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (cleaned up).  A plaintiff can also "establish standing based on a *current* injury if they have resorted to self-censorship out of 'an actual and well-founded fear' that the law will be enforced against them." *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)).

## B. Standing

### i. *Plaintiffs employing journalists: Indiana Broadcasters Association, IndianaProSPJ, Indianapolis Star, Nexstar Media, Scripps Media, & TEGNA*

All Plaintiffs except Reporters Committee either employ journalists themselves or are comprised of members that employ journalists.  These Plaintiffs have adequately alleged an injury in fact to support standing.  Defendants argue that these Plaintiffs lack standing because "[t]hey do not allege that the Buffer Law has actually been enforced against them." (Defs.' Br. 4, ECF No. 26.)  However, this is not necessary for a pre-enforcement challenge where the challenged statute implicates First Amendment rights.  *Schirmer*, 621 F.3d at 586.  Plaintiffs allege that "25 feet is often too far to obtain a clear line of sight" to certain events or "reliably capture audio of those events." (Compl. ¶¶ 39–40, ECF No. 1.)  As a result, the journalists are "put to a choice between committing a crime or forgoing reporting" if they are ordered to

move back.  (*Id.* ¶ 38.)   Reporters have engaged in reporting that "required close contact with members of law enforcement and often relied on videos or photographs captured within 25 feet of officers performing their official duties." (*Id.* ¶ 32.)   They will continue to record law enforcement officers within twenty-five feet in violation of the law, if necessary, (*id.* ¶ 33), but the "burdens and uncertainties [arising from the Buffer Law] chill the exercise of their and their reporters' First Amendment rights to document and report on public officials' activities," (*id.* ¶ 45).

Defendants argue that Plaintiffs' allegations that journalists (1) plan to continue their reporting and (2) are chilled in the exercise of their First Amendment rights are mutually exclusive.  (*See* Defs.' Br. 4–5, ECF No. 26.)   However, this does not impact the standing analysis.   A party may plead multiple "statements of a claim . . . alternatively or hypothetically," "even if the pleadings are inconsistent." *Alper v. Altheimer & Gray*, 257 F.3d 680, 687 (7th Cir. 2001) (citing Fed. R. Civ. P. 8(d)(2)). Additionally, it is not necessarily the case that the allegations are inconsistent.   For one, given the number of journalists represented by Plaintiffs, it is possible that some journalists plan to violate the law, while others have scaled back their reporting to avoid arrest or prosecution.   It is not necessarily the case that the same journalist will take the same approach every time, though.   On one occasion, where they cannot see the newsworthy event from further than twenty-five feet, they may intend to violate the statute, and on another occasion, they might stay back at the cost of better coverage.   This intent may change day to day or even minute to minute based on the

individual journalist's reading of evolving situations and assessment of the risk of arrest.

For example, Robert Scheer, a visual journalist at the Indianapolis Star, testified that he is in close proximity with law enforcement officers "approximately every other week," and that this work "often requires [him] to get within 25 feet of law enforcement officers," generally "within—at most—ten feet . . . to capture usable audio."[1] (Scheer Decl. ¶¶ 5, 9, ECF No. 27-3.) Scheer testified that before the Buffer Law was enacted, he was covering a shooting at a mall in Castleton. (*Id.* ¶ 13.) An officer asked him to stand in a media staging area with other journalists, but Scheer declined because he "understood the officer's request to be voluntary, and . . . knew that [he] was not impeding anything officers were doing." (*Id.*) Now, however, he "would be more likely to comply with the officer's request to move to the media staging area in order to avoid the risk of being arrested under" the Buffer Law. (*Id.* ¶ 14.) This supports Plaintiffs' allegations both of intent to violate the law and a change in behavior because of it.

Defendants also argue that Plaintiffs have not established that the Buffer Law will be enforced against them or that there is a credible threat of enforcement. (Defs.' Br. 5–12, ECF No. 26.) Defendants' argument boils down to the contention that police will enforce the Buffer Law "only when necessary to prevent interference with

---

[1] In reviewing a Rule 12(b)(1) motion to dismiss, the district court is permitted to "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (quoting *Capitol Leasing Co. v. Federal Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993) (per curiam)).

necessary law enforcement activity." (*Id.* at 5.) The Court is unpersuaded. The threat of enforcement "is latent in the existence of the statute," *Majors*, 317 F.3d at 721, and Plaintiffs have received no assurances that the law will not be enforced against them, *see Commodity Trend Service, Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998) (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)). It is difficult to fathom how such an assurance of "deferential" enforcement can even be made, given the number of law enforcement departments—let alone individual officers—in Indiana. In any event, Plaintiffs have produced evidence that their journalists have been asked to move back by law enforcement officers while gathering news, thus establishing that their fear of enforcement is well-founded. (*See, e.g.*, Thedwall Decl. ¶ 11, ECF No. 27-1; Hums Decl. ¶ 11, ECF No. 27-2.) This is sufficient; Plaintiffs have properly alleged an injury supporting pre-enforcement standing.

## ii. *Reporters Committee*

Reporters Committee alleges it is "compel[led] . . . to devote resources to combatting the effects of the law that are harmful to the organization[s'] mission[s]." (Compl. ¶ 46, ECF No. 1 (quoting *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (alteration in original)).) An organization may show an injury in fact sufficient to establish standing if it has experienced a "concrete and demonstrable injury to [its] activities" that has resulted in a "drain on the organization's resources." *Common Cause*, 937 F.3d at 950 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S.

363, 379 (1982)).  The injury must "constitute[] far more than simply a setback to the organization's abstract social interests."  *Id.* (quoting *Havens*, 455 U.S. at 379).

Reporters Committee works to inform journalists of their rights and assist in defending those rights by publishing educational materials, hosting trainings, operating a legal hotline, and providing legal advice and representation.  (Compl. ¶¶ 47–49, 53–54, ECF No. 1.)  Reporters Committee alleges it "has diverted limited resources that it 'would have spent differently or not spent at all.'"  (*Id.* ¶ 55 (quoting *Lawson*, 937 F.3d at 954); *see also* Pls.' Opp. Mot. Dismiss 23, ECF No. 32.)  Specifically, it "intends to host additional trainings in Indiana to address the effects" of the Buffer Law, "anticipates an increased need for legal advice and representation," and anticipates increased use of its legal hotline.  (*Id.* ¶¶ 48–49, 53.)

Defendants counter that Reporters Committee's expenditures in response to the Buffer Law are "discretionary" and that Reporters Committee "fail[s] to demonstrate how educational and legal efforts targeting the Buffer Law impaired standard function beyond" its ordinary activities.  (Defs.' Reply 10, ECF No. 33.)  Reporters Committee normally provides educational material and legal support to journalists, Defendants argue, and has not shown "demonstrable deviations from ordinary legal and educational work targeting perceived First Amendment challenges."  (*Id.* at 11.)  Additionally, Defendants argue that the anticipated increase in traffic to Reporters Committee's hotline or anticipated increase in demand for legal services are "hypothetical demand spikes" that "constitute possible future injury, insufficient to establish standing."  (*Id.*)

Plaintiffs rely primarily on *Lawson* to support their argument for a resource diversion injury.  In *Lawson*, organizational plaintiffs challenged an Indiana law allowing the state to remove voters from the voter rolls if a third-party service identified the voter as someone who may also be registered to vote in another state. 937 F.3d at 948.  The three plaintiffs, Common Cause Indiana, the Indiana NAACP, and the League of Women Voters of Indiana, "advocate[] for voter access, conduct[] voter education to promote voter access, help[] voters overcome any challenges they face trying to vote, and help[] voters register to vote." *Id.* at 951.  Because the statute created an "enhanced risk of erroneous voter removal," the plaintiffs argued, they would "be forced to spend resources cleaning up the mess." *Id.*

The injury recognized by the Seventh Circuit in *Lawson* is strikingly similar to that alleged in this case.  For example, Oscar Anderson, Co-President of the League of Women Voters of Indiana, testified that "[a]ny time League members spend addressing the risk of the voter purge by educating voters or re-registering purged voters takes away time and resources that could otherwise be spent registering voters or assisting voters with other purposes." *Id.* at 952 (alteration in original).  Common Cause provided "training sessions aimed at educating voters and community activists about the increased risk of erroneous voter registration cancellations" that it would not have held but for the new law. *Id.*  Similarly here, Lisa Zycherman, Deputy Legal Director and Policy Counsel at Reporters Committee, testified that "Reporters Committee has already diverted resources to address the burdens imposed by the Act," including by "allocat[ing] time of its attorneys who would otherwise have

dedicated their time to providing other legal services to journalists" to challenging the law in court.  (Zycherman Decl. ¶ 6, ECF No. 27-5.)  Zycherman believes, based on past experience with events that "bring working journalists and law enforcement officers in close proximity," that the use of Reporters Committee's legal hotline will increase due to the Buffer Law.  (*Id.* ¶ 8.)  Additionally, Reporters Committee "published new resources to educate Indiana journalists about [the Buffer Law] and intends to update its existing resources" and "conduct trainings for journalists and newsrooms in Indiana to inform journalists about the [Buffer Law] and its effect on newsgathering." (*Id.* ¶ 7.)

Defendants argue that this case is more analogous to *Plotkin v. Ryan*, 239 F.3d 882 (7th Cir. 2001).  However, this comparison falls short.  In *Plotkin*, the Better Government Association ("BGA"), an organization whose mission is to "expose and correct election fraud and corruption" by government officials, alleged that Illinois Governor George Ryan and others were engaging in corruption.  *Plotkin v. Ryan*, No. 99 C 53, 1999 WL 965718, at *1 (N.D. Ill. Sept. 29, 1999), *aff'd*, 239 F.3d 882 (7th Cir. 2001).  BGA asserted standing in part because it had spent time and money "monitoring and investigating the defendants' conduct, which it [said] impaired its ability to deal with other issues of the public interest." *Id.* at *5.  The district court and the Seventh Circuit rejected this argument because one of BGA's primary activities, regardless of government action, was a staffed investigative program. *Id.*; *see also Plotkin*, 239 F.3d at 886.  While the "investigation may have diverted certain BGA resources into its investigative program from the other programs, . . . it [was]

not alleged that the defendants' actions [had] themselves impaired BGA's ability to perform its work." *Plotkin*, 1999 WL 965718, at *5.

Here, however, Reporters Committee has alleged that it has altered its programs in response to the Buffer Law. That defending First Amendment rights is the heart of Reporters Committee's advocacy does not preclude it from asserting resource diversion as an injury. *See Lawson*, 937 F.3d at 953–54 (rejecting Indiana's argument that plaintiffs had not established injury or diverted resources because the work performed as a result of the law was still within their missions). Reporters Committee is not asserting standing by attempting to "convert ordinary program costs into an injury in fact," but has clearly demonstrated "new burdens . . . created by the law [it] is challenging." *Id.* at 955 (citation omitted). Reporters Committee has standing to pursue the claims against Indiana.

## C. *Nicodemus* and Collateral Estoppel

Defendants also point to a then-pending case in the Northern District of Indiana, *Nicodemus v. City of South Bend*, arguing that Plaintiffs' case should be dismissed or stayed "on grounds of the first-filed rule and collateral estoppel." (Defs.' Br. Supp. Joint Mot. Dismiss 2, ECF No. 26.) However, neither is appropriate. While the Motion to Dismiss was pending, the Northern District of Indiana ruled in *Nicodemus* that the Buffer Law "has many constitutional applications within its plainly legitimate sweep" and therefore was not facially overbroad. *Nicodemus v. City of South Bend*, No. 3:23-cv-744, 2024 WL 139248, at *8 (N.D. Ind. 2024). This decision is now pending on appeal to the Seventh Circuit. No. 24-1099 (7th Cir. Jan. 23, 2024).

Defendants filed a Motion to Stay this case while *Nicodemus* is pending before the Seventh Circuit. (ECF No. 41.) The motion was denied, with Magistrate Judge Mario Garcia finding that facial overbreadth, the sole issue advanced in *Nicodemus*, did not overlap with the additional issues brought here such that it would conserve judicial resources or avoid inequity to stay the case. (Order 6, ECF No. 46.) While this Court may agree in the end, and the Seventh Circuit may so find, that the Buffer Law is not facially overbroad, the Court finds that Magistrate Judge Garcia's decision was sound in that other issues are advanced in this case.

For similar reasons, the Court finds unpersuasive Defendants' collateral estoppel arguments.[2] Collateral estoppel, or issue preclusion, bars successive litigation of an issue where four elements are met: "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action." *H-D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 760 (7th Cir. 2007)).

Much of Defendants' argument fails at the first prong: putting aside the fact that Nicodemus does not appear to be a journalist, the issues in this case are not the same as those litigated in *Nicodemus*. Defendants argue that in both cases, "[t]he single issue is the constitutionality of" the Buffer Law. (Defs.' Br. 21, ECF No. 26.)

---

[2] The first-filed rule allows district judges discretion to dismiss or stay a case for the purpose of "deferring to another federal proceeding involving the same parties and issues to avoid duplicative litigation." *Trippe Mfg. Co. v. Am. Power Conversion Corp.*, 46 F.3d 624, 629 (7th Cir. 1995) (citing *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)). Because a final decision has been reached in *Nicodemus*, the Court will address only Defendants' collateral estoppel arguments.

However, "constitutionality" is an umbrella that contains several issues within it. Although Plaintiffs here and Nicodemus both challenged the Buffer Law as facially overbroad, Nicodemus did not bring a vagueness challenge to the law, *Nicodemus*, 2024 WL 139248, at *3 n.4, nor could he have argued that the Buffer Law is unconstitutional as applied to Plaintiffs in this case, (*see* Pls.' Opp. 8, ECF No. 32).

Additionally, although both suits involve overbreadth challenges, Plaintiffs here were not "fully represented in the prior action." *H-D Mich.*, 496 F.3d at 760. "Parties are in privity when 'there is a commonality of interest between the two entities' and when they 'sufficiently represent' each other's interests." *Studio Art Theatre of Evansville, Inc. v. City of Evansville*, 76 F.3d 128, 131 (7th Cir. 1996) (quoting *Tofany v. NBS Imaging Sys., Inc.*, 597 N.E.2d 23, 29 (Ind. Ct. App. 1992), *opinion adopted in part, vacated in part*, 616 N.E.2d 1034 (Ind. 1993)). Although "the rule against nonparty preclusion is subject to exceptions," *Taylor v. Sturgell*, 553 U.S. 880, 893 (2008), the exception Defendants seek does not apply here. Defendants argue that Plaintiffs here are in privity with Nicodemus because their "interests [were] fully represented and protected by" Nicodemus's suit. (Defs.' Br. 23, ECF No. 26.) However, the Supreme Court in *Taylor* held that a party's interest is adequately represented for preclusion purposes "only if (at a minimum)" there are "either special procedures to protect the nonparties' interests or an understanding by the concerned parties that the first suit was brought in a representative capacity." *Taylor*, 553 U.S. at 897. Defendants have not shown that either of these conditions is met. Therefore, Defendants cannot raise collateral estoppel against Plaintiffs in this case.

### D. Ripeness

Plaintiffs' claims are ripe.  Defendants argue that "[f]or the same reasons" Plaintiffs do not have standing, the suit is not ripe.  (Defs.' Br. 13, ECF No. 26.) However, Plaintiffs have established standing for a proper pre-enforcement challenge, so the issues are primarily—if not entirely—legal and fit for judicial decision.  In such cases, "the hardship of postponing judicial review weighs heavily in favor of hearing the case." *Wisconsin Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011).

For these reasons, Defendants' Motion to Dismiss, (ECF No. 25), is **denied**.

### III.    Preliminary Injunction

Now the question is whether Plaintiffs are entitled to a preliminary injunction preventing enforcement of the Buffer Law.  The Court finds that they are.

### A. Legal Standard

To obtain a preliminary injunction, a plaintiff must first show (1) that they have "some" likelihood of success on the merits; (2) that traditional legal remedies are inadequate; and (3) that they will suffer irreparable harm without preliminary relief. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020).  If the plaintiff proves these three elements, "the court next must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one" and consider "any effects on non-parties" to determine whether a preliminary injunction would be in the public interest. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).  Under the Seventh Circuit's "sliding scale" approach, "the more likely

the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

## B. Discussion

The Court finds that Plaintiffs are likely to succeed on their Fourteenth Amendment void for vagueness claim. Therefore, the Court need not address Plaintiffs' First Amendment arguments or consider which level of scrutiny is appropriate for Plaintiffs' challenges to the Buffer Law. *See Greater New Orleans Broad. Ass'n. v. United States*, 527 U.S. 173, 184 (1999) ("It is . . . an established part of our constitutional jurisprudence that we do not ordinarily reach out to make novel or unnecessarily broad pronouncements on constitutional issues when a case can be fully resolved on a narrower ground."). The Court also finds that Plaintiffs have established irreparable harm and shown that the balance of harms and public interest weigh in their favor.

### i. Likelihood of success on the merits

To establish a likelihood of success necessary to obtain a preliminary injunction, Plaintiffs must demonstrate that their "claim has some likelihood of success on the merits, not merely a better than negligible chance." *Mays*, 974 F.3d 810, 822 (7th Cir. 2020) (internal quotation marks omitted) (citing *Eli Lilly & Co. v. Arla Foods, Inc.*, 983 F.3d 375, 381 (7th Cir. 2018)).

Plaintiffs argue that the Buffer Law is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment because it contains no limiting standards for police officers to follow or indications of what type of conduct will

prompt an officer to order someone to move back.  (Pls.' Br. Supp. Mot. Prelim. Inj. 31, ECF No. 27.)  To withstand a void for vagueness challenge, a statute must define an offense "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement."  *Bell v. Keating*, 697 F.3d 445, 461 (7th Cir. 2012) (quoting *Skilling v. United States*, 561 U.S. 358, 402–03 (2010)).  Both prongs must be met for the statute to be upheld.  *Id.*  Plaintiffs are likely to succeed in showing that the Buffer Law fails both prongs.

1.  Notice of prohibited conduct

The Buffer Law is clear about what conduct may lead to an arrest: refusing to obey an officer after being told to move when one is within twenty-five feet.  However, the constitutional vagueness analysis requires more when a law criminalizes failing to obey such an order, as due process requires a "warning about the behavior" that will prompt that order.  *Bell v. Keating*, 697 F.3d 445, 462 (7th Cir. 2012).  The Buffer Law includes no such warning.  Instead, it "authorizes officers to order an individual to withdraw for any reason (or no reason)."  (Pls.' Br. 31, ECF No. 27.)

*Bell* dealt with a Chicago ordinance that "criminalize[d] an individual's refusal to leave a scene when so instructed by a police officer when three or more individuals are engaging in disorderly conduct nearby."  697 F.3d at 449.  "Disorderly conduct" was defined as "acts [that] are likely to cause substantial harm or serious inconvenience, annoyance or alarm," all of which could trigger a dispersal order.  *Id.* at 450.  The statute also specified that at least three people must be engaging in the

17

conduct.  *Id.*  The Seventh Circuit found that because "substantial harm" "signifies imminent property damage or violence," it is easy for a person to understand when this type of conduct is occurring and could trigger a lawful dispersal order.  *Id.* at 461–62.  The terms "serious inconvenience" and "alarm," however, did not give sufficient notice because they did not specify what type of behavior qualified as causing "serious inconvenience" or "alarm."  *Id.* at 462.  The Seventh Circuit held that although "predicating law enforcement's power on at least three people's behavior add[ed] definition and heft," the statute was impermissibly vague insofar as it allowed officers to issue a dispersal order in the face of "serious inconvenience," "alarm," and "annoyance."  *Id.* at 463.

The Buffer Law does not include any parameters such as "likely to cause substantial harm" to warn what kind of behavior might cause an officer to issue a stay back order.  It does not "make[] clear that conduct which *does* give rise to a lawful dispersal order."  *Id.* at 461 (emphasis in original).  The only limitation in the Buffer Law is the 25-foot requirement.  Simply being within twenty-five feet of a police officer is not a crime, and indeed, important First Amendment rights are regularly exercised within twenty-five feet of law enforcement every single day.  (*See* Thedwall Decl. ¶¶ 4–5, ECF No. 27-1; Hums Decl. ¶¶ 5, 8, ECF No. 27-2.)  This is not specific enough to allow the general public or "reporters to know how to conduct themselves to avoid receiving an order to move."  (Pls.' Br. 31, ECF No. 27.)

## 2. Arbitrary and discriminatory enforcement

A law "is susceptible to discriminatory or arbitrary enforcement" "if it impermissibly delegates to law enforcement the authority to arrest and prosecute on 'an ad hoc and subjective basis.'" *Bell*, 697 F.3d at 462 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Of course, law enforcement officers retain the authority to "exercise some degree of judgment" in the performance of their duties, but the discretion to carry out "arbitrary and erratic arrests" does not comport with due process. *Id.* (quoting *Wright v. New Jersey*, 469 U.S. 1146, 1151 (1985)).

The Buffer Law lacks standards for officers "to guide [them] in deciding who should be ordered to move and under what circumstances." (Pls.' Br. Supp. Mot. Prelim. Inj. 32, ECF No. 27.) There is nothing in the text of the statute requiring, for example, that the officer must observe the individual engaging in conduct "that would cause a reasonable person to believe that person intends to interfere with the execution of the officer's duties," and in fact, the General Assembly considered and rejected such an amendment. (Pls.' Br. 3–4, ECF No. 27 (internal citation omitted).) Instead, an officer can order reporters and others to move back simply because the officer does not want to be recorded, an unacceptable curtailment of First Amendment rights. *See Alvarez*, 679 F.3d at 597 (quoting *Arizona Free Enterp. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011)) ("[T]here is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs.").

Defendants argue that "the Buffer Law gives adequate guidance to" officers "so as to avoid discriminatory enforcement" because the terms "25 feet," "approaches," and

"stop" are clear.  (Defs.' Opp. 34, ECF No. 34 (internal quotation marks omitted).)
However, this does nothing to define the predicate behavior that would prompt an
order to move back.  All that is clear is that if a person is within twenty-five feet, they
could be on the receiving end of an order to move back, but this fails to identify a
specific behavior that may prompt that order.  Defendants also argue, based on *Ward
v. Rock Against Racism*, 491 U.S. 781 (1989), that Plaintiffs must account for the
policies of local law enforcement organizations informing officers of citizens' right to
record.  (Defs.' Br. Supp. Mot. Dismiss 10–11, ECF No. 26; Defs.' Opp. Mot. Prelim.
Inj. 17, ECF No. 34.)  They argue that the existence of these policies "cures concerns
based on theoretical vagueness."  (Defs.' Opp. 34, ECF No. 34.)

In *Ward*, the Supreme Court upheld a New York City ordinance requiring the use
of government personnel to control the volume of concerts in Central Park.  491 U.S.
at 803.  Specifically, Defendants point to the *Ward* Court's finding that although "the
officials implementing [the law] will exercise considerable discretion," *id.* at 794, the
scope of the ordinance was properly limited by the city's stated goals and on-the-
ground implementation, *id.* at 795.  The *Ward* Court wrote that New York City's
"policy" of deferring to concert sponsors and "practice" of "confer[ring] with the
sponsor . . . before taking any corrective action" appropriately limited officials'
discretion.  *Id.* at 795 (quoting *Rock Against Racism v. Ward*, 658 F. Supp. 1346, 1352
(S.D.N.Y. 1987)).  This was based on the district court's finding that Joseph Killian,
the author of the applicable guidelines and Program Director for the relevant area of

Central Park, "attend[ed] most if not all of the Bandshell events[ and made] it a practice to confer with the sponsor."  658 F. Supp at 1352.

There are two key distinctions between the Buffer Law and the challenged ordinance in *Ward* that render the case inapplicable to the vagueness analysis here. First, as Plaintiffs point out, in *Ward*, a city official was interpreting a city ordinance. (Pls.' Reply 5, ECF No. 38.)   Here, however, local officials interpret the statewide Buffer Law, and no locality's policy is binding on another locality's officers, providing no assurance that the law will be enforced uniformly.  Defendants additionally have not pointed to any guidance referencing the Buffer Law itself, but rather have produced police training materials from Marion County and South Bend that speak in general terms about citizens' right to record, the limits on that right, and how officers should respond in the event that recording is interfering with officers' investigations.  (*See* Defs.' Br. Supp. Mot. Dismiss Exs. E, F, ECF Nos. 26-6, 26-7.) This is not enough of a limiting policy for these two jurisdictions, let alone all of Indiana's law enforcement units.

Second, and relatedly, *Ward*'s analysis of enforcement policies was limited to the policy of the *single* individual who was tasked with enforcing the ordinance rather than the *several thousand* law enforcement officers in Indiana who may enforce the Buffer Law.  The presumption that this many officers will "always" enforce the Buffer Law in a deferential way and "adhere to standards absent from [its] face . . . is the very presumption that the doctrine forbidding unbridled discretion disallows." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988).  Unspecific training

materials from two jurisdictions are not the kind of policy interpretations that can save a law from unconstitutional vagueness.

Finally, Defendants argue that the Buffer Law's definition of its own crime provides a limiting principle. Because the crime is called "unlawful encroachment on an investigation," the State argues, this limits police discretion to cases where there is an ongoing investigation and where an individual is encroaching upon it. (Defs.' Opp. 22, 26 n.11, ECF No. 34.) This is circular reasoning: the name of the crime alone does not define its conduct. In any case, "the title of a statute . . . cannot limit the plain meaning of the text." *Brotherhood of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947).

Plaintiffs have shown that they are likely to succeed on their claim that the Buffer Law is void for vagueness and therefore unconstitutional.

### ii. Irreparable harm

Irreparable harm exists where "legal remedies such as monetary damages are inadequate" to address the harm. *Bedrossian v. Northwestern Mem'l Hosp.*, 409 F.3d 480, 842 (7th Cir. 2005). It is well established that "even short deprivations of First Amendment rights constitute irreparable harm." *Higher Soc'y of Ind. v. Tippecanoe Cnty.*, 858 F.3d 1113, 1116 (7th Cir. 2017); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Plaintiffs have established that reporters have (1) been asked to move several times while reporting within twenty-five feet of law enforcement—even when they

were not interfering with the officers' duties—and (2) changed behavior as a result of the Buffer Law in ways that impedes the exercise of their First Amendment right to gather and publish news.  For example, Robert Scheer testified that instead of taking officers' requests to move to a media staging area as unenforceable suggestions, behaving respectfully while obtaining the best footage, he is more likely to comply with officers' request at the cost of more complete reporting.  (Scheer Decl. ¶¶ 13–14, ECF No. 27-3.)  Scott Hums, the Director of Content at station WTHR, testified that some journalists were asked to move back to a staging area while other people— people who were not clearly journalists—were allowed to remain at a closer distance. (Hums Decl. ¶¶ 11–12.)   Defendants' arguments, to the extent they question Plaintiffs' alleged irreparable harm, focus on whether Plaintiffs have suffered actual harm as it relates to the standing analysis, not whether that harm is irreparable. (*See* Defs.' Br. 9–13, ECF No. 34.)   Plaintiffs have established sufficient harms to show standing—as discussed above—and have cleared the bar for irreparable harm due to the Buffer Law's impact on their First Amendment freedoms.

### iii.   Balance of harms and the public interest

The balance of harms and the public interest weigh in Plaintiffs' favor.   In the Seventh Circuit, once a plaintiff has established a likelihood of success on the merits, the court uses a "sliding scale" to determine the balance of harms, where "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa."  *Mays*, 974 F.3d at 818 (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).   Where a state action results in loss of

First Amendment freedoms, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Alvarez*, 679 F.3d at 589–90.

Defendants argue that Indiana would be harmed by an injunction because the Buffer Law advances "no less than ten weighty interests, including public safety, [officer] safety, and privacy rights." (Defs.' Opp. 35, ECF No. 34.)  To support this argument, Defendants offer an expert report from Dr. Richard Celeste, a retired law enforcement officer who has served as an expert witness or consultant in several cases regarding police practices, officer safety, and use of force.  (*See* Celeste Report 42–70, ECF No. 34-2.)  Plaintiffs argue that other Indiana laws address these concerns without infringing on First Amendment rights.  (*See* Pls.' Br. 27–28, ECF No. 27.) For example, Indiana already criminalizes "forcibly resist[ing], obstruct[ing], or interfer[ing] with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties."  Ind. Code § 35-44.1-3-1(a)(1).  State law also prohibits "refus[ing] to leave an emergency incident area," such as a "crime scene" or a "police investigation," "immediately after being requested to do so by . . . a law enforcement officer."  Ind. Code §§ 35-44.1-4-1.5, 35-44.1-4-5.

The unique harm that the Buffer Law purports to address, then, is the potential harm that comes from a person being within twenty-five feet of a police officer. Defendants argue that a twenty-five-foot buffer is important because it gives law

24

enforcement officers enough time to react if a "would-be assailant[]" is running at them.  (Defs.' Opp. 30, ECF No. 34.)  But it is unclear what harm is done by a person whose behavior is not already criminalized—i.e., a person who is not assaulting anyone, obstructing or interfering with an investigation, or refusing to leave an active crime scene.  *See McCullen v. Coakley*, 573 U.S. 464, 492 (2014) (purported state interest and risk of harm "can be readily addressed through existing local ordinances" and "available generic criminal statutes").  Law enforcement officers cannot expect to operate with a twenty-five-foot forcefield around them whenever they choose to enforce the Buffer Law, and certainly not at the expense of established rights.

Indiana's existing criminal statutes mitigate the potential harms that would result from enjoining the enforcement of the Buffer Law.  Conversely, without an injunction, Plaintiffs would continue to be harmed by the vagueness of the law, its potential for arbitrary enforcement, and the resulting curtailment of their First Amendment rights.  A preliminary injunction is therefore in the public's interest.

## C. Bond

Indiana will not incur any damages from the preliminary injunction.  Therefore, the Court waives the security requirement of Rule 65(c) of the Federal Rules of Civil Procedure.  *See Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (district court can waive bond requirement when there is no danger the opposing party will incur any damages from the injunction).

## IV.   Conclusion

Plaintiffs have standing to bring their claims and their claims are ripe for decision. The Northern District of Indiana's refusal to grant an injunction in *Nicodemus* does not impact this finding of standing.  Defendants' Motion to Dismiss, (ECF No. 25), is **denied**.

Plaintiffs have shown that they are likely to succeed on their claim that the Buffer Law is void for vagueness in violation of the Fourteenth Amendment, established irreparable harm, and satisfied the remaining requirements for a preliminary injunction.  Plaintiffs' Motion for Preliminary Injunction, (ECF No. 20), is **granted**. The injunction will issue by separate order.

   **SO ORDERED**.

Date: 09/27/2024

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to all counsel of record via CM/ECF